FILED
2025 Aug-01 AM 11:26
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| JOEL A. RIVERA, *et al.*,<br>Plaintiffs,<br>v.<br>TRIAD PROPERTIES CORPORATION, *et al.*,<br>Defendants. | Case No.: 2:24-cv-01802-AMM |

**<u>JOSHUA WATKINS RESPONSE TO SHOW CAUSE ORDER</u>**

COMES NOW, Joshua M. Watkins, and respectfully submits this Response to the Court's July 24, 2025 Order to Show Cause. Mr. Watkins fully acknowledges the seriousness of the Court's concerns and the obligations of candor imposed by Federal Rule of Civil Procedure 11, Local Rule 83.1(f), and Rule 1.4 of the Alabama Rules of Professional Conduct. The undersigned apologizes to the Court, opposing counsel, the clients, and all other parties for the confusion, extra work, expenditure of resources, and other consequences caused by his acts and omissions.

At no point did Mr. Watkins conceal information from his clients or his firm. To the contrary, the contemporaneous record—including CM/ECF service notices, firm-maintained Dropbox files, communications with co-counsel and opposing counsel, and the June 25, 2025 email exchange with the client following a similar

phone call—demonstrates that both the firm and the client were consistently informed of the status of the *Rivera* matter. The Firm's recent claim that it first learned of the filing issues on July 10, 2025 is directly contradicted by the documentary record.

The filing errors in this case were the product of extraordinary personal and professional strain, including multiple family deaths, a prolonged illness requiring hospitalization from April 22-24th, 2025, and an understaffed litigation environment at the law firm. Despite those circumstances, Mr. Watkins at all times attempted to act in good faith, promptly disclosed and attempted to correct the errors, and communicated about them with both the Court and his client.

For these reasons, and as more fully set forth below, Mr. Watkins respectfully submits that sanctions against the Plaintiff are not warranted. Mr. Watkins acknowledges his professional failings to the Court and opposing counsel in this case but hopes the Court will agree that he did not act in bad faith and respectfully requests that any remedial or disciplinary measures deemed appropriate will reflect the good faith nature of his conduct and the firm's contemporaneous knowledge of the case.

Consistent with this Court's Order (Doc. 82) and *Romero v. Drummond Co.*, 480 F.3d 1234 (11th Cir. 2007), Mr. Watkins is filing a redacted version of this response and appended exhibits on the docket and simultaneously will email an

unredacted version to the Court's chambers for *in camera* review. The only information being redacted by Mr. Watkins are confidential communications between counsel and clients and communications reflecting the mental impressions of counsel and attorney work product.

**The Firm and the Client Were Informed**

The record demonstrates that both the Firm and the client were informed of the filings and subsequent issues in the *Rivera* matter. The assertion that the Firm first became aware of the situation through a third party on July 10, 2025 is directly contradicted by available documentation. Additional documentation likely could shed further light on the Court's inquiry, but Mr. Watkins' response is limited by the law firm's decision to lock him out of access to emails and electronic files.

A. ECF Notice and File Access

All pleadings in this matter were filed through the Court's CM/ECF system, which provides contemporaneous service to all attorneys of record. The Firm received each filing at the same time as opposing counsel and the Court. As the Firm's office administrator, Sarah Woodward was an additional notice party under the CM/ECF system and routinely downloaded and archived pleadings into the Firm's shared drive in court document order, in addition to those documents saved into the shared drive by Mr. Watkins. (*See Exhibit A – Feb 9th from Watkins to Sarah Woodward re keeping the pleadings and calendar docket*). At the time of the hearing

and during these events there were at least three folders that contained the relevant pleadings at issue. There was the court document ordered list maintained by Ms. Woodward, there was a chronologically and descriptive named pleading folder, and there was a folder specifically for the filing issues. This is in addition to other typical folders such as research, correspondence, and discovery matters. At all relevant times, the Firm had access to the full case record, including notes, research, and filed pleadings.

In addition to the direct Dropbox access, on June 18th Mr. Burrill requested the case files to be emailed to him. Mr. Watkins informed Ms. Woodward of that request so they could be provided to him. (*See Exhibit B – Burrill request files*).

