FILED
2025 Aug-11 AM 10:54
U.S. DISTRICT COURT
N.D. OF ALABAMA



UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

CASE NO: 2:24-cv-1802-AMM

JOEL RIVERA,

Plaintiff,

v.

TRIAD PROPERTIES CORPORATION, et al.,

Defendants.

* * * * * * * * * * * * * * * * * * * * * * * * * * *

SHOW CAUSE HEARING

THURSDAY, AUGUST 7, 2025

HUGO L. BLACK UNITED STATES COURTHOUSE
1759 FIFTH AVENUE NORTH
BIRMINGHAM, ALABAMA 35203

BEFORE THE HONORABLE ANNA MANASCO
UNITED STATES DISTRICT JUDGE

COURT REPORTER:
Kelli Griffin, RPR
Federal Official Court Reporter
1759 Fifth Avenue North
Birmingham, Alabama 35203
Kelli_Griffin@alnd.uscourts.gov

Proceedings reported by stenographic court reporter, transcript produced using computer-aided transcription.

**APPEARANCES**

**FOR THE PLAINTIFF:**

**JOSHUA BURRILL, ATTORNEY AT LAW**
**HANNAH ROBERTS, ATTORNEY AT LAW**
**WILLIAM DELAHAY, ATTORNEY AT LAW**
**Burrill Watkins, LLC**
**1000 Eagle Point Corporate Drive**
**Suite 3**
**Birmingham, Alabama 35242**

**FOR THE FITE DEFENDANTS:**

**KEVIN R. GARRISON, ATTORNEY AT LAW**
**Baker, Donelson, Bearmn, Caldwell & Berkowitz, PC**
**1901 Sixth Avenue North**
**Suite 2600**
**Birmingham, Alabama 35203**

**FOR THE TRIAD DEFENDANTS:**

**STEPHEN WHITEHEAD, ATTORNEY AT LAW**
**MARGARET WALDROP, ATTORNEY AT LAW**
**Lloyd, Gray, Whitehead & Monroe, PC**
**880 Montclair Road**
**Suite 100**
**Birmingham, Alabama 35213**

**Also present:**
**Joshua M. Watkins, Attorney at Law**
**Bruce Barze, Attorney at Law**

(Proceedings commenced at 1:00 p.m. in open court.)

THE COURT: All right. Good afternoon, everybody.

MS. ROBERTS: Good afternoon, Your Honor.

MR. GARRISON: Good afternoon, Your Honor.

MR. WHITEHEAD: Good afternoon, Your Honor.

THE COURT: All right. Let's start with appearances. Who all do I have for the plaintiff?

MS. ROBERTS: Good afternoon, Your Honor. My name is Hannah Roberts, and I represent the firm and -- for the purposes of this pleading of this matter today. I'm here with Will Delahay, and he has conducted the internal investigation for this matter. I'm also here with Josh Burrill, who's partner of the firm.

And before we begin, Your Honor, if I may, if appropriate now or at the end of the proceeding, there is a relevant matter that we would like to discuss regarding defense counsel's sanctions pleading. He -- we recognize that at this point the case is stayed, but we do have an idea of how we can move things along constructively, and in defense counsel's sanction pleadings they request the Court to investigate whether prior counsel's pleadings were tainted because they believe that the record was compromised. We do not dispute that notion, but we do believe that the most efficient path forward would be to file a motion to -- for leave to amend the complaint under Rule 15(a)(2). To be clear, we're not asking for relief today. We

just want to make the Court aware of our intentions --

THE COURT: Thank you.

MS. ROBERTS: -- once the stay is lifted.

THE COURT: I appreciate it. All right. For defendants?

MR. GARRISON: Your Honor, this is Kevin Garrison on behalf of the Fite defendants.

THE COURT: Okay, Mr. Garrison.

MR. WHITEHEAD: Your Honor, Steve Whitehead for the Triad defendants. There are three individuals. Do you need me to list them, or are you good?

THE COURT: I'm good with the Triad defendants.

MR. WHITEHEAD: And my cocounsel, Maggie Waldrop, is here.

THE COURT: Excellent. All right. Thank you very much.

All right. Are there any other members of the firm or client representatives who are here just so that the record is clear?

MR. BARZE: Your Honor, I'm Bruce Barze, and I represent Mr. Watkins.

THE COURT: Okay.

MR. BARZE: He's on his way, and I apologize that he is late. But he is scurrying here as quickly as he can get here.

THE COURT: Thank you. I appreciate it. Anybody else who needs to put in an appearance?

Okay. All right. Well, we -- obviously, I have some questions for Mr. Watkins when he gets here. And Mr. Barze, did you intend to make a presentation, or are you just counseling him as I ask questions?