B. Firm's Contemporaneous Awareness

Between October 2024 and June 2025, numerous emails and text messages confirm that Josh Burrill himself was actively directing the case, as he had indicated to the client he would at the time he negotiated their engagement. (*See Exhibit C – October email with clients regarding amended engagement; Burrill filing complaint; other various communications*). Mr. Burrill also initially engaged the firm of Raines Feldman Littrel LLP in California to assist the Firm with the case. (*See Exhibit D – Emails from January 19 – Feb 5 with Raines attorneys included*). Mr. Burrill was often in exclusive communications regarding the matter, including with opposing counsel, and was always the primary client point of contact, as clearly indicated by

his regular communications, including a request that Watkins cover one of his recurring client calls in March 2025, Mr. Burrill indicating that Mr. Watkins wasn't needed at the client meeting on April 22nd , and Mr. Burrill including Mr. Watkins only via cc on exchanged emails with co-counsel Wexler regarding Mr. Burrill's case strategy and their communications with opposing counsel on May 5, 2025. (*See Exhibit E – March re Call Coverage; April 22nd Meeting; May 5th Emails*).

Nonetheless, despite his activity in the case, following the termination of Mr. Hare and the Raines firm, Mr. Burrill requested that Mr. Watkins contact Mr. Wexler about the matter when Mr. Burrill decided to engage him in late April (See *Exhibit F – Communication from Burrill to Watkins regarding termination of Raines* [redacted][1] *and substitution of Goldberg Kohn; Communications with clients regarding addition of Mr. Wexler*), and following the direction of Mr. Burrill (*See Exhibit G– April 30th Text from Burrill to Watkins; May 20th text to Wexler and Watkins re* [redacted][2] Mr. Watkins actively discussed the matter with Mr. Wexler, including the proper method of correction, review, and preparation for the June 18 hearing. (*See Exhibit H - June 3-18th communications with Mr. Wexler*). Mr. Burrill also discussed the *Rivera* matter with Mr. Watkins extensively, outside of communications with Mr. Wexler, including the

[1] This redaction was made to protect the mental impressions of counsel.
[2] This redaction was made to protect the mental impressions of counsel.

filing issues and any potential financial consequences, which were very clearly expected to be borne by Mr. Watkins. (See *Exhibit I – May 22-23rd texts from Burrill to Watkins re* [redacted][3]

These communications confirm that Burrill was not simply aware of the status but was principally leading the case activities as he had indicated he would to the clients at the time of their engagement.

C. Client Notification

The client was also informed directly of the filing and other issues by Mr. Watkins, which was also discussed by Mr. Watkins and Mr. Burrill both beforehand and afterward. On June 24, 2025, Mr. Watkins conducted a phone call with the client to discuss [redacted][4] That conversation was confirmed by a June 25, 2025 follow-up email, [redacted].[5] *(See Exhibit J - June 25, 2025 Watkins and client emails; June 24–25, 2025 texts with Burrill referencing client discussion*).

Taken together, the contemporaneous ECF notifications, the Firm's ongoing access to and regular archiving of pleadings, Mr. Burrill's own documented active

[3] This redaction was made to protect the mental impressions of counsel.
[4] This redaction was made to protect the attorney-client privileged communication.
[5] This redaction was made to protect the attorney-client privileged communication.

participation in the matter, and the June 24–25 disclosure to the client establish that neither the Firm nor the client was ever left uninformed. To the extent Rule 11, Local Rule 83.1(f), or Rule 1.4 of the Alabama Rules of Professional Conduct require such candor and reasonable communication, Mr. Watkins at all times attempted to satisfy those obligations. The allegation of "concealment" is therefore not supported by the record and should not provide a basis for sanctions.

**Context and Mitigation (Good Faith, No Concealment)**

The circumstances surrounding the filing errors further demonstrate that they arose from good faith mistakes under extraordinary personal and professional strain, not from any intent to conceal information from the Firm or the client.

A. Personal and Medical Circumstances

Between September 2024 and March 2025, Mr. Watkins experienced a significant series of family tragedies, including the passing of his father, his sole maternal uncle, sister-in-law, as well as several other close family members and friends in a matter of only a few months. Thereafter, beginning in early March 2025, Mr. Watkins developed a severe lung infection which ultimately progressed to pneumonia. (*See Exhibit K – March first steroid shot; April 14th texts with Sarah Woodward; April 15th – re Hives*). Despite multiple urgent care and emergency room visits, his condition worsened, and he was admitted to Baptist Health Brookwood Hospital on April 22, 2025, where he remained until April 24, 2025. (*See Exhibit L*

*–April 22nd texts between Burrill and Ann Watkins re ER and Hospital; April 24-26th texts with Burrill during hospital stay regarding work; April 24th texts with Sarah Woodward regarding work availability*).