MR. BARZE: Your Honor, yes, I didn't file a notice of appearance for this, because I thought that would mean that you would expect me to be heard. And I am really just here to represent him and help him -- helping him in the response to the Court.

THE COURT: Great. Thank you very much.

Is there anything else anybody wants to be heard about before we commence waiting on Mr. Watkins?

Okay. All right.

MR. GARRISON: No, Your Honor.

THE COURT: Well, we will just sit tight until he gets here.

(Break while waiting for Mr. Watkins.)

MR. WATKINS: Joshua Watkins. I'm here.

THE COURT: All right. Good afternoon.

Okay. We can get started. I thought what I might do is I have a few questions just based on the materials everybody submitted, and so I think I will ask those, and then if they're -- I don't need anybody to summarize what they filed for me

because I have read it -- but if anybody, after hearing the questions, has anything further that they want to say or argument that they want to make, then I am happy to hear it at that time.

All right. Mr. Watkins, why don't you come right up to the podium? My first batch of questions are --

MR. WATKINS: I apologize for this, Your Honor.

THE COURT: -- for you. Thank you. Let me get to the correct space.

Okay. So I am working from the in camera copy -- do you have copies of your documents to refer to?

MR. WATKINS: I do not. I ran and -- literally ran.

THE COURT: All right. I will tell you in the -- what I am looking at so that when you look at the transcript you know exactly what page I'm talking about, but what I am working from is what was emailed for in camera review, not the file stamped.

MR. WATKINS: Okay.

THE COURT: Okay. So in your response -- and I really just want to focus this on the second order to show cause. So I have materials about a wide range of matters, but my principle focus is on what the communications to the client were and when those occurred and who made them and whether the client was appropriately kept advised of the status of their case.

So on page 12 of the in camera submission, I see that you say that on June the 24th, 2025, you discussed and informed the client directly by phone of filing mistakes, the issues with the AI generated content, the potential for sanctions, and attempted corrective steps taken, and then that on the next day, June 25, 2025, you confirmed those disclosures in writing --

MR. WATKINS: That's correct, Your Honor.

THE COURT: -- and you state that the client acknowledged awareness and expressed understanding.

Did you -- in making those representations, did you review any records or notes, or was that working from memory or so on and so forth? You attached a number of items of correspondence, of course, to the response.

MR. WATKINS: Right. The phone call was from memory. I mean, we had obviously discussed it, you know, extensively internally ahead of time. So -- but the call itself was, you know, a regular phone call.

THE COURT: Okay.

MR. WATKINS: I had my bullet points, but, you know, I knew what those were.

THE COURT: Okay. So -- and I noticed that in the declaration of Dulce Rivera, which is Document 75-3, at paragraph 3, the declaration says, I was informed on June 24, 2025, by Mr. Burrill.

Am I pronouncing your name correctly?

MR. BURRILL: Yes, ma'am.

THE COURT: Okay. By Mr. Burrill that there were some issues involving AI and that Mr. Watkins might be sanctioned by the Court for it, and the declaration goes on to say, I was told by Mr. Burrill that he told Mr. Watkins to call me and tell me what happened.

Did you notify the clients, sort of, of your own accord, or was it at the direction or after consultation with Mr. Burrill?

MR. WATKINS: I was unaware of that earlier phone call. When I saw it in the filing that was the first time I was aware of that conversation, but Mr. Burrill and I had had -- spoken about it. And we had talked to Dulce specifically prior to that that there were some filing issues and we had a hearing coming up. But, I mean, as you may remember, initially in that first hearing, you know, I was under the impression that we were focused on not correcting it correctly and, you know, why the prior filing was still on the record. We clearly were more focused on AI, and so that's why we really needed to have that conversation after the hearing to explain that this is not just a filing issue, there's an issue with AI. There's more issues at stake, and so that was a more expansive conversation than we had beforehand to really be able to cover, you know.

THE COURT: So are you saying that you also spoke with the client about these matters before the hearing on the first order to show cause?

MR. WATKINS: Oh, yeah. Yeah.

THE COURT: Where in any document that I have is there a reference to that conversation?

MR. WATKINS: I don't know that there is, other than it occurred. And I believe Josh probably talked to her as well. But -- but it was a much more limited conversation because we were talking about that there were, you know, filing issues that we were having to address and it was going be paused until we could get that -- you know, and so clearly that wasn't really what we talked about at the hearing, and so that's why we, you know, needed a more substantive discussion.

THE COURT: Tell me everything you remember about the prehearing conversation because this is -- unless it is -- is any other lawyer in the room aware of a reference to a prehearing conversation in any other file document?

MS. ROBERTS: No, Your Honor.

THE COURT: Okay.