Following discharge, his physicians directed him to maintain a restricted schedule and undergo follow-up treatment, including a chest CT scan after six weeks. Nonetheless, Mr. Burrill's expectations required him to resume a substantial workload almost immediately and made it difficult to comply with the physician's directions. (*See Exhibit M – Ann Watkins April 30th text messages re limited schedule; Burrill's April 26th text messages regarding work needs*).

B. Firm's Staffing and Delegation Choices

At all relevant times, Burrill Watkins LLC operated without dedicated litigation support. Mr. Burrill negotiated the *Rivera* engagement and served as the principal client contact. Despite Mr. Watkins' health condition and repeated indications that additional litigation support was needed, the Firm did not retain dedicated litigation counsel, regularly citing cost concerns, or at times simply turning candidates away with excessive work demands. In one example of many, a March 9, 2025 email confirms that a qualified candidate with litigation experience accepted a position but was ultimately not hired due to cost. (*See Exhibit N - March 9 email from Burrill to Watkins re offer; Texts from Burrill to Watkins regarding disclosure of expectations for Hannah Roberts*).

Instead, the Firm engaged outside assistance only on a limited and shifting basis. Burrill initially engaged the firm of Raines Feldman Littrell and Scott Hare, but quickly became disenchanted by them. By late April, Burrill alternatively engaged and directed Mr. Watkins to coordinate with Colin Wexler of Goldberg Kohn, whose *pro hac vice* motion was not entered until May 5, 2025. In the interim this left Mr. Watkins as the only actively admitted federal court counsel and particularly during the critical period of April–May 2025, while he was actively engaged in recovering from pneumonia and trying to manage other, significant firm obligations and duties.

C. Work Environment and Strain

The Firm has consistently maintained an intense, some might say untenable, work schedule. Attorneys were expected to work six days a week, to begin work by 5:00 a.m., while also often working until late at night or sleeping at the office. (*See Exhibit O– February 9th Late for 5am Start; March 6th re 15 minutes late; April 2nd re Mental health day at 3-4am; April 15th re Get well…No Mercy; April 17-18 texts with Ann Watkins re Dr said you are supposed to take it easy*). Mr. Watkins was expected to and routinely did work to exhaustion under these conditions, including leading up to, during, and immediately after his actual hospital stay. (*See Exhibit P – Texts from Ann Watkins June 9th "Sleeping there"; June 23rd "I miss you"*).

The intense long-term strain is evident in many communications from Burrill. This is exhibited by regular tense exchanges, such as a three-page text message on February 18, 2025 responding to Mr. Watkins by criticizing him for "taking advantage" of Mr. Burrill after Watkins had just worked until 2:00 a.m. on a filing, or a June 25-26th exchange when Mr. Burrill having earlier in the same day asked of Mr. Watkins "I want you to build me a strategic plan. Build me a law firm" later made a late-night call where he awoke a sleeping Mr. Watkins and accused him of being a saboteur, only to then apologize the following morning. (*See Exhibit Q – February 18th texts from Burrill; June 25-26th texts messages with Burrill; July 11th texts from Burrill encouraging a break*).

These communications underscore that the *Rivera* filing error did not result from concealment or intentional misconduct, but from the combination of a relentless workload, lack of litigation support, mental exhaustion, and Mr. Watkins' serious medical condition.

Taken together, these circumstances show that Mr. Watkins' conduct, while imperfect, did reflect a good faith effort to meet his professional obligations under conditions of extraordinary strain. The Federal Rules and applicable standards make clear that sanctions require evidence of intentional concealment or bad faith misconduct. The contemporaneous record—firm and client notifications, co-counsel involvement, and documented medical hardship—demonstrates that the filing errors

arose from pressure and illness, not from dishonesty or concealment. Accordingly, it is hoped that the Court will consider these facts as mitigating circumstances that negate any basis for sanctions.