MR. WATKINS: Well, Your Honor, I think where there are some references would be we had regular weekly phone calls with Ramirez. So, you know, there was a conversation about what was going on, you know, every week. Now, some of it covered operational things. It wasn't all litigation because

we were also handling their litigation -- I mean also handling their operations, but they had a weekly phone call with a status update.

THE COURT: Okay. Do you understand that we are here today on an order to show cause about whether you kept them appropriately apprized of the potential risk of sanctions and prejudice in this litigation that I have?

MR. WATKINS: Yes.

THE COURT: And there is no reference in any materials submitted in response to that order to a prehearing conversation that occurred to them but you are now telling me that that did occur?

MR. WATKINS: I believe there are references to those regular meetings because I think we attached --

THE COURT: I'm not interested in a regular meeting. I'm interested in whether they knew that they were at risk of sanction or prejudice in connection with the first hearing that we had on the first order to show cause.

MR. WATKINS: They knew there was a hearing. They were under the impression that it was something that we were handling and that -- you know, going to be able to address.

THE COURT: Did they understand that there was any risk to them associated with it?

MR. WATKINS: Other than it was -- I mean, we told them opposing counsel had opposed. I mean, they knew it was a

motion to dismiss and that this had gotten more complicated. So, I mean, they asked -- or Dulce asked if, you know, what that meant for the case. And, you know, I said -- I told her what we thought, that it was not helpful but it was something that we felt like we could address and hopefully would be able to, you know, to move past. But it was going to, you know, create a delay. I mean, that was my impression at the time.

THE COURT: Was a copy of the order to show cause provided to them at that time?

MR. WATKINS: I don't believe so.

THE COURT: Okay. And you -- I think you have reviewed the declaration of Dulce Rivera at this point.

MR. WATKINS: I have.

THE COURT: And I take what you're telling me now to be that it is materially omissive as to what they were told and when.

MR. WATKINS: I would say it didn't discuss the regular communications and anything about the prior discussions, you know, so it is materially omissive as to that.

THE COURT: So the declaration purports to tell me that on June 24th there was a phone call from Mr. Burrill and on June 25th there was a telephone call and an email from you about those matters, and the declaration leads the reader to the conclusion that those were the first correspondences from the firm. It doesn't mention any before that. And so is it

your position that the declaration of Dulce Rivera is materially omissive as to what the Riveras knew about the first show cause hearing and when they knew it?

MR. WATKINS: Yes. They were aware that -- that we had a hearing.

THE COURT: Okay. And I -- just out of an abundance of caution, I will ask one last time. Can you point me to any evidence to support your version of those events?

MR. WATKINS: Again, Your Honor, as we pointed out in our filing, I don't have access to my emails, the case system. You know, so that's why we attached a bunch of text messages. You know, I'm very limited in the documents that I have access to at this point.

THE COURT: Mr. Barze, I think you wanted to say something?

MR. BARZE: That was the point I was going to make, Your Honor. He has been locked out of that firm's system now, you know, and has not had access to those communications that could have occurred with the Riveras. That was the only point I was going to make.

THE COURT: Well, I guess, you can understand how I'm struck by what would be a critically important piece of information being completely without support in a record that actually contains a lot of information, some of which is not all that relevant to what we're here to talk about and that not

only is that information not included in the record but that I have now got an allegation that the client's declaration is materially omissive with no evidentiary basis.

Are there any comments that either of you would like to make about that?

MR. WATKINS: Your Honor, I mean, what I would add is what we did attach in the discussion -- and I understand it doesn't have a detailed listing of what was discussed in those meetings, but I think there is evidence that there were weekly meetings occurring, you know, with the client and that, you know, presumably the -- their matters were discussed at those -- at those weekly meetings because there was one attached where Josh had asked me to substitute for him because he was having most of those meetings with them. You know, that's...

THE COURT: All right. Mr. Barze, when were you engaged?

MR. BARZE: Can I take a look?

THE COURT: You may. You may.

MR. BARZE: I think it was July 23rd, Your Honor.

THE COURT: Thank you very much.

All right. Mr. Watkins, the declaration of Dulce Rivera was executed on July the 25th and filed into the Court record the next day, July the 26th. And your response to the second order to show cause, at least the copy, the in camera copy, is dated August the 1st. Is that correct?

MR. WATKINS: Yes, Your Honor.

THE COURT: Okay. So just so I'm clear about your position, it's that you reviewed the Dulce Rivera declaration, several days later submitted your own declaration, and in your declaration did not allege that the Dulce Rivera declaration was materially omissive, and I am just now hearing about that today?