**Rebuttal of the Firm's July 10 "First Notice" Claim**

The Firm's assertion that it first became aware of the Rivera filing issues on July 10, 2025 through a third party is contradicted by the documentary record.

A. ECF Notices

Every filing in this matter was submitted through the Court's CM/ECF system. By operation of that system, contemporaneous notice was automatically provided to all counsel of record, including not only the Firm's counsel but also the Firm's administrator.

B. Firm Dropbox File Maintenance

In addition to ECF notices, the Firm's administrator, Sarah Woodward, as additional notice party regularly downloaded and archived pleadings into the Firm's Dropbox case folder made accessible to the entire firm. This routine practice ensured that all pleadings and filings were readily accessible to the Firm at all times, in addition to notes, research, drafts, and correspondences.

C. Burrill's Contemporaneous Communications

Communications between Mr. Burrill, Mr. Watkins, opposing counsel, and co-counsel Colin Wexler demonstrate that Burrill was active in the case. Numerous

emails and texts in May and June confirm that Burrill was still substantially directing the matter, including coordination with Wexler, conferencing with opposing counsel, discussing strategy, and was fully aware of the case matters during the times at issue.

D. Client Notification

On June 24, 2025, both before and after internal discussion of the matter with Mr. Burrill, Mr. Watkins discussed and informed the client directly by phone [redacted], and on June 25, 2025 confirmed that disclosure in writing. The client [redacted].[6]

E. Implausibility of the July 10 Claim

In light of (1) automatic CM/ECF notices to the Firm, (2) independent staff Dropbox file maintenance, (3) Burrill's contemporaneous case activity and internal communications, and (4) documented client disclosure in June, the Firm's position that it first learned of these issues on July 10, 2025 is implausible. The record demonstrates that the Firm and the client had both knowledge and access to information throughout the case, and that the allegation of concealment is contradicted by significant objective evidence.

[6] These redactions were made to protect the attorney-client privileged communication.

## Email Account Domain

As an aside, but one raised by the Firm, Mr. Watkins has never indicated any intention to do anything to the burrillwatkins.com domain that would in any way harm clients or the communications of the Firm. The only party that has impeded such communications is the Firm toward Mr. Watkins, which has terminated their relationship and locked him out of all Firm systems, which has created significant additional hurdles both in responding to this matter and with regard to serving his own ongoing client matters.

## Legal Standard and Application

A. Governing Authority

Federal courts have both rule-based and inherent authority to sanction attorney misconduct, with certain limitations.

Federal Rule of Civil Procedure 11 requires that filings be made in good faith and with a reasonable basis in fact and law. When a court considers sanctions *sua sponte*, Rule 11(c)(3) requires a show cause order and permits sanctions only where the attorney acted in bad faith or with objective unreasonableness.

Rule 16(f) authorizes sanctions for violations of scheduling or pretrial orders, but only "after giving an opportunity to be heard."

Beyond the Rules, courts retain inherent authority to sanction bad faith conduct that abuses the judicial process. *Chambers v. NASCO, Inc*., 501 U.S. 32, 44–46 (1991).

In all circumstances, sanctions are not warranted for mere negligence, inadvertence, or good faith error; rather, the law requires a showing of bad faith or intentional misconduct.

B. Application to This Case

Mr. Watkins respectfully submits the record here does not support any finding of bad faith:

- Filing Error Was Inadvertent. The problematic filing resulted from a file-saving error and subsequent mis-attachment while Mr. Watkins was working late under significant medical and mental duress.
- Prompt Remedial Action Was Taken. Upon discovery, Mr. Watkins contacted chambers, opposing counsel, and attempted to correct the record in accordance with the Administrative Procedures Manual.
- Firm and Client Were Contemporaneously Informed. As set forth above, all filings were visible to the Firm through CM/ECF notices and Dropbox records, and the client was directly informed of the issues by Mr. Watkins on June 24–25, 2025.

- No Concealment Occurred. The allegation that Mr. Watkins failed to inform his firm or client is flatly contradicted by contemporaneous communications and records.