MR. WATKINS: Yes, Your Honor. I mean, that was not my intention in that filing to -- to not address that. As you have mentioned, we included a lot of information, so I felt like we had addressed that, that there were regular communications ongoing but -- of which, you know, I was only handling, you know, those occasionally, but that they were regularly occurring, you know, and her matters were being discussed, you know, at least weekly if not more often than weekly.

THE COURT: Okay. In the conversation that occurred on June the 25th, 2025 --

MR. WATKINS: The 24th? Or the written conversation?

THE COURT: Well, the Dulce Rivera declaration says it occurred on June the 25th. I think your declaration says that it occurred on June the 24th with an email on the 25th. But whatever day it occurred, the phone conversation on June 24 or 25 that you had with Dulce Rivera, tell me everything you remember that you said.

MR. WATKINS: Well, you know, I started out by saying, you know, Dulce, I have to tell you, you know, I have made some mistakes in this that, you know, appear to be bigger than I thought they were and you need to know about them because they can affect your case. And I -- you know, I'm sorry for that but, you know, it's -- I want you to know about it.

And Dulce's a really -- she's really sweet and so she made some, you know, placating comments.

And I said, well, you know, just to be clear -- and I went through my bullet points and said, you know -- I basically told her, I think, the same essential thing that I told you in the hearing, that I was trying to file the original filing, was going through my last check and had overwritten my final draft. I still had the deadline staring at me and so at first I thought it was a -- that I had chosen the wrong file and, you know, file again. And it clearly wasn't because it was that same overwritten file. I realized at that point that I still hadn't made a substantive response and so -- and then I didn't have my final draft anymore so I went back through my earlier versions and, you know, attempted to find one that I thought was, you know, maybe not my final draft but that was a good approximation thereof and was -- would be sufficient and ran through it, but I obviously had gone through it too quickly, didn't realize that it had, you know, at least one entire section that was not edited and reviewed. I filed it, and

**then, you know, got up in the middle of the night essentially realizing that was just so chaotic and it wasn't, you know, it didn't feel good. And so I went through it more specifically and realized that it had all of these errors in here and prior stuff in AI and so that's, you know, an issue that the Court is really -- so then -- and I told her, I said it's a big issue with courts right now, you know, and it's -- unfortunately I wander right into it. You know, and so it's a big deal. But I did submit a second one that I felt like had corrected all of that, unfortunately, you know, I had a citation that I didn't correct Utah. It should have been Florida, and it still said Utah. And then I had a quotation that was an improper quotation. It should have been like two words and, you know, it had like six words quoted and then another -- a case that was a real case but it just didn't apply. I said, you know, unfortunately those were still in there, and I didn't catch them because I was going too fast. And, you know, I said, you know, right now we've got motions for sanctions and fees that -- that I may be looking at and hope it doesn't negatively impact your case, but, you know, we are going to try to address it as best we can, you know, and, you know, I'll have to accept responsibility and I'm hopeful that the Court will not have that negatively impact, you know, your case and although, you know, I may not come out as well.**

**And she, you know, was sweet. I mean, she just said,**

well, I know you've had a lot going on and, you know, I appreciate all of the -- I mean, she said nice things, and we hung up. I mean, it really wasn't a whole lot more than that.

THE COURT: Do you have any personal knowledge or even just understanding about why she later asked for you to be removed from the case?

MR. WATKINS: I don't. My last conversation or communication with Dulce was really, you know, kind and sweet. Now, I had said in my email that I expected that Josh and maybe Hannah -- at that time she had been hired -- would probably be more involved in the case and that I would be taking a secondary position. So, I mean, she was aware that we were likely shuffling counsel at that point anyway.

THE COURT: But that's fundamentally different from her asking that you have no involvement with it.

MR. WATKINS: Correct.

THE COURT: And so you are completely in the dark as to why that request was made?

MR. WATKINS: Yes, Your Honor.

THE COURT: Okay. I think that's all of my questions for you. You may sit down.

Mr. Barze, I will give you an opportunity if there's anything you wanted to say on your client's behalf in response to any questions that I asked, and of course no prejudice if you say nothing.

MR. BARZE: I don't think so at this time, Your Honor. Thank you.

THE COURT: Okay. Great. Thank you.

All right. Mr. Burrill, you're next.

MR. BURRILL: Yes, Your Honor.

THE COURT: All right. Have you heard before today that there was any conversation between Mr. Watkins and Dulce Rivera in advance of the hearing on the first order to show cause about that order and the hearing?

MR. BURRILL: No, Your Honor, I have not.

THE COURT: Are you aware -- I take it that you have -- from the record as a whole, it is my impression, and please correct me if I am wrong, that you and other people at your direction at your firm and in association with your firm, have made extensive efforts to investigate whether the Riveras were appropriately advised of the status of their case in real time.