C. Mitigating Circumstances

Mr. Watkins acknowledges the significance of the filing and citation errors but hopes the Court will view these in light of surrounding circumstances, which should weigh against sanctions:

- Mr. Watkins suffered multiple family losses in late 2024 and early 2025 creating many issues that extended well into 2025.
- Mr. Watkins was working 90- to 100-hour weeks, averaging 15 to 16 hours a day, often sleeping at the office.
- Not surprisingly, he was hospitalized for pneumonia in April 2025 yet continued working at the same pace under physician restrictions.
- The Firm maintained an extreme workload, with 5:00 a.m. start times and insufficient litigation staffing, leaving him as the only admitted litigator during the critical period.

It is hoped that the Court agrees that such circumstances indicate that the errors were the product of pressure and illness, not concealment or bad faith.

D. Conclusion

Under FRCP 11, Rule 16(f), and the Court's inherent authority, sanctions are reserved for willful or bad faith misconduct. The record here establishes that Mr. Watkins acted in good faith, disclosed the matter to his client and firm, and made diligent efforts to correct the error. Accordingly, Mr. Watkins respectfully submits that no sanction is warranted.

**Requested Relief**

For the foregoing reasons, the allegation that Mr. Watkins concealed material information from his firm or his client is not supported by the record. To the contrary, the evidence establishes that:

- All filings were made through CM/ECF and were contemporaneously available to the Firm;
- The Firm's administrator routinely saved filings into the shared case folder;
- Mr. Burrill engaged in contemporaneous communications with co-counsel and with Mr. Watkins about the filings and the June 18 hearing; and
- The client was informed directly by phone and email no later than June 24–25, 2025.

The record demonstrates good faith efforts by Mr. Watkins to correct the filing error, candor to both the Court and the client, and circumstances of significant medical and personal hardship that negate any inference of intentional misconduct.

Suffice it to say, Mr. Watkins recognizes he cannot fulfill his professional obligations, his family commitments, or take care of his mental and physical health working in the manner that he was during 2024 and so far this year. The current circumstances, while extraordinarily difficult and stressful, also have permitted Mr. Watkins to gain some perspective on his life and career. Mr. Watkins has learned his lesson, is resolved to take better care of his health, his family, and his clients. Although he has learned the hard way regarding the use of AI in a legal practice, he is committed to learning more about the issue, and has signed up for an ABA CLE program on *Navigating the Use of Generative AI in Your Legal Practice*.

Accordingly, Mr. Watkins respectfully requests that the Court:

- Find that no sanctionable misconduct occurred, and that the allegation of concealment is unfounded;
- Deny any request for sanctions against Mr. Watkins; and
- To the extent the Court deems further corrective action appropriate, limit such measures to remedial steps (such as filing protocol review or additional CLE training) rather than punitive sanctions.

Respectfully submitted,

/s/Joshua M. Watkins (ASB-5559-A56W)
Joshua M. Watkins
jwatkins@watkinsfirmonline.com

J Watkins Law Firm LLC
4000 Eagle Point Corporate Drive
Birmingham, Alabama 35242

## CERTIFICATE OF SERVICE

I hereby certify that on August 1st, 2025, a true and correct copy of the foregoing has been furnished through the Court's electronic filing system upon the following parties:

Colin Wexler, Esq.
GOLDBERG KOHN LTD
55 East Monroe Street, Suite 3300
Chicago, IL 60603
Tel: (312) 201-4000
Email: Colin.Wexler@goldbergkohn.com

William N. Delahay, Esq.
Hannah Eckel, Esq.
Burrill Watkins LLC
1000 Eagle Point Corporate Drive, Suite 3
Birmingham, Alabama 35242
Telephone: 205-701-5536
Email: wmdelahay@burrillwatkins.com
Email: hannah.roberts@burrillwatkins.com
Attorneys for Plaintiffs

Steve E. Whitehead, Esq.
Sarah G. Redmond, Esq.
Margaret J. Waldrop, Esq.
Lloyd, Gray, Whitehead & Monroe, P.C.
880 Montclair Road, Suite 100
Birmingham, Alabama 35213
Attorneys for Defendants Triad Properties Corporation, Joseph Marion Moseley, Hugh Fuller McClendon, and John Kendall

Kevin R. Garrison, Esq.
Katelyn K. Dodd, Esq.

Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
1901 Sixth Ave. N., Suite 2600
Birmingham. AL 35203
Attorneys for Defendants Jack Fite, Fite Building Company, Inc. and Fite Construction Company LLC

/s/ Joshua M. Watkins
Joshua M. Watkins