MR. BURRILL: Yes, Your Honor. We have taken efforts to make sure that we do a conclusive investigation into when the Riveras could have known, whether any other party at the firm was aware so that they could have known. And from our conclusions, I thought it was important to have objectivity and try to mitigate any bias so I -- most of the investigational review was done by our associates, but as they can tell from everything they have reviewed, there's no indication that the Riveras knew about the show cause hearing on the 18th or any of

the other events prior to the June 24th and 25th conversations.

THE COURT: And I can tell a little bit about what investigation has been done from these filings. I'm aware that, you know, there may be additional things that the firm has done. If there were emails to the Riveras advising them of an order to show cause in their case and any potential down side risk or risk of prejudice or harm to them, is it your expectation that the investigation would have turned up those emails?

MR. BURRILL: As far as I know, Your Honor. As I have stated, I wasn't as involved in looking through all of the emails, but we certainly made our best attempts.

THE COURT: And you -- I take it from your own declaration and from the Rivera declaration, that as of at least June the 24th, you sort of knew enough to know that something was unfolding but you did not have a personal understanding of the full scope of all of the information related to what was unfolding. Is that a fair summary?

MR. BURRILL: I would say it is a very accurate summary, Your Honor. We weren't even aware that there was a show cause hearing, that there had just been a hearing.

THE COURT: Okay. Do you have any awareness of any reason or incentive or purpose why Dulce Rivera might not have told the whole truth and nothing but the truth in her declaration?

MR. BURRILL: No, Your Honor.

THE COURT: Okay. I think I know the answer to this, but I just want the record to be clear. If the firm had been aware of the hearing on the order -- of the existence of the order to show cause and the hearing on the order to show cause, would the firm have appeared and responded timely?

MR. BURRILL: Absolutely, Your Honor.

THE COURT: Okay. And I assume that the substance of the responses would be similar to what I have gotten now in terms of what had occurred as of the date of that hearing?

MR. BURRILL: Yes, Your Honor.

THE COURT: Okay. All right. I think that's all of my questions.

MR. BURRILL: Thank you, Your Honor.

THE COURT: Thank you. And, oh, I did not mean to cut you off. Is there anything that you would like to say that my questions maybe have generated?

MR. BURRILL: In general, Your Honor, I would just like to say to the Court and to the defendants, we as a firm apologize emphatically about the disruption to the events that caused a disruption to the Court and lack of candor and quite frankly the Riveras and their case being so disrupted, and our goal and intention is not to rehash what was said or not said but to really get this case back on course and to take care of and address any of the procedural issues.

THE COURT: Okay. Thank you very much.

All right. So I'll just ask all of the other lawyers at counsel table if you have any information or comments that is relevant -- that are relevant to the topics I have brought up and the questions that I have asked that you would like to make at this time or anything else you would like to call to my attention?

MR. GARRISON: Your Honor, Kevin Garrison on behalf of Fite defendants. We really have no independent knowledge about the various conversations and communications that occurred between Mr. Watkins and the partners at his firm and his client, so I don't have anything to add with respect to that.

I would note that the firm itself appears to be taking some position that the firm should not be responsible for these actions of its partner, and as Your Honor has noted in prior orders, Rule 11 says that that indicates they should be responsible for their partners absent extraordinary circumstances. We feel like, based on what we have read in the pleadings here, some of the indications are that the firm has set aside $300,000 in reserves to deal with claims arising out of this whole situation, and we believe that the firm itself should also be responsible for these actions that its own partner has caused the defendants in this case. I know that we have already submitted the documentation about the additional legal fees that the Fite defendants have incurred. Those

really don't capture all of the fees that has been caused by these actions, not to mention we cut those off before the day of the first show cause hearing and now we've had these extended documents that have been put into the record that we need to review. They have been lengthy. They contain all kinds of material as Your Honor just had mentioned earlier. It takes time for us to figure out what are the -- what is the position of these parties, and somehow it's like we have been drug into a business divorce case where two partners are fighting over control of a web domain and there's all of these allegations of the -- almost like a toxic work environment that have crept into this case and that have really caused a lot of additional, you know, fees and time that we've had to deal with.

Right now we've got a motion to dismiss that was filed back in April for all of the claims against the Fite defendants. Your Honor stayed the case, but we are eager for Your Honor to take up that motion because we believe it is due to be granted. We did file a motion for fees under the Alabama Litigation Accountability Act because under that statute it has to be filed before there's a final judgment, and so that's why we filed it when we did. We would ask Your Honor at the appropriate time to take up the motion to dismiss and then reserve jurisdiction to consider those fees under the Litigation Accountability Act.

I also note on the first show cause hearing we submitted proposed sanctions. We did not see any kind of response to those proposed sanctions from any of the attorneys or other parties unless I missed it. I did see that the firm responded to the original show cause order, but I don't believe there has been any kind of response filed as of the due date, which I understood to be yesterday. So that is what I understand to still be pending before Your Honor, and that's all I have to say.

THE COURT: All right. Thank you. Anything on behalf of the Triad defendants?

MR. WHITEHEAD: Your Honor, Steve Whitehead. I would echo a lot of what Mr. Garrison said. As the Honorable Court can tell, we filed joint responses to some of these issues. The Triad defendants believe strongly in the motions, the three motions to dismiss I guess we have filed now, on the merits and that they should be addressed. And in that sense we do feel like we have been delayed, you know, improperly as a result of all of this. We also have filed our motion for sanctions and Litigation Accountability Act claims, and as Mr. Garrison pointed out, we certainly have incurred additional time, effort, and expenses in what has unfolded since then. And we do believe it would be appropriate for the Court at the right time to address the motion to dismiss and then move on to the Litigation Accountability Act claims afterwards, and we reserve

the right to obviously supplement what our fees are.

THE COURT: Okay. And I will just --

MR. WHITEHEAD: I'm sorry, Your Honor. And we have no other independent knowledge of any of this. I wanted to be clear on that.

THE COURT: Okay. And just before the firm and its representatives respond, I will just say, for purposes of the second order to show cause I'm really focused on the issue about whether the clients were appropriately notified. I am not focused on, in connection with that specific order, however well or not the firm may have been functioning as a work place at the relevant point in time.

Mr. Burrill, you were about to say something?

MR. BURRILL: Yes, Your Honor. I agree with Your Honor that I believe that this hearing was about this second order to show cause, but since the defendants raise it, we did -- contrary to what Mr. Garrison just stated, we did on time file our opposition to the attorney's fees motion based on the Accountability Act. That was filed by our firm, and in addition to that, we -- if you look at our response, Your Honor, in our response to the show cause, it was not a -- that we asked Your Honor that we simply said we do not want to be sanctioned or we shouldn't be sanctioned. It was that the idea of it was that we wanted to give context so that when Your Honor weighs whether the firm should be sanctioned that there

are some exceptional circumstances. There are context around the events that occurred that involved the use of citations, involved the use of, you know, had we known about the citation use on the day it occurred, we would have, you know, done something different. And the clients were not made aware, neither before the show cause hearing or until more recently, that the clients may have done different things. And so we made them aware. And our response to show cause was, Your Honor, I believe what we asked you was please do not punish our clients for something that they are blameless in; second, it was to please consider the context of the circumstances; and third was whether there are -- is any other relief. We mentioned the domain, Your Honor, because there could be more prejudice to them because Mr. Joel Rivera, ultimately, who is the owner of Mi Pueblo and all of those businesses, does not speak very good English and that is the primary way we communicate with him. And we have asked our former counsel for access to those domains and credentials and so far it has been refused. So I think the defendants to bring this up and suggest that this -- the issues in this case now keep the case from moving forward, we would be happy to respond to the motions to dismiss if the stay is lifted. And we would also -- at some point, when it's -- as Ms. Roberts indicated, we plan on asking Your Honor in a motion to amend -- to address what they brought up in their sanctions request that there needs to

be an investigation. That's one of the options they asked this Court, to address the fact that they're saying that the whole case and all of the other filings are tainted. We suggest that that would be a very efficient and procedural way to have judicial economy into addressing that issue.

Thank you, Your Honor.

THE COURT: Okay.

MR. GARRISON: May I, Your Honor?

THE COURT: You may.

MR. GARRISON: First off, if I stated they didn't respond to the Litigation Accountability Act motion, I did not mean to state that, and I don't think I did. What I was referring to was the brief we filed at Document 67 that was our brief regarding proposed sanctions on the attorney Josh Watkins. I don't believe there has been any kind of response that was filed to that.

THE COURT: And I assume Burrill Watkins or the law firm in its present iteration does not intend to file a response, does it?

MR. BURRILL: Your Honor, as we can see it and we looked very closely, we noticed the attorney's fees motion stated our clients and Josh Watkins specifically. We also noticed in the sanctions motions that it named only Josh Watkins, which I found to be peculiar because from what I have seen most of time when there are motions for sanctions

requested, they do name the individual attorney and the law firm itself.

THE COURT: Okay. Let me ask this. Well, first let me ask this.

Mr. Barze, is there any intention on Mr. Watkins's behalf to file a response to the motion for sanctions?

MR. BARZE: Your Honor, I think -- should I come up here?

THE COURT: That would be better for the court reporter.

MR. BARZE: And I didn't make an appearance so I didn't know if I should.

THE COURT: You can come on up.

MR. BARZE: I think we were trying to be comprehensive in the response to the show cause order which I would think would answer a lot of the same questions.

THE COURT: So you will rest on that?

MR. BARZE: We can certainly -- if the Court is willing to give us a day or two, I wouldn't mind having a look at it to see if we think we need to and we can let you know if we can stand on the response or file if we feel like we need to file anything additional.

THE COURT: Well, let's do it this way. Review the response carefully and if you see there's a need for further argument, just file a motion for leave and then whatever it

would be to amend it.

MR. BARZE: Okay.

THE COURT: But if the position is that you want to rest on the response, that's fine too.

MR. BARZE: Okay. Your Honor, one thing I wanted to say.

THE COURT: Sure.

MR. BARZE: Because I found it inappropriate is there's a suggestion being made that somehow Mr. Watkins is doing something wrong with the firm's email domain, and I agree with Mr. Garrison that there's an injection of firm politics and break up stuff into this that has really nothing to do with the issues that we're here about, and we really tried to stay out of that fray, and, you know, on the one hand they're saying -- they're suggesting something that Mr. Watkins has never said and number two they're having lawyers send him demand letters, threatening demand letters, at the same time they're coming in here playing the victim saying, you know, we don't -- we're worried he's going to cut us off. So I just don't think that's appropriate for the issues -- I didn't think it was appropriate when they filed it in response to the show cause order, and I don't think it bears on the issues that we're here about.

THE COURT: Well, I think the record has a number of inappropriate things in it. I think the business divorce piece of this is probably some other action for some other court, and

I'm really working hard to stay laser focused on the issues that are within my jurisdiction because this will be difficult enough within my jurisdiction without me extending into waters that would not be proper for me to extend into.

My question for -- you can sit down, Mr. Barze. Thank you.

My question for the firm and the defendants is this: There has been motion practice on the fees issue. I understand that that kind of comes from two angles, one is the Litigation Accountability Act, the other is as part and parcel of the sanctions determination. I understand that the defendants want the opportunity to supplement the request with fees incurred in connection with this hearing. Do the firm and the defendants want an opportunity to meet and confer about any possible negotiated resolution to those requests before I rule on them or has that already occurred?

MR. GARRISON: Your Honor, I am happy to meet and confer with opposing counsel and their firm to discuss that. My main concern was we did not want to feel like we were imposing a private agreement on what the Court should do based on the Court's inherent power and decision, and we weren't sure how to navigate those waters and would welcome your guidance.

THE COURT: Okay. Is there conceptual interest in a meet and confer?

MR. BURRILL: We are certainly open to a meeting, Your

Honor. However, we would stand by the firmness and strength of our recently filed opposition to the attorney's fees under the Accountability Act. Quite frankly, procedurally and substantively, it is flawed, and if Your Honor wants to rule on the substance of our motion, our opposition, we are comfortable with that. However, in the interest of getting this case back on track I would be happy to meet with Mr. Garrison.

THE COURT: Okay. All right. A couple of things. The first is defendants have 14 days to supplement fees motions as appropriate, which I think sort of by default means y'all have 14 days to meet and confer. And, of course, to the extent that any meet and confer affects Mr. Watkins, he and his counsel should be included.

To the extent anyone has a concern about invading the Court's domain, I would say this, parties are always welcome to settle part or all of the motions that they file, and even if y'all are able to come to a negotiated resolution on that particular request, the Court will still have a decision to make about how to proceed in terms of other sanctions.

So I would not view that meet and confer as dispositive of the sanctions issue. It, I think, probably would remain pending, but it may inform it in some way. And I -- you are, of course, under no pressure to reach any kind of agreement. I just want to allow enough time for there to be those conversations if there's interest in having them. So 14 days,

here you go.

At the end of 14 days, well, it -- to the associates, how long have y'all been at the firm?

MS. ROBERTS: I started on July 7th, Your Honor.

MR. DELAHAY: I started on July 16th, Your Honor.

THE COURT: Excellent. Okay. Are you ready to proceed on the underlying litigation, or do you need time to get up to speed?

MS. ROBERTS: I would argue we're ready to proceed, Your Honor.

MR. DELAHAY: Yes, I believe we're ready to proceed, Your Honor.

THE COURT: Okay. All right then. We will then lift the stay of the underlying case at the 14-day mark and consider pending motions as appropriate. If, in connection with the supplemental filing on fees or the meet and confers that may occur, there are any revisions to pending requests, you'll need to let us know. But otherwise we will consider pending motions at that time.

All right. Is there anything else we need to take up?

MR. BURRILL: Yes, Your Honor. Keeping in mind that we are going to attempt to meet and confer and talk with Mr. Garrison and defendant's counsel, I just want to get on the record that I think part of our intent to meet is not only to talk about a resolution on the attorney's fees and sanctions

but also to see if we can jointly agree that, to their point, if the pleadings and the filings that have been presented by former counsel in this case they feel is so tainted that it warrants an investigation, we can settle that issue if we jointly discuss it and say let's just amend the complaint so that there is clean filings to move forward with. So that is something that I will be bringing up with the defendants' counsel.

MR. GARRISON: Your Honor, we would strenuously object to granting yet another chance to amend the complaint in this case. It has been amended, I believe, six times now if you count some of their attempts to amend that were not allowed by the Court. If they have issues in terms of something that's inaccurate in their existing complaint, that should be brought to the Court's attention immediately. The counsel that filed that submission and the law firm that filed that submission should correct that. That doesn't mean they get to go back and get another bite at the apple with yet another amended complaint. The complaint has been pending since we finally were able to file that motion to dismiss back in April. We would strongly object to any allowance of amending the complaint. We believe it is due to be -- that the motion to dismiss is due to be heard and granted.

THE COURT: All right. Well, it sounds like y'all have a number of ripe discussions for your meet and confer. It

may be that you need to see a red line of what they're proposing in order to understand whether it would be objectionable or not, but I trust able counsel to alert me to the status of disputes and agreements when the stay lifts.

Anything else?

MR. WATKINS: Your Honor, if I may?

THE COURT: You may.

MR. WATKINS: Addressing the show cause that we're here on at the moment, I just wanted to say, you know, there certainly wasn't any effort to conceal anything from the clients. You know, we had regular communications. I think it is clear that those were going -- Mr. Burrill had most of those, but even the day -- I guess it was the 22nd, something along those lines, you know, that was the day that I ended up in the hospital. You know, we were meeting with them that day, you know, on site.

THE COURT: What day?

MR. WATKINS: I guess it was like the 22nd. It was shortly before the filing.

THE COURT: The 22nd of what month?

MR. WATKINS: It would have been May. Is that right? Or June. It was a week or two weeks before -- yeah, no, that would have been April because the filing was May 2nd. So.

THE COURT: Well, I mean, to be clear, what I am looking for is evidence that discloses that the clients were

told the whole truth and nothing but the truth about the potential risk and prejudice to their case before the first show cause hearing. So I'm not here to determine whether they were regularly advised of developments in their case before I issued a show cause order. I'm not here to determine really what has happened since I issued the second show cause order. I'm trying to figure out whether at the moment that their case was in peril they knew it, and the only evidence I have in the record is that they didn't.

MR. WATKINS: Your Honor, I would say, as Mr. Burrill said, most of the communications with the client were by phone.

THE COURT: There is no reference in her declaration or in yours to a phone call that occurred before the first show cause hearing.

MR. WATKINS: There -- I mean, again, I hate to beat a dead horse but those were the regularly occurring -- and I would love to be able to cite them, you know, to show, you know, where those occurred on our calendar system but I just -- I simply don't have -- I couldn't attach those because I didn't have access to be able to say, you know, on such and such day we had a scheduled appointment to talk to them. I mean, I would love to be able to do that. I just don't have -- but those did occur.

THE COURT: Do you have any explanation why if Dulce Rivera knew the peril that their case was in before the first

show cause hearing that she waited so late to insist that you not be her lawyer?

MR. WATKINS: Your Honor, I can't answer how or why she changed her mind about what she was doing. You know, what I can say is that the communications that I had with her were very clear, and she was not -- she was very understanding and, you know, interested in maintaining a relationship and, you know, did not express anything, you know, to that effect in my communications with her. And they were very, very clear.

THE COURT: All right. Anything else I need to hear?

MR. BURRILL: Your Honor, I think I have to, for the record -- and I'm not sure if it is more appropriate that the associates have been in touch with Ms. Dulce Rivera and have talked on frequency with her, but we did have standing calls on a bi-weekly basis with the Riveras. Sometimes they happened. Sometimes I was there. Many times Mr. Watkins wasn't there, and nowhere in our records in our review of the e-mails or information we found any reference or consideration to the show cause hearing or the use of generative AI in the context of fake citations, and so I feel it is my duty on behalf of the clients to say that that is just factually untrue. Thank you.

THE COURT: Anything else I need to hear? Any other requests of the Court?

MR. GARRISON: Not from the Fite defendants, Your Honor.

MR. WHITEHEAD: Not from Triad.

MS. ROBERTS: No, Your Honor.

THE COURT: Mr. Barze?

MR. BARZE: No, Your Honor.

THE COURT: All right. Y'all have a great day.

(Proceedings concluded at 2:04 p.m.)

**C E R T I F I C A T E**

**I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.**

**Dated: 8/10/2025**

**Kelli M. Griffin, RPR, CSR**