## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| JOEL A. RIVERA, *individually* *and, in the alternative,* MI PUEBLO SUPERMARKET, LLC, | ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | **Case No.: 2:24-cv-01802-AMM** ) ) |
| TRIAD PROPERTIES CORPORATION, *et al.*, | ) ) ) |
| Defendants. | ) ) |

## ORDER

This case is before the court for ongoing disciplinary proceedings against Attorney Joshua Watkins and his former law firm, Burrill Watkins LLC, following Mr. Watkins's misuse of artificial intelligence to make false statements to the court. The court previously issued two orders to show cause: one for Mr. Watkins and the firm "to show good cause, if there be any, why they should not be sanctioned under Federal Rule of Civil Procedure 11, the court's inherent authority, Local Rule 83.1(f), and/or Alabama Rule of Professional Conduct 3.3 for making false statements of fact or law to the court" in connection with the use of artificial intelligence, Doc. 51 at 12, and the other for Mr. Watkins "to show good cause, if there be any, why he should not be sanctioned under the court's inherent authority,

Local Rule 83.1(f), and/or Alabama Rule of Professional Conduct 1.4 for failure to keep his client reasonably informed about the status of the case" as it relates to these disciplinary proceedings and their impact on the underlying litigation, Doc. 72 at 4.

For the reasons explained below, the court **GRANTS** the requests for sanctions. Docs. 64, 67.

## I.    BACKGROUND

On November 20, 2024, plaintiff Joel A. Rivera filed a complaint against Triad Properties Corporation and a number of its employees ("the Triad Defendants").[1] Doc. 1-1 at 2–39. On December 20, 2024, Mr. Rivera filed an amended complaint, which added as defendants Jack Fite and Fite Building Company, Inc. ("the Fite Defendants").[2] *Id.* at 100–41. Shortly after, the defendants removed the case to this court. Doc. 1. The Triad Defendants then filed a partial

---

[1] The Triad Defendants are Triad Properties Corporation, Joseph Marion Moseley, Hugh Fuller McClendon, and John Michael Kendall. Doc. 1-1 at 2, 100.

[2] The Fite Defendants are Fite Construction Company LLC, Fite Building Company, Inc., and Jack Fite. Doc. 1-1 at 100; Doc. 35 ¶ 4. Mr. Rivera's amended complaint filed in state court includes Fite Building Company, Inc. and Jack Fite, but not Fite Construction Company LLC. *See* Doc. 1-1 at 100. Mr. Rivera's amended complaint filed in this court similarly includes Fite Building Company, Inc. and Jack Fite, but not Fite Construction Company LLC. *See* Doc. 12 ¶ 3. Mr. Rivera's second amended complaint filed in this court introduces Fite Construction Company LLC, along with Fite Building Company, Inc. and Jack Fite. *See* Doc. 35 ¶ 4.

motion to dismiss and motion for more definite statement. Doc. 3. Mr. Rivera responded with another amended complaint. Doc. 12. In the light of the amended complaint, the court denied as moot the first motion to dismiss. Doc. 18.

The Triad Defendants filed another partial motion to dismiss and motion for more definite statement. Doc. 21. Mr. Rivera once again filed another amended complaint, Doc. 24, but because he did so without leave of court or permission from the defendants, the court struck Mr. Rivera's second amended complaint. Doc. 26. Mr. Rivera then filed a motion for leave to amend his complaint, Doc. 27, which the court ultimately granted, Doc. 33. The Fite Defendants opposed the motion to amend, emphasizing that "Mr. Rivera's proposed Second Amended Complaint is the fifth iteration of his pleading." Doc. 28 at 1. The Fite Defendants objected to "Mr. Rivera's cycle of filing a pleading, waiting for Defendants to explain the pleading's defects in a motion to dismiss, and then amending the pleading to address those defects," calling it "futile (given the continued defects)" and "inequitable to Defendants." *Id.* at 3.

In response, Mr. Rivera "request[ed] that the Court impose costs and sanctions against Defendants" for "bad faith litigation conduct," which "caused unnecessary delay and . . . forced Plaintiff to incur additional costs and legal expenses." Doc. 32 at 6. The court rejected Mr. Rivera's accusation of bad faith as "meritless." Doc. 33

3

at 5.

The plaintiffs—now Mr. Rivera and Mi Pueblo Supermarket, LLC—filed an amended complaint on March 28, 2025, against the Triad Defendants and the Fite Defendants, this time adding Fite Construction Company LLC. Doc. 35 ¶¶ 1–4.

The Triad Defendants filed another partial motion to dismiss and motion for more definite statement on April 11, 2025. Doc. 36. The court set a briefing schedule on that motion. Doc. 37. Separately, on April 11, 2025, the Fite Defendants filed a motion to dismiss all the claims against them. Doc. 38. The court set a briefing schedule on the Fite Defendants' motion. Doc. 39.

### A. May 2025 Filing Errors and *Ex Parte* Email to the Court

At 11:54 PM[3] on May 2, 2025, the plaintiffs filed a docket entry labeled as a response to the Triad Defendants' motion to dismiss. Doc. 40. The CM/ECF receipt

---

[3] All times noted in this Order are in Central Daylight Time.

and first page of that docket entry appear below.

**U.S. District Court**

**Northern District of Alabama**

**Notice of Electronic Filing**

The following transaction was entered by Watkins, Joshua on 5/2/2025 at 11:54 PM CDT and filed on 5/2/2025
**Case Name:**        Rivera v. Triad Properties Corporation et al
**Case Number:**    2:24-cv-01802-AMM
**Filer:**        Joel A Rivera
**Document Number:** 40

**Docket Text:**
RESPONSE in Opposition re [36] MOTION to Dismiss *FEWER THAN ALL CLAIMS AND FOR MORE DEFINITE STATEMENT* filed by Joel A Rivera. (Watkins, Joshua)

Case 2:24-cv-01802-AMM    Document 30    Filed 05/02/25    Page 1 of 15    **FILED**

2025 May-02 PM 11:53
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

JOEL A. RIVERA, individually )
and, in the alternative, )
MI PUEBLO SUPERMARKET, )
LLC, )        CIVIL ACTION NO.
)
    Plaintiffs, )        2:24-cv-01802-AMM
)
v. )
)
TRIAD PROPERTIES )
CORPORATION, JOSEPH )
MARION MOSELEY, an )
Individual, HUGH FULLER )
MCCLENDON, an Individual, and )
JOHN KENDALL, an Individual, )
JACK FITE, an Individual, FITE )
BUILDING COMPANY, INC. and )
FITE CONSTRUCTION )
COMPANY, LLC, )

    Defendants.

**MOTION TO DISMISS FEWER THAN ALL CLAIMS AND FOR MORE**
**DEFINITE STATEMENT**

Defendants Triad, Moseley, McClendon, and Kendall (Triad Defendants) move to dismiss certain causes of action in the Second Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b). Triad Defendants move to dismiss Counts I, II, III, IV, V, IX and X because they fail to state a claim

A few minutes later, at 11:57 PM, the plaintiffs filed another docket entry labeled as

5

a response to the Triad Defendants' motion to dismiss. Doc. 41. The CM/ECF receipt

and first page of that second docket entry appear below.



Both of these docket entries appear to be file-stamped copies of the Triad

Defendants' motion to dismiss instead of responses to the Triad Defendants' motion

to dismiss.

Then, at 12:01 AM on May 3, 2025, the plaintiffs filed a third docket entry labeled as a response to the Triad Defendants' motion to dismiss. Doc. 42. This time, upon review of the document's first page, it facially appeared to be a response to the Triad Defendants' motion to dismiss. The CM/ECF receipt and first page of the third docket entry appear below.

**U.S. District Court**

**Northern District of Alabama**

**Notice of Electronic Filing**

The following transaction was entered by Watkins, Joshua on 5/3/2025 at 0:01 AM CDT and filed on 5/2/2025
**Case Name:**          Rivera v. Triad Properties Corporation et al
**Case Number:**      2:24-cv-01802-AMM
**Filer:**                 Joel A Rivera
**Document Number:** 42

**Docket Text:**
RESPONSE in Opposition re [36] MOTION to Dismiss *FEWER THAN ALL CLAIMS AND FOR MORE DEFINITE STATEMENT* filed by Joel A Rivera. (Watkins, Joshua)

FILED
2025 May-03  AM 12:01
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| JOEL A. RIVERA individually and, in the alternative, MI PUEBLO SUPERMARKET, LLC, Plaintiffs, | ) ) ) ) |
| v. | ) )     CIVIL ACTION NO. ) ) ) |
| TRIAD PROPERTIES CORPORATION JOSEPH MARION MOSELEY, an Individual, HUGH FULLER MCCLENDON, an Individual, and JOHN KENDALL, an Individual, JACK FITE, an Individual, FITE BUILDING COMPANY, INC., and FITE CONSTRUCTION COMPANY LLC, Defendants. | )    2:24-cv-01802-NAD ) ) )(Removed from the Circuit Court ) of Shelby County, Alabama, Case )     No. CV-2024-901254) ) ) ) ) ) ) ) |

---

**PLAINTIFFS' RESPONSE TO TRIAD DEFENDANTS'
MOTION TO DISMISS FEWER THAN ALL CLAIMS AND
FOR MORE DEFINITE STATEMENT**

---

Plaintiff Joel A. Rivera and alternative Mi Pueblo Supermarket, Inc.

("Plaintiffs") respectfully oppose the Motion to Dismiss filed by Triad, Moseley,

McClendon, and Kendall (collectively "Triad Defendants") and state as follows:

**INTRODUCTION**

- 1 -

Later that same morning, at 4:28 AM, counsel for the plaintiffs emailed Chambers

*ex parte* regarding the filings with "the correct PDF version of the document" as an

attachment. The entire email is reproduced below.



The PDF attachment and Word attachment are appended to this Order as Exhibits 1 and 2, respectively.

Counsel for the plaintiffs then sent a similar email at 4:44 AM to opposing

counsel that attached "the accurate PDF version of the Plaintiffs' Response that ha[d] been provided to the Court." Doc. 48-6 at 2. That email is reproduced below.

| | |
|---|---|
| **From:** | Joshua Watkins |
| **To:** | Dodd, Katelyn; Garrison, Kevin; Margaret Waldrop; Sarah Redmond; Steve Whitehead |
| **Cc:** | Joshua Watkins |
| **Subject:** | Correction to Plaintiffs' Response Filing – Case No. 2:24-cv-01802 |
| **Date:** | Saturday, May 3, 2025 4:44:07 AM |
| **Attachments:** | 2025.5.1_Plaintiff-ResponseToTriadDs-MTD_v1.1comp.pdf |

Counselors,

I am writing to notify you of an issue concerning the Plaintiffs' Response filed in Case No. 2:24-cv-01802. Due to an unexplained error, the document submitted via CM/ECF initially appeared as the original motion, rather than the intended response. Despite multiple attempts to correct the submission, the system continued to reflect the incorrect version—even after it appeared to update.

I have contacted the Court to request assistance in correcting the record. For your reference, I have attached the accurate PDF version of the Plaintiffs' Response that has been provided to the Court.

Please let me know if you have any questions.

Best,
Joshua Watkins
Partner
Burrill Watkins LLC
1000 Eagle Point Corporate Drive, Suite 3
Birmingham, AL 35242
Tel. (205) 701-5536
Cell. (205) 529-5723
jwatkins@burrillwatkins.com
burrillwatkins.com



Confidentiality Notice: This e-mail message and all contents (including any attachments) from Burrill Watkins are covered by the Electronic Communications Privacy Act, 18 U.S.C. 2510-2521 and may include the Health Information Portability & Accountability Act, 45 CFR 160 & 164. It is confidential and may be legally privileged. The message and attachments are for the sole use of the intended recipient(s) and may contain proprietary, confidential, trade secret or privileged information. Any unauthorized review, use, disclosure, or distribution is prohibited and may be a violation of law. If you are not the intended recipient or a person responsible for delivering this message to an intended recipient, any disclosure, copy, distribution or issue of the contents of this message is prohibited. Please contact the sender by reply e-mail or by phone and destroy all copies of the original message immediately.

 Sent with Mailsuite · Unsubscribe

The response filed as Document 42 with the court via CM/ECF differs from the response emailed to chambers. Those differences appear in a redline appended to this Order as Exhibit 3. Several citations have been removed or modified, and those changes correlate with the defendants' identification of nonexistent or incorrect citations, as explained below.

On May 5, 2025, the plaintiffs filed a response to the Fite Defendants' motion to dismiss. Doc. 43. The CM/ECF receipt and the first page of that docket entry appear below.

**U.S. District Court**

**Northern District of Alabama**

**Notice of Electronic Filing**

The following transaction was entered by Watkins, Joshua on 5/5/2025 at 10:28 PM CDT and filed on 5/5/2025

| | |
|---|---|
| **Case Name:** | Rivera v. Triad Properties Corporation et al |
| **Case Number:** | 2:24-cv-01802-AMM |
| **Filer:** | Joel A Rivera |
| **Document Number:** | 43 |

**Docket Text:**
RESPONSE in Opposition re [38] MOTION to Dismiss *Motion to Dismiss Second Amended Complaint* filed by Joel A Rivera. (Attachments: # (1) Exhibit Communications)(Watkins, Joshua)

11



Case 2:24-cv-01802-AMM    Document 43    Filed 05/05/25    Page 1 of 13    FILED
2025 May-05 PM 10:27
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

JOEL A. RIVERA individually and,  )
in the alternative,  )
MI PUEBLO SUPERMARKET, LLC,  )
Plaintiffs,  )
                                  )          CIVIL ACTION NO.
v.                                )
                                  )          2:24-cv-01802-NAD
TRIAD PROPERTIES CORPORATION )
JOSEPH MARION MOSELEY, an  )
Individual, HUGH FULLER  )(Removed from the Circuit Court
MCCLENDON, an Individual, and  ) of Shelby County, Alabama, Case
JOHN KENDALL, an Individual, JACK ) No. CV-2024-901254)
FITE, an Individual, FITE  )
BUILDING COMPANY, INC., and  )
FITE CONSTRUCTION COMPANY  )
LLC,  )
                                  )
Defendants.  )

PLAINTIFFS' RESPONSE IN OPPOSITION TO
DEFENDANTS JACK FITE, FITE BUILDING COMPANY,
INC., AND FITE CONSTRUCTION COMPANY LLC'S
MOTION TO DISMISS

Plaintiffs Joel A. Rivera and Mi Pueblo Supermarket, LLC ("Plaintiffs") submit

this response in opposition to the Motion to Dismiss filed by Defendants Jack Fite,

Fite Building Company, Inc., and Fite Construction Company LLC ("Fite

Defendants") pursuant to Rule 12(b)(6) and Rule 9(b) of the Federal Rules of Civil

- 1 -

## B. False Citations

The Triad Defendants filed a reply on May 16, 2025. Doc. 46. In that reply, they discuss several unverifiable citations and quotes in the plaintiffs' as-filed response, Doc. 42. *See, e.g.*, Doc. 46 at 7–8. For example, as seen below, plaintiffs' as-filed response cites to a purported case from the United States District Court for the District of Utah.

> confusion as to the nature of the allegations—only that they prefer a different formatting style.
>
> Courts have repeatedly declined to grant Rule 12(e) motions where, as here, the allegations permit the defendant to frame a responsive pleading. *See SEC v. Dig. Lightwave, Inc.,* 196 F.R.D. 698, 700 (D. Utah 2000) (denying motion for more definite statement despite sloppy formatting because the allegations were substantively clear).

There is no such case from the District of Utah. Instead, there is case from the United States District Court for the Middle District of Florida by that name, but that case makes no mention of sloppy formatting. *See generally S.E.C. v. Dig. Lightwave, Inc.,* 196 F.R.D. 698 (M.D. Fla. 2000).

Plaintiffs' as-filed response also purports to quote *American Federation of Labor & Congress of Industrial Organizations v. City of Miami*, 637 F.3d 1178 (11th Cir. 2011), as seen below.

13

> These allegations, supported by specific references to exhibits, text messages, and documented conduct, satisfy the requirement that the complaint "plead enough factual content to allow the court to draw the reasonable inference that the defendants reached an agreement to accomplish an unlawful objective." *See American Federation of Labor & Cong. of Indus. Organizations v. City of Miami, 637 F.3d 1178, 1193* (11th Cir. 2011).

That quote appears nowhere in the opinion. *See generally Am. Fed'n of Lab. & Cong. of Indus. Orgs. v. City of Miami*, 637 F.3d 1178 (11th Cir. 2011). "Triad Defendants' counsel searched Westlaw and was unable to find any case containing this specific quote in any Alabama, 11th Circuit, or Supreme Court case." Doc. 46 at 7 n.5.

Similarly, the Fite Defendants filed a reply on May 19, 2025, that discussed issues with the plaintiffs' statements of law in the response to the Fite Defendants' motion to dismiss, Doc. 43. *See, e.g.*, Doc. 47 at 8–10, 12. As seen below, the plaintiffs cite a Northern District of Alabama case for a broad proposition about fiduciary duties.

> **III. THE COMPLAINT STATES VALID CLAIMS FOR BREACH OF FIDUCIARY DUTY AND NEGLIGENCE PER SE**
>
> A fiduciary duty may arise in Alabama where one party places trust in another, and the latter accepts that trust knowingly. See *Belcher v. Birmingham Trust Nat'l Bank*, 348 F. Supp. 61, 67 (N.D. Ala. 1968). The Complaint alleges that Plaintiffs trusted Fite's recommendation of Triad, unaware of the Defendants' concealed

Doc. 43 at 7. The cited page contains only headnotes, and the headnotes discuss the duties inherent in partnerships and corporations. *See Belcher v. Birmingham Tr. Nat'l Bank*, 348 F. Supp. 61, 67 (N.D. Ala. 1968). A screenshot of the cited page appears below.

15

BELCHER v. BIRMINGHAM TRUST NATIONAL BANK          67
Cite as 348 F.Supp. 61 (1968)

annually employed in small loan operation and interest thereon at legal rates even though loan transactions were void.

**77. Partnership ⊜92, 93, 97**

A partner is not precluded from dealing with his own firm but cannot use firm property for his individual use or benefit, nor derive secret personal profit out of business of firm.

**78. Partnership ⊜97**

Managing partner of partnership was under legal duty to advise fellow partners as to preferential treatment given by partnership to corporation controlled by managing partner.

**79. Partnership ⊜97, 114**

Managing partner was required to account to partnership to extent partnership suffered because of preferential treatment given business controlled by managing partner and statute of limitations was not available to bar claim.

**80. Contracts ⊜10(4)**

Agreement requiring lumber company to sell its output to sales company which was not required to purchase entire output was not void for lack of mutuality.

**81. Trusts ⊜249**

Where corporation producing lumber and partnership selling lumber had same owners although not in same proportion and, notwithstanding agreement by corporation to supply its entire output to partnership, corporation made direct sales of lumber from its plant over period of several years which sales were reflected in financial reports obtained by trustee of trust which had greater interest in partnership than in corporation, trustee was not entitled to complain of direct sales by corporation without payment of commission to partnership.

**82. Trusts ⊜249**

Where corporation engaged in production of lumber and partnership selling lumber had same owners although in different proportions and partnership in connection with output agreement with corporation advanced substantial sums of money to corporation for which cor-poration paid no interest, trustee of trust having greater interest in partnership than in corporation could not complain as to failure of partnership to collect interest.

**83. Trusts ⊜249**

Trustee of trust which had interest in corporation producing lumber and sales company selling lumber could not complain about fact that company which was formed by certain corporate stockholders to manufacture roof trusses from corporation's products was financed by corporation or about failure of sales partnership to collect commissions on sales of corporation's products to company.

**84. Partnership ⊜138**

Without consent of other partners, partners lacked power and authority to organize and acquire stock control of corporation and to extend credit to it and obligate partnership contingently on its behalf.

**85. Corporations ⊜300**

Even if corporation under its charter power could have engaged in foreign venture on proper authorization of board of directors, it did not follow that president and general manager of corporation had power to engage in foreign venture on behalf of corporation.

**86. Corporations ⊜300**

Whatever authority president of corporation has must be expressly conferred on him by statute, charter, or by-laws or by board of directors or implied from express powers granted, usage or custom or nature of company's business.

**87. Corporations ⊜304**

Unless authority of general manager is restricted, his authority and powers are coextensive with powers of corporation itself, and he has authority to do any act on its behalf in ordinary course of company's business.

**88. Corporations ⊜312(1)**

Even though harvesting of timber and manufacture of lumber were two of things corporation was organized to do,

Additionally, as seen below, the plaintiffs cite an Alabama Court of Civil Appeals case for their argument about equitable claims.

16

**VI. EQUITABLE CLAIMS (UNJUST ENRICHMENT AND PROMISSORY ESTOPPEL)**

Where a party benefits unjustly from another's reliance in a trust-based relationship, Alabama law permits recovery. In *Jordan v. Mitchell* 705 So.2d 453 (Ala.Civ. App.1997), the court recognized that a confidential relationship may support equitable relief even when a formal contract exists, which nonetheless appear to be disputed by Defendants at least in part. Here, Plaintiffs entrusted Fite

Doc. 43 at 11.

But, as the Fite Defendants explained, no contract was at issue in *Jordan*, which discussed the "imposition of a constructive trust or quasi-contract where improvements to property were made by a party not the owner of the property." Doc. 47 at 12. The *Jordan* court did analyze whether there had been abuse of a confidential relationship such that a constructive trust should be imposed. *Jordan v. Mitchell*, 705 So. 2d 453, 461–62 (Ala. Civ. App. 1997); *see id.* at 458 ("Retention of a benefit is unjust if . . . the recipient of the benefit . . . engaged in some unconscionable conduct, such as . . . abuse of a confidential relationship."). And it did mention that the plaintiff "might have been entitled to relief if she had alleged and proved that [the defendant] was guilty of some wrongdoing in inducing her to make the improvements to the property." *Id.* at 459. Nevertheless, the *Jordan* court did not discuss whether Alabama law permits equitable relief in the presence of a

formal contract. *See* Doc. 43 at 11; *see Jordan*, 705 So. 2d at 459–60 (distinguishing the *Jordan* facts from a case in which "the complaint 'invoked both contractual and equitable grounds upon which the court could . . . afford her relief.'" (alteration in original) (quoting *Glasgo v. Glasgo*, 410 N.E.2d 1325, 1327 (Ind. App. 1980))); *see also Branch Banking & Tr. Co. v. Howard*, No. 12-0175-WS-N, 2013 WL 951652, at \*5 (S.D. Ala. Mar. 8, 2013) (collecting cases and concluding that "Alabama law is clear that quasi-contractual, equitable remedies such as unjust enrichment are not cognizable in the presence of an express contract").

The plaintiffs also cite an Alabama Supreme Court case that supposedly supports their fraud argument, as seen below.

> These allegations satisfy Rule 9(b) and are further supported by the legal framework laid out in *Cook's Pest Control, Inc. v. Rebar*, 28 So. 3d 716, 726 (Ala. 2009), where the Alabama Supreme Court recognized actionable fraud based on omissions and nondisclosures by parties in a position of trust.

Doc. 43 at 7.

On the page cited by the plaintiffs, the court stated that "preparing the [termite inspection report] did not impose a duty on Cook's to inform the [plaintiffs] of" certain termite infestation problems because of limitations and disclaimers in the parties' agreement. *See Cook's Pest Control, Inc. v. Rebar*, 28 So. 3d 716, 725–26

18

(Ala. 2009). For that reason—and because the plaintiffs could not prove that the Cook's inspector knew of the allegedly suppressed fact—Cook's was entitled to judgment as a matter of law on the fraud and negligence claims based on those allegations. *Id.* at 726. The cited page also discusses the *Cook's* plaintiffs' negligence *per se* claim, on which Cook's was entitled judgment as a matter of law, and another fraudulent misrepresentation claim, on which the court concluded that "the [plaintiffs] did not reasonably rely on any misrepresentation made by Cook's concerning the contract." *Id.* at 726–27. Elsewhere, the court explained that Cook's was entitled to judgment as a matter of law on all but one fraud claim, which "Cook's fail[ed] to address this claim in its brief to th[e] [Supreme] Court." *See id.* at 727, 729.

Though the Fite Defendants alleged that the plaintiffs' filing made misleading overstatements and misstated authorities, they did not raise concerns that the plaintiffs' cited cases or quotes were outright falsified or hallucinated by artificial intelligence. *See* Doc. 47 at 8–10, 12.

On May 28, 2025, the defendants jointly filed a reply discussing these purportedly "misconstrued statements of the law in Plaintiffs' briefings" and "discrepancies" between the as-filed version of the plaintiffs' response to the Triad Defendants' motion and the version emailed several hours later to the defendants

19

and the court. Doc. 48 ¶¶ 10–12.

The defendants also identified an additional errant citation in the plaintiffs' as-filed response to the Triad Defendants' motion to dismiss. *See id.* ¶ 9. The plaintiffs' citation appears below.

> At the pleading stage, Plaintiffs need not assign precise subsections to each factual allegation; the Complaint is to be read as a whole. See *Skinner v. Beemer*, 293 So. 3d 930 (Ala. 2019) ("Alabama's notice pleading standard requires only a short and plain statement of the claim showing the pleader is entitled to relief.").

Doc. 42 at 4.

"No such case appears to exist." Doc. 48 ¶ 9. "The case found at 293 So. 3d 930 is *Ex parte K.W.*, from the Alabama Court of Civil Appeals in 2019, and it discusses subject matter jurisdiction in a juvenile custody case; it does not discuss notice pleading." *Id.* "Further, a case titled *Skinner v. Beemer* out of the Eastern District of Michigan involves a § 1983 claim against a police officer for excessive police force; it does not discuss Alabama law or concepts of notice pleading." *Id.*; *see generally Skinner v. Beemer*, No. 05-71150, 2008 WL 659795 (E.D. Mich. Mar. 11, 2008). The defendants represented that "it is unclear whether [these issues] are the result of human error or the use of generative artificial intelligence." Doc. 48 ¶ 12.

20

## C. Plaintiffs' Sur-Reply Regarding False Citations

On May 29, 2025, the court ordered the plaintiffs "[t]o aid the court in deciding whether to issue a show cause order and hold a hearing" by filing "a sur-reply to defendants' joint supplemental reply that specifically addresses whether generative artificial intelligence was utilized in drafting the plaintiffs' as-filed responses to the defendants' motions to dismiss." Doc. 49 at 1–2.

Plaintiffs acknowledged in their sur-reply that counsel utilized generative artificial intelligence programs, but asserted that such use was appropriate:

> For efficiency, and consistent with guidance regarding best practice of both the ABA and Alabama State bar, generative AI tools were appropriately used in a supplemental capacity during the drafting process and as part of argument review. However, **no arguments or citations were included in the final pleading without attorney review, verification, and appropriate editing as should be apparent from the very edits and changes complained of by opposing counsel**.

Doc. 50 at 3 (emphasis added). The plaintiffs also attempted to explain the late night/early morning filings and emails of May 2–3, 2025 in connection with their response to the Triad Defendants' motion to dismiss. *Id.* at 2. Plaintiffs represented that "[t]he intended version [of the response to the Triad Defendants' motion] is now correctly reflected in the docket as document 43," *id.* at 2, and stated again that "the corrected pleading" was "shown in the docket as document 43," *id.* at 9. However,

21

as previously discussed and shown, Document 43 is the response to the Fite Defendants' motion to dismiss and was filed days after the events of May 2–3, 2025.

As to the citation issues raised by the defendants, the plaintiffs attached copies of some authorities but did not acknowledge many of the specific citation issues raised by the defendants. For instance, the plaintiffs did not acknowledge the false citation to the case purportedly arising from the District of Utah and, instead, simply said it "stand[s] for the purpose given" and faulted the Triad Defendants for referring to "the outdated document [that] was erroneously filed." *Id.* at 3–4. (That accusation is false: that citation in the emailed version of the response refers to the District of Utah. *See* Ex. 1 at 16.) In an apparent attempt to deflect blame, the plaintiffs accused the defendants of "wishful thinking," "linguistic gymnastics[,] and intentional blindness." Doc. 50 at 5.

### D. First Order to Show Cause

"The plaintiffs' sur-reply raise[d] further questions and concerns with the court," so on June 3, 2025, the court issued an order staying the case and requiring Mr. Watkins and Burrill Watkins "to show good cause, if there be any, why they should not be sanctioned under Federal Rule of Civil Procedure 11, the court's inherent authority, Local Rule 83.1(f), and/or Alabama Rule of Professional Conduct 3.3 for making false statements of fact or law to the court." Doc. 51 at 11–13. In

22

addition, the court ordered Attorney A. Colin Wexford[4] "to a file a response stating the extent of his participation with any of the[] filings [at issue] and whether he was aware of them." *Id.* at 12. Mr. Watkins filed an incomplete response, *see* Doc. 56 (failing to follow the court's instructions regarding the contents of his response), in which he emphasized that "these difficulties were not the product of inappropriate AI use, they were simpl[y] caused by a significant initial computer error," *id.* at 3. Mr. Watkins claimed that after he realized his mistake, he acted "promptly and transparently" when he "[p]roactively engaged both the Court and opposing counsel in good faith with explanation of the matter." *Id.* at 4.

The defendants disagreed with Mr. Watkins's characterization of events and emphasized that "[e]ven after the Triad Defendants filed a reply . . . , specifically mentioning some of the case law that had been removed from the 'corrected' brief, Mr. Watkins took no steps to point out that the Triad Defendants were responding to an outdated version of the Response." Doc. 57 ¶ 4.

Burrill Watkins did not file an independent response to the order to show cause. Mr. Wexford filed a response stating that he "had no involvement of any kind

---

[4] Mr. Wexford is admitted *pro hac vice* to the Northern District of Alabama for this case on behalf of the plaintiffs, but has not entered a notice of appearance.

in the drafting of the pleadings at issue in this [order to show cause],” and sought an excuse on that basis, Doc. 52 at 1–2, which the court granted him, Doc. 53.

### E. First Motion for Leave to Correct Response

Before the show cause hearing on June 18, 2025, the plaintiffs filed a motion for leave to correct their response “to the Triad Defendants’ Motion to Dismiss.” Doc. 58 at 1. In the motion, the plaintiffs criticized the defendants’ claim that they had to “exert considerable time and effort” to sort out the plaintiffs’ filing errors and to determine whether the errors were linked to artificial intelligence. *Id.* ¶ 8. And the plaintiffs accused the defendants of trying to avoid substantively responding to the plaintiffs’ arguments by throwing out “conjecture.” *See id.* Further, the plaintiffs maintained that “the error had been sufficiently disclosed.” *Id.* ¶ 10. And the plaintiffs blamed the defendants for not asking follow-up questions about the emailed response document. *See id.* ¶ 11.

Based on the plaintiffs’ narrative about human error and “good-faith advocacy,” along with the apparent attempts to deflect blame onto the defendants, the plaintiffs urged the court to “[a]ccept the corrected version of Plaintiffs’ Opposition to the Triad Defendants’ Motion to Dismiss.” *Id.* ¶¶ 8, 9, 18. But there was no such “corrected version” of the brief. To their motion, the plaintiffs attached a document entitled “Plaintiffs’ Response in Opposition to Defendants Jack Fite,

24

Fite Building Company, Inc., and Fite Construction Company LLC's Motion to Dismiss." *See* Doc. 58-1.

### F. First Show Cause Hearing

The court held a show cause hearing on June 18, 2025. Mr. Watkins's responses to the court's questions at this hearing deepened the court's growing concern. Mr. Watkins represented to the court that the proposed amended opposition, *id.*, was "the same as the emailed, corrected response with the exception of the additional correction [of one of the case citations]," *see* Doc. 67-2 at 10. But the brief that Mr. Watkins had emailed the court *ex parte* was a response to the Triad Defendants' motion to dismiss, *see* Ex. 1, and the proposed amended opposition was a response to the Fite Defendants' motion, *see* Doc. 58-1.

When the court gave Mr. Watkins an opportunity to explain the discrepancy, Mr. Watkins offered no coherent response and blamed the court staff for not uploading his "correct" document. *See* Doc. 67-2 at 17. Mr. Watkins stated:

> I would love to say that was the correct -- it was -- my intention was to try to -- because the original correction that still had the [*Lightwave*] jurisdictional issue was emailed, but it was referenced in the Show Cause Order and in the reply. I was trying to put it in front of the Court in a more formal way, but, you know, clearly that was poorly done. So -- but I do think to respond a little. The -- the version that only has that jurisdictional issue, you know, has been available since -- and I was -- you know, I

> was under the impression -- because two of the three -- I still don't really know why the third filing wasn't corrected, which is why I filed the motion in the first place or filed this last motion.

*Id.* The court replied:

> When you say you don't understand why it wasn't corrected, I mean it is not the practice of the Court -- surely you understand it is not the practice of the Court to take documents that are emailed to the Court and drop them into the CM/ECF record.

*Id.* at 17–18. He responded:

> No. I was following the administrative procedure, and that's -- it said to email the help desk if you have an issue, and two of the three, you know, appeared to be corrected.

*Id.* at 18. The court asked:

> Well, certainly to email the help desk if you have an issue, but if you make a filing and it is not the document you intended to file, what gave you the impression that emailing that document to the Court would result in the filing of that document?

*Id.* Mr. Watkins referred to "the response from the court clerk," but he never produced a copy of any such response. *See id.* According to Mr. Watkins, the response "simply said . . . [the Clerk] w[ould] speak to the judge and let [Mr. Watkins] know if anything else [wa]s needed." *Id.*

The court asked, "So do we have, other than by email transmission, a copy of

26

the correct document that you intended to file?" *See id.* at 19. Mr. Watkins responded, "Not other -- not other than by email. I intended to file it, you know, to try to correct the record, but clearly I added the Fite when I added the exhibit." *Id.*

The court also asked Mr. Watkins if he appended an affidavit to his response to the order to show cause. *Id.* at 5. When he denied appending an affidavit, the court asked why, and he stated, "I don't know that I realized I was supposed to respond with an affidavit." *Id.* The order to show cause states, "Mr. Watkins shall append to his filing a sworn affidavit about" the various issues delineated in the order to show cause. Doc. 51 at 12. Mr. Watkins acknowledged that instruction but alleged that he "missed it" when he filed his response. Doc. 67-2 at 5.

The court explained that it was trying to understand whether the errors in the filing were attributable to artificial intelligence or human error, and Mr. Watkins responded, "Candidly, I can't tell you. I mean, not for sure because of the way, you know, I will take a section and come up -- those might have been my mistakes. They may have been something that was AI generated." *Id.* at 9. He then attempted to describe "what [he] ha[s] noticed with the AI stuff," such as when AI is most likely to make mistakes and how "it's usually pretty easy to go through and see" whether things are correct or helpful. *Id.*

So the court asked Mr. Watkins, "Is it your representation or position that any

errors that persist in that version [emailed to the court] are human errors?" *Id.* at 10.

Mr. Watkins replied with a seemingly conflicting answer:

> Yes. Yes. I just simply -- again, the Utah versus Middle District, I just missed it. I mean, I was going through trying to -- and since so much of the citation was correct, I just overlooked it and the same thing really with the parenthetical. Yeah. I probably wouldn't have kept the formatting just that, you know, it stands for the purpose of being able to provide a response. I actually like that better, but again, I was going quickly enough that it didn't jump out at me as something that was not what I was trying to say, and so, you know, I didn't change it. Now, whether that was my editing from before or something that was leftover, I don't know for sure. I just can't say.

*Id.*

The court provided the Fite Defendants and Triad Defendants the opportunity to discuss the effect that the plaintiffs'—namely, Mr. Watkins's—errors had on them. *See id.* at 11–16. The defendants asked the court to consider a way to offset their clients' costs due to the issues caused by Mr. Watkins. *Id.* at 13–14. The defendants described the increased time and effort required to address Mr. Watkins's mistakes. *Id.* at 11, 14–15. And the defendants emphasized that "this is . . . one of the many mistakes that we've had in this case, and this just seems to be an ongoing pattern" and "a constant issue going forward." *Id.* at 15.

The court asked Mr. Watkins whether he understood the "significant

28

additional expense" to which he put the defendants, and he responded that he did. *Id.* at 19. When the court asked Mr. Watkins what he thought would be an appropriate remedy for that prejudice, he feigned acceptance of responsibility and again blamed court staff. *See id.* at 19–20. He said:

> I would say that, you know, the file -- the emailed version was intended to be -- was available, and so I would have hoped that would have mitigated it, but I understand that wasn't the one that was filed and that the help desk response didn't correct that and then, you know, this latest one, which was after their response anyway, you know, didn't put the correct one on the record. So, again, I think there's -- it is clear to me, you know, that there was an effort that was made but also, you know, I think it's understandable there's some -- you know, some work has been -- that has been caused that I'm responsible for. And I don't like that, but it is my -- I have to accept that.

*Id.*

The day of the show cause hearing, the court lifted the stay in this case "for the limited purpose of filing . . . appropriate motions from the plaintiffs to correct the record and appropriate motions from the defendants for fee sanctions and relief under the Alabama Litigation Accountability Act. Responses to all motions [we]re due within fourteen days from the date the motions [we]re filed." Doc. 59. The court gave the plaintiffs twenty-one days to file an amended motion for leave to file a corrected response. *See id.*

29

### G. Second Motion to Correct Response

The plaintiffs filed that amended motion on June 19, 2025, and represented that the motion included their response to the Triad Defendants' motion to dismiss as Exhibit A. Doc. 60 at 7. However, Exhibit A is a collection of unexplained emails and text messages. *See generally* Doc. 60-1. So the court struck the plaintiffs' amended motion and gave the plaintiffs an opportunity to file a second amended motion. Doc. 61. The plaintiffs filed yet another motion to amend their filing, Doc. 62, and this time the attached motion appeared to be directed to the Triad Defendants' motion, *see generally* Doc. 62-1.

In their motion, the plaintiffs represented that they did "not seek to revise or remove any additional citations or arguments" that were present in the emailed copy. *See* Doc. 62 ¶ 9. They further represented that "[t]he corrected version of the opposition attached as Exhibit A differs from the version previously emailed on May 3, 2025, as stated: the citation to *SEC v. Digital Lightwave* has been amended to reflect the correct jurisdiction (M.D. Fla.) and to revise the explanatory parenthetical." *Id.* ¶ 5. And they represented that "[n]o other substantive changes have been made." *Id.* To this representation, the plaintiffs added a footnote. *Id.* n.5. This footnote cross-referenced a footnote in another section of the plaintiffs' motion. *See id.* ("See footnote 4[.]"). Footnote 4 disclosed that "[f]or accuracy two other

30

edits were made before this filing (a) to narrow the quotation mark on *Reindel*, and (b) removed *US v. Georgia Dep't of Nat. Res* as the 12(b)(6) legal standard stated is well settled but not significant in that case." *See id.* ¶ 3 n.4.

A screenshot of the version emailed to chambers appears below.

Rule 8(a) requires a short and plain statement showing entitlement to relief. Rule 10(b) encourages a "paragraph form" to make pleadings clear, but it does not require perfect sequential numbering. Minor typographical or formatting inconsistencies—such as paragraph numbering—are not grounds for dismissal or repleading when the substance of the complaint is intelligible. Courts in the Eleventh Circuit have long held that pleadings will be upheld so long as a defendant can reasonably ascertain the claims and respond accordingly. *See United States v. Georgia Dep't of Nat. Res.,* 897 F. Supp. 1464, 1471 (N.D. Ga. 1995) ("[T]he ultimate question remains whether the pleading gives fair notice of the claim and the grounds upon which it rests.").

Ex. 1 at 15. The quote attributed to *United States v. Georgia Department of Natural Resources*, 897 F. Supp. 1464 (N.D. Ga 1995) does not appear in the cited case, and the so-called "well settled" legal standard for Rule 12(b)(6) motions is "not significant in that case" because the case resolved cross motions for summary judgment and did not discuss the standard for a motion to dismiss. *See generally id.*

The plaintiffs also changed a quote attributed to *Ex parte Reindel*, 963 So. 2d

614 (Ala. 2007). A screenshot of the version emailed to chambers appears below, followed by a screenshot of the same section in the plaintiffs' proposed "corrected" response.

> Second, the conspiracy allegations are not limited to fraud. Count IX expressly incorporates a broader set of wrongful acts that include—but are not limited to—breach of fiduciary duty, negligence, and unjust enrichment. Alabama law recognizes that a conspiracy may be based on "any unlawful act, including torts other than fraud." *See Ex parte Reindel*, 963 So. 2d 614, 622 (Ala. 2007) (upholding a conspiracy claim based on breach of fiduciary duty); *Hooper v. Columbus Reg'l Healthcare Sys., Inc.*, 956 So. 2d 1135, 1141 (Ala. 2006).

Ex. 1 at 11. The quotation attributed in this emailed version to *Ex parte Reindel* appears nowhere in the case. *See generally* 963 So. 2d 614. Nor does it appear in *Hooper v. Columbus Healthcare System, Inc.*, 956 So. 2d 1135 (Ala. 2006).

> Second, the conspiracy allegations are not limited to fraud. Count IX expressly incorporates a broader set of wrongful acts that include—but are not limited to— breach of fiduciary duty, negligence, and unjust enrichment. Alabama law recognizes that a conspiracy may be based on any "unlawful" act, including torts other than fraud. *See Ex parte Reindel*, 963 So. 2d 614, 622 (Ala. 2007) (upholding a conspiracy claim based on breach of fiduciary duty); *Hooper v. Columbus Reg'l Healthcare Sys., Inc.*, 956 So. 2d 1135, 1141 (Ala. 2006).

Doc. 62-1 at 12.

Even though the plaintiffs removed the nonexistent quote attributed to *Reindel*, their "corrected" briefing still mischaracterized *Reindel* altogether. *Reindel* addressed only whether the lower court properly exercised personal jurisdiction over the defendants. *See generally* 963 So. 2d 614. Without "defin[ing] the contours of conspiracy jurisdiction," *id.* at 622, the court upheld the exercise of "personal jurisdiction . . . grounded on a conspiracy theory of imputed conduct" because the "complaint [met] the specificity threshold" and the defendants did "not ma[k]e a *prima facie* evidentiary showing of the *absence* of jurisdiction," *id.* at 624–25.

These "corrections" to the filing were necessary even though the plaintiffs represented to the court that "[u]pon recognizing the [filing] error, Plaintiffs' counsel located the available prior drafts and legal research, reviewed and corrected, before

promptly submitting that corrected version via email to the Court and opposing counsel on the morning of May 3, 2025." Doc. 62 ¶ 2.

To the proposed amended opposition, the plaintiffs also attached a number of text messages and emails, *see* Doc. 62-1 at 20–34, which were not included in the emailed "corrected" response, *see* Ex. 1. Accordingly, to this day the plaintiffs still have not filed into the record a true, accurate copy of the version that they emailed to the court *ex parte*.

### H. Motions for Attorney's Fees and Sanctions

At the June 18, 2025, hearing on the first order to show cause, the defendants moved for relief to offset the costs associated with Mr. Watkins's misconduct. Doc. 67-2 at 13–14. They also informed the court that the defendants were considering requesting attorney's fees under the Alabama Litigation Accountability Act. *Id.* at 13. But the Fite Defendants clarified that the defendants' "intent was to address the lack of merit on the underlying claims themselves, not for any sanctions related to [the] Show Cause Order." *Id.* The court then provided the parties twenty-one days to file appropriate motions for sanctions and fees. *Id.* at 21. On July 9, 2025, the defendants supplemented their requests for sanctions. Docs. 64, 67. They also moved for attorney's fees under the Alabama Litigation Accountability Act. Docs. 65, 66.

In the Triad Defendants' Motion for Sanctions, the Triad Defendants informed

34

the court that "[a]fter the Show Cause Hearing, Triad counsel became aware of similar issues in a Jefferson County Circuit Court case in which Mr. Watkins represents the plaintiffs." Doc. 64 ¶ 35 (citing *Richard Tidwell v. Birmingham Heart Clinic, PLLC et al.*, Case No. 01-cv-2025-900144.00). Defense counsel in the state court action "ha[d] raised concerns that Mr. Watkins improperly used AI to draft a response to the defendant's motion to dismiss containing fake, misleading, and incorrect citations." *Id.* ¶ 36; *see* Doc. 64-1 at 4–12.

The Fite Defendants contended that sanctions are proper in this case because, along with Mr. Watkins's improper use of AI and unwillingness to tell the full truth, "Mr. Watkins has had repeated filing mishaps, both before and after the Show Cause Hearing, and he has demonstrated an inattention to and disregard for Court orders and federal civil procedure." Doc. 67 at 5. The Fite Defendants provide a list of examples of this misconduct, including that Mr. Watkins filed his response to the court's order to show cause more than two hours after the court's deadline had expired. *See id.* at 5–6; *compare* Doc. 51 at 12 ("Mr. Watkins and Burrill Watkins LLC are ORDERED to show good cause . . . not later than NOON Central Daylight Time on Monday, JUNE 9, 2025." (emphasis omitted)), *with* Doc. 56 (filed at 2:34 PM on June 9, 2025).

35

### I. Removal of Mr. Watkins as Plaintiffs' Counsel

On July 17, 2025, the plaintiffs filed a motion requesting (1) "[t]hat Joshua Watkins be removed as counsel of record," (2) "[t]hat Hannah Eckel be added as counsel for the Plaintiff[s]," and (3) "[t]hat the Court grant the Plaintiff[s] an extension on the deadline to file responses to the Defendants' [motions for attorney's fees and costs, and motion for sanctions]" because other attorneys at Burrill Watkins and the plaintiffs "were not informed of the true status of the case until July 10, 2025." Doc. 68 at 2–3. Specifically, the plaintiffs represented:

> That on or about July 10, 2025, Burril[l] Watkins LLC (hereinafter known as "the Firm") was notified by a third party of numerous developments in the case that were never fully disclosed to the staff of the Firm. These developments include the following: (1) the allegations that prior counsel filed documents relying on citations to nonexistent case law, potentially created using artificial intelligence, (2) the *ex parte* communication that took place on the morning of May 3, 2025, (3) that the foregoing resulted in a Show Cause Hearing that took place on June 18, 2025, (4) the Defendants' Motions for Sanctions filed on July 9, 2025, (5) the Defendants' [Motions for] Attorneys' Fees, and numerous other errors throughout the case. . . .
>
> That after being informed of the above-mentioned facts on July 13, 2025, the Plaintiffs instructed the Firm that they no longer wanted Joshua Watkins to represent them and wanted another attorney at the firm to do so going forward. . . .

36

That on July 14, 2025, Joshua Watkins was removed as a partner and attorney and is no longer associated with the law firm of Burrill Watkins LLC.

*Id.* at 1–2.

On July 21, 2025, the court granted the plaintiffs' motion "to the extent that Attorney Hannah Eckel is added as counsel for the plaintiffs and the plaintiffs shall file their responses to the defendants' most recent motions on or before AUGUST 6, 2025." Doc. 71 (emphasis omitted). In addition, the court retroactively extended Burrill Watkins's deadline to respond to the court's initial order to show cause. *Id.*

## J. Second Order to Show Cause

On July 24, 2025, the court ordered Mr. Watkins "to show good cause, if there be any, why he should not be sanctioned under the court's inherent authority, Local Rule 83.1(f), and/or Alabama Rule of Professional Conduct 1.4 for failure to keep his client reasonably informed about the status of the case" as it relates to these disciplinary proceedings. Doc. 72 at 4. In addition, the court ordered Mr. Wexler "to file a response stating the extent of his participation with any of these issues and whether he was aware of them." *Id.*

Mr. Wexler responded, describing "the very limited nature of [his] representation in this matter, which did not include any participation at all in the day-to-day litigation activities in this case." Doc. 77 ¶ 3. Mr. Wexler explained that based

37

on his limited participation, he "never had any knowledge or awareness of the level or nature of communication between Mr. Watkins, Mr. Burrill or anyone else at their law firm and their client." *Id.* ¶ 4. Mr. Wexler did not expect to be part of the client communications, and "it was [his] understanding that Mr. Watkins was in full and complete communication with Mr. Burrill and his client about what was happening." *Id.* ¶ 5. Upon hearing about the allegations against Mr. Watkins, Mr. Wexler "forwarded them to Mr. Burrill to make sure that he was managing the situation." *Id.* ¶ 6. "That is the sum total" of Mr. Wexler's knowledge about the situation. *Id.* ¶ 7. Accordingly, the court granted his motion to be excused from the August 7, 2025, show cause hearing. Doc. 80.

## K. Burrill Watkins's Response to the First Order to Show Cause

Burrill Watkins responded to the first order to show cause. Doc. 75. The firm "assure[d] the Court of their commitment to full candor, cooperation, and remediation." *Id.* at 1. Burrill Watkins explained that after Mr. Watkins's actions came to light, Burrill Watkins enlisted two associate attorneys to investigate the situation. *Id.* ¶¶ 6–7. According to those attorneys, Mr. Watkins took several steps to cover the true extent of the situation in this case. *See id.* ¶¶ 12–16. Mr. Watkins made these concealment attempts while serving as the Riveras' "lead litigation counsel," Doc. 75-3 at 11, and though Mr. Burrill "provided his insight into strategy

and potential claims to pursue," Doc. 75 ¶ 10, Mr. Burrill claims that he "did not participate in drafting pleading[s] and did not regularly review any drafts that were sent to [him]," Doc. 75-3 at 11.

From the time of the May 2025 filing problem until the June 18, 2025, show cause hearing, Mr. Watkins allegedly never informed the plaintiffs or the firm about the filing issues or the order to show cause, Doc. 75 ¶ 12, even though the firm was ordered to respond to and participate in the show cause proceedings, Doc. 51 at 12. Mr. Burrill allegedly asked for periodic updates on the case, but Mr. Watkins never disclosed the filing issues. Doc. 75 ¶ 13; *see* Doc. 75-2 at 13.

### 1. Allegations About Mr. Watkins's Similar Misconduct in State Court

The day before this court's June 18, 2025, show cause hearing, "Mr. Watkins informed [Mr. Burrill] that he had a court appearance for a hearing on a Motion to Dismiss in Jefferson County." Doc. 75-3 at 10. In fact, Mr. Watkins did have a hearing on a motion to dismiss in Jefferson County at 9:30 AM on June 18, 2025. *See Tidwell*, Case No. 01-cv-2025-900144.00, Doc. 53 (setting a hearing on a motion to dismiss).[5] At the hearing, opposing counsel in that case raised concerns about Mr.

---

[5] "[A] court may take notice of another court's order only for the limited purpose of recognizing the judicial act that the order represents or the subject matter of the

Watkins's use of artificial intelligence and hallucinated citations in Mr. Watkins's briefing. *See id.* at Doc. 65 (discussing the issues raised at the hearing and describing the citation errors).

In her later ruling on the motion to dismiss, Judge Shera Grant was "deeply troubled by the use of a fabricated case" in Mr. Watkins's filing. *See id.* at Doc. 72 at 2. She was also "unimpressed with [Mr. Watkins's] explanation as to the fabricated case." *Id.* at 2–3. Such behavior "left [the court] to question the character of those who would attempt to persuade and deceive the judicial system by fabricated case citations instead of authentic judicial precedents." *Id.* at 3.

The court takes judicial notice of the state court proceedings as relevant to Mr. Watkins's repeated claim that the improper filing in this case was a result of a one-off accident due to a filing mishap and not a pattern of behavior across cases that has caused concern in other courts.

### 2. Allegations About Mr. Watkins's Failure to Disclose the Situation to the Client or the Firm

Mr. Watkins's calendar listed "Follow up – Conf."—with no case details or mention of a show cause hearing—for June 18, 2025, at the same time the show

---

litigation." *United States v. Jones*, 29 F.3d 1549, 1553 (11th Cir. 1994) (cleaned up).

cause hearing in this court took place. *See* Doc. 75-2 at 20; Doc. 75 ¶ 14; Doc. 51 at 12. After the show cause hearing, he informed Burrill Watkins that the hearing was one to show cause, but he allegedly represented to his law partners "that it was a simple misunderstanding based on a filing error and erroneous dates resulting from the use of generative artificial intelligence." Doc. 75 ¶ 16. Burrill Watkins maintains that even after the hearing, Mr. Watkins made no mention that the firm had been ordered to participate in the proceedings. *Id.* After Mr. Burrill received the case file, Mr. Burrill commented on June 22, 2025, that the case file was "completely disorganized" and "is not how a case file of this size and importance should look." *See* Doc. 75-1 at 4.

Dulce Rivera, daughter of Mr. Rivera and CEO of Mi Pueblo Supermarkets, represented that on June 24, 2025, Mr. Burrill called her and informed her "that there were some issues involving artificial intelligence (AI) in [her] case and that Joshua Watkins may by sanctioned by the Court for it." Doc. 75-3 at 3. Mr. Burrill allegedly instructed Mr. Watkins to call Ms. Rivera to discuss the issues, and if Mr. Watkins did not do so, Ms. Rivera was to let Mr. Burrill know. *Id.*

The next day, Mr. Watkins called and emailed Ms. Rivera to inform her "that there were some issues involving artificial intelligence (AI) in [her] case." *Id.* at 4. Ms. Rivera called Mr. Burrill and "informed him that Joshua Watkins did call [her],

but he was vague and did not explain nearly as in-depth as Joshua Burrill had the previous day." *Id.* Based on Mr. Watkins's representations to Ms. Rivera, she understood "that the use of AI had occurred that resulted in a minor technical issues involving wrong dates and mechanical errors." *Id.*; *see also* Doc. 75-1 at 6.

On June 30, 2025, Mr. Burrill emailed Mr. Watkins, requesting several deliverables from Mr. Watkins, including "[a] clear status update" and a folder with "[r]ecent communications," "complaints from opposing counsel," and "[t]he original *For Cause Hearing* filing." Doc. 75-1 at 8. On July 6, 2025, Mr. Watkins emailed Mr. Burrill several documents. *Id.* at 11.

According to Burrill Watkins, the firm was not made fully aware of the circumstances until July 10, 2025, at which time Mr. Wexler provided notice of the pending motions for sanctions and attorney's fees. Doc. 75 ¶ 1; *see* Doc. 75-1 at 12–13. According to Ms. Rivera, two days later Mr. Burrill called her and "disclosed to [her] the full extent of the issues in [her] case." Doc. 75-3 at 4. Ms. Rivera asserted that prior to Mr. Burrill's July 12, 2025, phone call, she "was not aware of the full scope of these legal issues, and [she] had not been told that pleadings with fake citations had been filed on [her] behalf or that any court proceedings, including a show cause hearing or sanctions, were underway or being contemplated." *Id.* The day after Mr. Burrill's phone call, Ms. Rivera emailed Mr. Burrill, indicating distrust

of Mr. Watkins and asking Mr. Burrill, instead of Mr. Watkins, to represent the plaintiffs in this case. *See id.*; Doc. 75-1 at 19. According to Ms. Rivera, "[t]his directive was issued in response to being informed of new developments in [their] case for which Joshua Watkins . . . had never informed [her] or [her] father." Doc. 75-3 at 4.

Shortly after, Ms. Rivera instructed Burrill Watkins "to take immediate action to remove Josh Watkins as counsel of record" and "to prepare and deliver a cease-and-desist letter to Joshua Watkins," instructing him to discontinue any efforts to contact the Riveras. *Id.* at 4–5; *see* Doc. 75-1 at 20–21. Mr. Burrill contends that he attempted to contact Mr. Watkins to discuss the situation, but Mr. Watkins was unresponsive. *See* Doc. 75 ¶ 20; Doc. 75-1 at 14 ("As you know, I have tried to call you and text you several times."), 16 ("We've tried to contact you on this. If we don't hear from you by noon, we will reach out to them."), 17 ("I want to help you, but we have to talk. Do you plan on talking to me today? . . . This is the last time I will bother you. But I can't force you to talk to me."); Doc. 75-2 at 15–18 (texting Mr. Watkins repeatedly over the course of two days but receiving no response); *but see* Doc. 75-1 at 18 (responding to Mr. Burrill's email and indicating that Mr. Watkins "planned to work on" the *Rivera* matter that day).

43

### L. Mr. Watkins's Removal from Burrill Watkins

On July 14, 2025, Mr. Watkins was removed from Burrill Watkins. *See* Doc. 75-2 at 1–8.

Burrill Watkins contends that it "has taken decisive action and continues to take determinative steps to address and correct the issues at hand." Doc. 75 at 1–2. According to Burrill Watkins, "prior to this incident, it was the Firm's policy that generative AI tools were to be used solely in a responsible manner and strictly for utility purposes." *Id.* at 7. And "any substantive assertions derived from such tools were required to be independently verified for accuracy, and no document or content generated entirely by AI was ever to be submitted to any Court." *Id.* "Additionally, it has never been, nor would it ever be, the policy of the Firm to withhold any information in a case from the client." *Id.* at 7–8. "The Firm is firmly committed to developing long term corrective action into its practices." *Id.* at 8.

Burrill Watkins also claimed that Mr. Watkins has "full and sole access to the Firm's domain," which inhibits "the Firm's ability to ensure secure, reliable, and uninterrupted email communication." *Id.* ¶ 23. Accordingly, Burrill Watkins asked the court to grant "remedies to secure the Firm's domain." *Id.* at 8.

### M. Mr. Watkins's Response to the Second Order to Show Cause

Mr. Watkins filed a response to the court's second order to show cause. Doc.

44

83. Mr. Watkins claimed that "[a]t no point did [he] conceal information from his clients or his firm." *Id.* at 1. He maintained "that both the firm and the client were consistently informed of the status of the *Rivera* matter." *Id.* at 2. According to Mr. Watkins, "[t]he assertion that the Firm first became aware of the situation through a third party on July 10, 2025 is directly contradicted by available documentation." *Id.* at 3. Mr. Watkins said that "[a]dditional documentation likely could" further support his claim, but his "response is limited by the law firm's decision to lock him out of access to emails and electronic files." *Id.*

Mr. Watkins assured the court that "neither the Firm nor the client was ever left uninformed." *Id.* at 7. Mr. Watkins alleged that this is proven by several things.

*First*, Sarah Woodward, Burrill Watkins's office administrator, "was an additional notice party" in the court's CM/ECF system "and routinely downloaded and archived pleadings into the Firm's shared drive in court document order." *Id.* at 3. Along with Ms. Woodward's notices from CM/ECF, "the Firm had access to the full case record, including notes, research, and filed pleadings." *Id.* at 4. Further, on June 18, 2025, Mr. Burrill requested the case file, *id.*, which Mr. Watkins made available for Mr. Burrill's review, *see* Doc. 83-3 at 2.

*Second*, contrary to Mr. Burrill's contention that he was only passively and intermittently involved in the case, Mr. Watkins contended that "Josh Burrill himself

45

was actively directing the case." Doc. 83 at 4. Mr. Watkins alleged that Mr. Burrill was "substantially directing the matter, including coordination with [Mr.] Wexler, conferencing with opposing counsel, discussing strategy, and was fully aware of the case matters during the times at issue." *Id.* at 12. The unredacted version of Mr. Watkins's Exhibit C reflects emails about the representation agreement between the Riveras and Mr. Burrill, in which Mr. Burrill told the Riveras that he would provide legal services for the litigation involving Triad Properties. *See* Doc. 83-4 at 3. The emails about the agreement also show an ongoing retainer (unrelated to the present litigation) in which Mr. Burrill agreed to assist and advise the Riveras in all aspects of their business. *See id.* Mr. Watkins's Exhibit C also reflects various emails and text messages between Mr. Watkins and Mr. Burrill regarding litigation strategy in the early stages of this lawsuit. *See id.* at 7–10. According to Mr. Watkins, this involvement was not limited to the early stages of litigation, as Mr. Burrill "was always the primary client point of contact." Doc. 83 at 4. The unredacted version of Mr. Watkins's Exhibit E reflects instances in which Mr. Burrill discussed meetings with the Riveras and exchanged emails with Mr. Wexler about case strategy as late as May 5, 2025. *See* Doc. 83-6. In late April 2025, Mr. Burrill instructed Mr. Watkins to meet with Mr. Wexler. Doc. 83 at 5; *see* Doc. 83-8 at 2. On May 20, 2025, Mr. Burrill directed Mr. Watkins and Mr. Wexler to respond to opposing counsel in the

*Rivera* matter. *See* Doc. 83-8 at 3. And on May 23, 2025, Mr. Burrill demanded to know Mr. Watkins's plan for the *Rivera* matter. *See* Doc. 83-10 at 2. According to Mr. Watkins, "[t]hese communications confirm that [Mr.] Burrill was not simply aware of the status but was principally leading the case activities." Doc. 83 at 6.

*Third*, Mr. Watkins called the Riveras on June 24, 2025, to discuss the issues in the case, and he allegedly followed up with an email on the next day. *Id.*; *see* Doc. 83-11; *but see* Doc. 75-3 at 4 (testifying that Mr. Watkins called and emailed Ms. Rivera on the same day, June 25, 2025).

According to Mr. Watkins, "the contemporaneous ECF notifications, the Firm's ongoing access to and regular archiving of pleadings, Mr. Burrill's own documented active participation in the matter, and the June 24–25 disclosure to the client establish that neither the Firm nor the client was ever left uninformed." Doc. 83 at 6–7. In Mr. Watkins's view, these things make "the Firm's position that it first learned of these issues on July 10, 2025 . . . implausible." *Id.* at 12.

### 1. Allegations About Personal Strain

Mr. Watkins also attempted to defend himself by claiming that he acted not with any intent to conceal information but "under extraordinary personal and professional strain." *Id.* at 7. Mr. Watkins explained that he "experienced a significant series of family tragedies," including the deaths of several people with

whom he was close. *Id.* He then explained that he "developed a severe lung infection" that turned into pneumonia and ultimately hospitalized him. *Id.* After discharge from the hospital, Mr. Watkins's "physicians directed him to maintain a restricted schedule," but "Mr. Burrill's expectations required him to resume a substantial workload almost immediately and made it difficult to comply with the physician's directions." *Id.* at 8.

### 2. Allegations About Burrill Watkins's Internal Systems

Along with the personal strain, Mr. Watkins alleged that the firm structure and culture at Burrill Watkins created an "untenable[] work schedule." *Id.* at 9. Mr. Watkins alleged that the staffing was inadequate despite "repeated indications that additional litigation support was needed." *See id.* at 8. This poor staffing "left Mr. Watkins as the only actively admitted federal court counsel and particularly during the critical period of April–May 2025, while he was actively engaged in recovering from pneumonia and trying to manage other, significant firm obligations and duties." *Id.* at 9. Mr. Watkins described "excessive work demands," and explained that "[a]ttorneys were expected to work six days a week, to begin work by 5:00 a.m., while also often working until late at night or sleeping in the office." *Id.* at 8–9; *see* Doc. 83-16 at 2. Mr. Watkins referred to "intense long-term strain . . . evident in many communications from [Mr.] Burrill," Doc. 83 at 10, in which Mr. Burrill

criticized Mr. Watkins and accused him of being a saboteur just after Mr. Burrill requested that Mr. Watkins "build [Mr. Burrill] a strategic plan" and "[b]uild [him] a law firm," *see* Doc. 83-18 at 5.

Taken together, according to Mr. Watkins, "[t]he record demonstrates good faith efforts by Mr. Watkins to correct the filing error, candor to both the Court and the client, and circumstances of significant medical and personal hardship that negate any inference of intentional misconduct." Doc. 83 at 16.

### N. Second Show Cause Hearing

The court held another show cause hearing on August 7, 2025. Doc. 85. After the hearing began at the scheduled time and counsel made appearances, the court waited for Mr. Watkins to arrive. *See* Doc. 87 at 5. When he arrived late and empty-handed, Mr. Watkins explained that he did not have any documents with him because he "literally ran." *Id.* at 6. The court explained that its "principle focus is on what the communications to the client were and when those occurred and who made them and whether the client was appropriately kept advised of the status of their case." *Id.*

The court asked Mr. Watkins about his June 24, 2025, phone call with the Riveras and whether it was done by his own accord or at the direction of Mr. Burrill after Mr. Burrill told the Riveras that a call would be coming. *Id.* at 7–8. Mr. Watkins replied:

> I was unaware of that earlier phone call. When I saw it in the filing that was the first time I was aware of that conversation, but Mr. Burrill and I had had -- spoken about it. And we had talked to Dulce specifically prior to that that there were some filing issues and we had a hearing coming up. But, I mean, as you may remember, initially in that first hearing, you know, I was under the impression that we were focused on not correcting it correctly and, you know, why the prior filing was still on the record. We clearly were more focused on AI, and so that's why we really needed to have that conversation after the hearing to explain that this is not just a filing issue, there's an issue with AI. There's more issues at stake, and so that was a more expansive conversation than we had beforehand to really be able to cover, you know.

*Id.* at 8. The court asked, "So are you saying that you also spoke with the client about these matters before the hearing on the first order to show cause?" *Id.* at 9. Mr. Watkins assured the court, "Oh, yeah. Yeah." *Id.* But when the court asked, "Where in any document that I have is there reference to that conversation?," Mr. Watkins replied, "I don't know that there is, other than it occurred." *Id.* The court asked whether "any other lawyer in the room [was] aware of a reference to a prehearing conversation in any other file[d] document," and no lawyer in the room indicated that they were aware of such reference. *See id.*

Mr. Watkins then pointed to "regular weekly phone calls" that were had with the client so "there was a conversation about what was going on . . . every week." *Id.* When the court made clear that it was asking for proof on the record that the

clients were apprised of the risk associated with Mr. Watkins's mistakes, Mr. Watkins re-emphasized, "They knew there was a hearing. They were under the impression that it was something that we were handling and that -- you know, going to be able to address." *Id.* at 10. The court asked if the clients understood the risk to the client associated with the hearing, and Mr. Watkins said:

> Other than it was -- I mean, we told them opposing counsel had opposed. I mean, they knew it was a motion to dismiss and that this had gotten more complicated. So, I mean, they asked -- or Dulce asked if, you know, what that meant for the case. And, you know, I said -- I told her what we thought, that it was not helpful but it was something that we felt like we could address and hopefully would be able to, you know, to move past. But it was going to, you know, create a delay. I mean, that was my impression at the time.

*Id.* at 10–11. But Mr. Watkins admitted that he did not provide the clients a copy of the show cause order. *Id.* at 11.

The court pointed to the sworn statement of Ms. Rivera, explaining a glaring discrepancy between her statement and Mr. Watkins's new and unsupported narrative:

> So the declaration purports to tell me that on June 24th there was a phone call from Mr. Burrill and on June 25th there was a telephone call and an email from you about those matters, and the declaration leads the reader to the conclusion that those were the first correspondences from the firm. It doesn't mention any before that. And so is it your position that the declaration of Dulce Rivera is

51

> materially omissive as to what the Riveras knew about the
> first show cause hearing and when they knew it?

*Id.* at 11–12. Mr. Watkins responded, "Yes. They were aware that -- that we had a

hearing." *Id.* at 12.

When asked if he could point to any evidence that supports his version of

events, Mr. Watkins said that he is "very limited in the documents that [he] ha[s]

access to." *Id.* The court responded:

> Well, I guess, you can understand how I'm struck by what
> would be a critically important piece of information being
> completely without support in a record that actually
> contains a lot of information, some of which is not all that
> relevant to what we're here to talk about and that not only
> is that information not included in the record but that I
> have now got an allegation that the client's declaration is
> materially omissive with no evidentiary basis.

*Id.* at 12–13; *see also id.* at 34 ("I'm trying to figure out whether at the moment that

their case was in peril they knew it, and the only evidence I have in the record is that

they didn't."). Mr. Watkins again attempted to claim that evidence of weekly

meetings in which "presumably . . . their matters were discussed" was sufficient

evidence to show that he kept his client appropriately apprised. *See id.* at 13.

After reviewing the relevant dates with counsel, the court stated:

> Okay. So just so I'm clear about your position, it's that you
> reviewed the Dulce Rivera declaration, several days later
> submitted your own declaration, and in your declaration

52

did not allege that the Dulce Rivera declaration was materially omissive, and I am just now hearing about that today?

*Id.* at 13–14; *see also id.* at 34 ("There is no reference in her declaration or in yours to a phone call that occurred before the first show cause hearing."). Mr. Watkins responded, "Yes, Your Honor" and then claimed that he "felt like [they] had addressed that" by alleging "that there were regular communications ongoing." *Id.* at 14. When asked to tell the court what Mr. Watkins allegedly said to Ms. Rivera in June 2025, he alleged that he informed Ms. Rivera of the true status of the case, including that the situation might "negatively impact [her] case":

> Well, you know, I started out by saying, you know, Dulce, I have to tell you, you know, I have made some mistakes in this that, you know, appear to be bigger than I thought they were and you need to know about them because they can affect your case. And I -- you know, I'm sorry for that but, you know, it's -- I want you to know about it.
>
> And Dulce's a really -- she's really sweet and so she made some, you know, placating comments.
>
> And I said, well, you know, just to be clear -- and I went through my bullet points and said, you know -- I basically told her, I think, the same essential thing that I told you in the hearing, that I was trying to file the original filing, was going through my last check and had overwritten my final draft. I still had the deadline staring at me and so at first I thought it was a -- that I had chosen the wrong file and, you know, file again. And it clearly wasn't because it was that same overwritten file. I realized at that point that I still

53

hadn't made a substantive response and so -- and then I didn't have my final draft anymore so I went back through my earlier versions and, you know, attempted to find one that I thought was, you know, maybe not my final draft but that was a good approximation thereof and was -- would be sufficient and ran through it, but I obviously had gone through it too quickly, didn't realize that it had, you know, at least one entire section that was not edited and reviewed. I filed it, and then, you know, got up in the middle of the night essentially realizing that was just so chaotic and it wasn't, you know, it didn't feel good. And so I went through it more specifically and realized that it had all of these errors in here and prior stuff in AI and so that's, you know, an issue that the Court is really -- so then -- and I told her, I said it's a big issue with courts right now, you know, and it's -- unfortunately I wander right into it. You know, and so it's a big deal. But I did submit a second one that I felt like had corrected all of that, unfortunately, you know, I had a citation that I didn't correct Utah. It should have been Florida, and it still said Utah. And then I had a quotation that was an improper quotation. It should have been like two words and, you know, it had like six words quoted and then another -- a case that was a real case but it just didn't apply. I said, you know, unfortunately those were still in there, and I didn't catch them because I was going too fast. And, you know, I said, you know, right now we've got motions for sanctions and fees that -- that I may be looking at and hope it doesn't negatively impact your case, but, you know, we are going to try to address it as best we can, you know, and, you know, I'll have to accept responsibility and I'm hopeful that the Court will not have that negatively impact, you know, your case and although, you know, I may not come out as well.

And she, you know, was sweet. I mean, she just said, well, I know you've had a lot going on and, you know, I appreciate all of the -- I mean, she said nice things, and we

54

> hung up. I mean, it really wasn't a whole lot more than
> that.

*Id.* at 14–17.

The court asked if Mr. Watkins had any knowledge or understanding about why Ms. Rivera later asked for his removal from the case. *Id.* at 17. He replied:

> I don't. My last conversation or communication with Dulce was really, you know, kind and sweet. Now, I had said in my email that I expected that Josh and maybe Hannah -- at that time she had been hired -- would probably be more involved in the case and that I would be taking a secondary position. So, I mean, she was aware that we were likely shuffling counsel at that point anyway.

*Id.*

The court emphasized that his narrative was "fundamentally different from her asking that [he] have no involvement with [the case]," and Mr. Watkins agreed. *Id.* But Mr. Watkins claimed that he is "completely in the dark as to why that request was made." *See id.* The court later asked Mr. Watkins if he had "any explanation why if Dulce Rivera knew the peril that their case was in before the first show cause hearing that she waited so late to insist that [Mr. Watkins] not be her lawyer." *Id.* at 34–35. Mr. Watkins said:

> Your Honor, I can't answer how or why she changed her mind about what she was doing. You know, what I can say is that the communications that I had with her were very clear, and she was not -- she was very understanding and,

> you know, interested in maintaining a relationship and, you know, did not express anything, you know, to that effect in my communications with her. And they were very, very clear.

*Id.* at 35.

The court asked Mr. Burrill if he had "heard before today that there was any conversation between Mr. Watkins and Dulce Rivera in advance of the hearing on the first order to show cause about that order and the hearing." *Id.* at 18. He had not. *Id.* After describing the "conclusive investigation into when the Riveras could have known" and "whether any other party at the firm was aware so that they could've known," Mr. Burrill told the court that "there's no indication that the Riveras knew about the show cause hearing on the 18th or any of the other events prior to June 24th and 25th conversations." *Id.* at 18–19. Mr. Burrill assured the court that the firm made its "best attempts" to find any emails to the Riveras advising them of the order, the hearing, or the commensurate risk to their case. *See id.* at 19.

In response to Mr. Watkins's allegations that he had been "very, very clear" with Ms. Rivera in his communications, Mr. Burrill stated:

> [W]e did have standing calls on a bi-weekly basis with the Riveras. Sometimes they happened. Sometimes I was there. Many times Mr. Watkins wasn't there, and nowhere in our records in our review of the e-mails or information we found any reference or consideration to the show cause hearing or the use of generative AI in the context of fake

56

> citations, and so I feel it is my duty on behalf of the clients
> to say that that is just factually untrue.

*Id.* at 35.

Mr. Burrill alleged that as of June 24, 2025, he was aware that some kind of problem was unfolding in the case, but he did not have personal knowledge or understanding about the full scope of information and risk. *See id.* at 19. As of June 24, 2025, Mr. Burrill was not "even aware that there was a show cause hearing." *Id.* Further, Mr. Burrill alleged that had he known of the show cause order, Burrill Watkins would "have appeared and responded timely," with a response same in substance to the one they provided after the second order to show cause. *See id.* at 20. Finally, Mr. Burrill affirmed that he had no "awareness of any reason or incentive or purpose why Dulce Rivera might not have told the whole truth and nothing but the truth in her declaration." *See id.* at 19–20.

The Fite Defendants then addressed the court and emphasized that "[Burrill Watkins] itself appears to be taking some position that the firm should not be responsible for these actions of its partner," and the Fite Defendants disagreed with that position. *Id.* at 21. But the Fite Defendants explained that it had taken them extensive time to figure out the parties' positions because "somehow it's like [all parties] have been drug into a business divorce case," with allegations from bitter

ex-partners about stolen domain names and toxic work environments, which has "caused a lot of additional . . . fees and time" for the other parties in parsing what they must respond to. *Id.* at 22. The court emphasized that it is "not focused on . . . however well or not the firm may have been functioning as a work place." *Id.* at 24. Mr. Watkins's counsel agreed that there had been "an injection of firm politics and break up stuff into this that has really nothing to do with the [real] issues." *Id.* at 28.

Mr. Burrill contended that when the court considers whether to sanction Burrill Watkins, "there are some exceptional circumstances," namely, the firm's lack of knowledge about the true state of affairs. *Id.* at 24–25. He alleged that had it known about the citation issue "on the day it occurred," the firm would have "done something different." *Id.* at 25.

The court gave the defendants fourteen days to supplement their motions for fees and gave the parties fourteen days to meet and confer about a number of issues, including fees and a potential amendment to the complaint. *Id.* at 29–32. The court stated it would lift the stay at the end of those fourteen days and "consider pending motions as appropriate." *Id.* at 31.

### O. Supplemented Motions for Fees

On August 21, 2025, the defendants supplemented their motions for fees and reported on the results of the meet and confer. *See* Docs. 95, 96. The Fite Defendants

explained that "[c]ounsel for the Fite Defendants and Plaintiffs' counsel (including Mr. Watkins and Burrill Watkins) have been unable to come to an agreement regarding sanctions in the time provided." Doc. 95 ¶ 5. So the Fite Defendants "account[ed] for additional attorneys' fees and costs incurred due to the actions of Plaintiffs' counsel, including, but not limited to, both Mr. Watkins and Burrill Watkins." *Id.* ¶ 6. "The total amount of fees and costs incurred by the Fite Defendants related to both the First and Second Show Cause Orders and Hearings is at least $35,603.90, from May 7, 2025 through August 12, 2025." *Id.* ¶ 7. "These legal fees are specifically limited only to time entries relating to issues that are the subject of the Court's Show Cause Orders . . . and related filings, and the subject of the hearings . . . ." Doc. 95-1 ¶ 4. The Fite Defendants renewed their request for sanctions against Mr. Watkins and Burrill Watkins, including those attorney's fees and costs. *See* Doc. 95 ¶ 8.

The Triad Defendants represented that they have "incurred a total of $18,453.00 in attorney fees . . . relating to the underlying issue of Mr. Watkins's AI usage and filing errors." Doc. 96 ¶ 10. However, the "Triad Defendants and Mr. Watkins have reached a resolution as to the attorney's fees requested in the Motion for Sanctions." *Id.* ¶ 12. "Mr. Watkins has agreed to pay $2,000.00 to the clerk of the Court." *Id.* And "Mr. Watkins has agreed to pay $7,000.00 to resolve the

attorney's fees requested in Triad's Motion for Sanctions." *Id.* ¶ 13. So the Triad Defendants withdrew their motion for sanctions as to Mr. Watkins. *Id.* ¶ 14.

But the "Triad Defendants are still pursuing their Motion for Sanctions against Burrill Watkins" because "Burrill Watkins has made Triad Defendants aware it is taking the position it should not be associated with any of the disciplinary proceedings in this case." *Id.* ¶¶ 16–17. And the Triad Defendants "strongly disagree" with "Burrill Watkins's representations that they have made multiple good faith attempts to engage with defense counsel on this Motion." *Id.* ¶ 15. So the Triad Defendants moved the court to order "Burrill Watkins to pay [the] Triad Defendants' remaining attorney's fees, in the amount of $11,453.00." *Id.* at 4.

Burrill Watkins filed a response to the motion for sanctions, alleging that it should not be held jointly responsible for Mr. Watkins's actions because Mr. Watkins's "concealment of the submission of hallucinatory cases, the Show Cause Hearing on June 18, 2025, and the Defendants' Motions for Sanctions constitutes 'extraordinary circumstances' under the Federal Rule of Civil [Procedure] 11(c)(1)." Doc. 86 ¶ 1. Burrill Watkins also objected to the Triad Defendants' agreement with Mr. Watkins regarding the sanctions because the agreement was reached "without involving Plaintiffs' counsel, even though the outcome directly affects [the] firm." Doc. 94 at 1.

60

### P. Mr. Watkins's Supplemental Declaration

The court granted Mr. Watkins leave to file a supplemental declaration, addressing the issues discussed at the second show cause hearing. *See* Docs. 88, 91. In that supplemental declaration, Mr. Watkins's version of events sharply diverged from the record. According to Mr. Watkins, Mr. Burrill "maintained the primary communications with the clients, [so] it was [Mr. Watkins's] understanding that relevant case information was communicated to the clients during their regularly scheduled and other communications." Doc. 92 ¶ 3. "[A]ll communications from the clients when [Mr. Watkins] spoke to them directly indicated that presumption was correct." *Id.*

Mr. Watkins asserted that after the May 2, 2025, filing incident, he "discussed this original problem within the office during regular communications about the Riveras' legal matters, including with Mr. Burrill." *See id.* ¶ 5. Mr. Watkins "maintained [his] belief that the principal matter at issue was a correction process issue" because the defendants' responses "treated these case issues as a footnote item in the pleading" and responded substantively. *Id.* ¶¶ 7–8.

Mr. Watkins asserted in his supplemental declaration that on "May 22-23, 2025, Mr. Burrill inquired . . . about the plan [Mr. Watkins] proposed for moving the Rivera case forward and acknowledged some of the struggles and frustrations

[Mr. Watkins] had been communicating." *Id.* ¶ 9. These frustrations were "with counsel for Triad appearing to take issue with what [Mr. Watkins] believed to be an obsolete filing that had been replaced." *Id.* ¶ 10; *see also* Doc. 62 ¶ 4 (lamenting the need to correct the record "given the continued references to Document 42 by both the Court and opposing counsel" despite their access to his emailed version). According to Mr. Watkins, the defendants' joint filing, which raised concerns about potential AI use, "further reinforced [Mr. Watkins's] impression of the matter being a 'correction process' related issue." Doc. 92 ¶ 12. Mr. Watkins allegedly "discussed this additional joint filing" with Mr. Burrill, "but with the understanding that it was representative of opposing counsel coordinating and attempting to exploit issues with my attempted filing correction." *Id.* ¶ 13. Mr. Watkins attempted to minimize the defendants' concerns by blaming the defendants for focusing on "the erroneous May 2 pleading that [he] had previously attempted to replace." *See id.* ¶ 12. Mr. Watkins then communicated with Mr. Wexler from June 3 to June 18, 2025, but their "focus at the time was determining the proper way to correct the record." *Id.* ¶ 14.

Mr. Watkins also asserted in his supplemental declaration that on June 17, 2025, he "had a meeting with the Riveras to sign documents unrelated to this case." *Id.* ¶ 15; *see id.* at 7 (messaging Ms. Rivera to schedule a time "for the estate planning meeting with [her] parents"). Mr. Watkins claimed that at this June 17,

2025, meeting, he "discussed the status of the case and the upcoming hearing with the Riveras." *Id.* ¶ 15. During this "long meeting," several topics were discussed, including the upcoming hearing. *Id.* ¶ 16. Mr. Watkins allegedly addressed the issues based on his "presumption at the time . . . that the case would likely proceed typically following clarification of the filing errors and issues and [he] told the Riveras that what was [he] expected and hoped [they] could get back to the main case shortly." *Id.* Mr. Watkins admitted his "naïve belief" that the hearing "would be on the improper filing issues," and he "did not fully appreciate the gravity of the situation, [so he] did not communicate to the Riveras that they or their case were in peril of being sanctioned." *Id.* ¶ 17.

According to Mr. Watkins, during the show cause hearing, he came to understand that the issues involved more than his improper filing, so he "had extensive discussions at the firm with Mr. Burrill." *Id.* ¶¶ 18–19. After his discussion with Mr. Burrill, Mr. Watkins decided to "email opposing counsel and offer to pay an agreed-upon cost associated with the delay." *Id.* ¶ 20. Mr. Watkins then had a follow-up "explanatory" call with the Riveras. *Id.* Mr. Watkins maintained that his failure to properly advise his clients about their risk was due to his "improper perception of the nature and gravity" of the situation, and as soon as the full gravity became apparent to him, he allegedly "made additional efforts to fully disclose the

63

situation and possible consequences to the clients." *Id.* ¶ 21.

### Q. Plaintiffs' Supplemental Notice

Several months later—as briefing on the pending motions continued and a motion to amend the complaint was filed, Doc. 97—the plaintiffs moved for leave to provide a "Supplemental Notice," Doc. 106. The court granted leave. Doc. 107.

### 1. Ms. Rivera's Declaration

To the supplemental notice the plaintiffs attached a second declaration by Dulce Rivera, which directly contradicted everything that Mr. Watkins had represented to the court about his communications with the plaintiffs. *See* Doc. 108-1 at 2–5. Ms. Rivera stated that at the meeting on June 17, 2025, "[n]o litigation pleadings, motions, or court orders were presented or discussed." *Id.* at 2–3. Unlike Mr. Watkins's claim that the meeting was "long," Doc. 92 ¶ 16, Ms. Rivera explained that "[t]he meeting was relatively short," Doc. 108-1 at 3. After the Riveras signed the estate planning documents, Mr. Watkins then discussed his "involvement in the Tequila business," which "took up the majority of the rest of the meeting." *Id.*

According to Ms. Rivera, the "only reference" to the present case was Mr. Rivera's "brief[]" question to Mr. Watkins about how the case was going. *Id.* "Mr. Watkins replied that everything was fine and that there was an upcoming hearing but

he did not explain the nature or subject matter for the hearing but said that he expected settlement negotiations were likely to begin after the hearing." *Id.* According to Ms. Rivera, Mr. Watkins made no mention of sanctions, artificial intelligence, filing errors, or any improper communications with the court. *Id.*

Ms. Rivera maintained that "the first time that [she] was made aware that there were any issues with [this] case" was on June 24, 2025, in a phone call with Mr. Burrill. *Id.* Ms. Rivera again acknowledged the June 25, 2025, phone call from Mr. Watkins "about the sanctions," but according to Ms. Rivera, he "said it was related to a minor technical issue involving a wrong date and did not say anything abut his use of a non-existent case citation that was generated by AI." *Id.* Ms. Rivera stated, "Unequivocally, prior to June 18, 2025, Mr. Watkins never shared or communicated to [her] in any way, the facts and circumstances that resulted in the stay in proceedings . . . , the Show Cause Order . . . , and the subsequent . . . Show Cause Hearing and that the Defendants requested Mr. Watkins be sanctioned." *Id.* Ms. Rivera claimed that "[h]ad [she] known about the full extent of the misconduct issues and the surrounding facts and circumstances" earlier, "[she] would have taken immediate steps to terminate Mr. Watkins's representation and retain qualified counsel to protect [her] interests." *Id.* at 4.

### 2. Forensic Examination of Mr. Watkins's ChatGPT Account

According to the plaintiffs in their supplemental notice, they had "newly discovered information" that supported their version of the events. Doc. 108 at 1–2. The newly discovered information came from a forensic examination of the firm's software. *See id.* at 4. After the August 2025, hearing, Burrill Watkins hired Seamus Burke, a forensic analyst, to analyze Mr. Watkins's ChatGPT history. *Id.*

According to the plaintiffs, Burrill Watkins "has maintained a Business-level ChatGPT workspace since early 2024." *Id.* "The Burrill Watkins ChatGPT workspace is registered under the ChatGPT Business Plan." Doc. 108-1 at 8. Mr. Watkins held "a member-level account" but had no rights as an "admin" or "owner," such as the right to "modify workspace-level settings." *Id.* Burrill Watkins's "workspace retention policy" is "infinite," meaning that ChatGPT does not automatically delete chats. *Id.* According to Mr. Burke, under this "infinite" retention policy, no one can modify or delete a chat except for the person who created it. *See id.*

When Mr. Burke reviewed Mr. Watkins's account, only one chat remained, titled "Settlement Agreement Terms." *Id.* at 9. The contents of the remaining chat did not correspond to any of the problematic citations that Mr. Watkins included in his filings. *Id.* And "[n]one of the conversations that should correspond to the

66

production of the documents filed in court containing ChatGPT generated information exist in the account." *Id.* at 10.

Contrary to this sparse history, Mr. Burke found evidence of "active and personalized prior use of ChatGPT" because Mr. Watkins's account bore a "custom instruction stating: 'Don't use emojis or icons; make communications human sounding; check any case law against Justia . . . for validation before using and provide case link for any citation.'" *Id.* at 9. Mr. Burke concluded that "[t]he pattern of one surviving chat, absence of memories, and absence of images reflects systematic deletion rather than non-use or accidental erasure." *Id.* Mr. Burke confirmed that the lack of history "cannot be attributed to the removal of the Watkins account from the workspace." *Id.* In Mr. Burke's professional opinion, "the absence of chat history in the Josh Watkins account is . . . forensically consistent with user-initiated manual deletion." *Id.* at 11.

### 3. Mr. Watkins's Email to Insurance Carrier

The plaintiffs also included in their supplemental notice a heavily redacted version of an August 5, 2025, email from Attorneys Insurance Mutual of the South to Mr. Watkins. *See id.* at 15–20. The plaintiffs claimed that this email—whose substance is entirely redacted—proves that Mr. Watkins "eventually notified his malpractice carrier, [but] that notice was made only after he was removed from

Burrill Watkins LLC and terminated as the Plaintiffs' attorney." Doc. 108 at 6. The plaintiffs claimed that "[t]he [substantively redacted] malpractice notice therefore underscores that even after his removal, [Mr. Watkins] still did not provide Plaintiffs with the information necessary to understand and correct the situation." *Id.* at 7.

According to the plaintiffs, these findings, when paired with Mr. Watkins's conduct throughout the case, "reflect[] a consistent pattern" of problematic behavior. *Id.* These findings further "demonstrate[] even more clearly that [the plaintiffs] did not and could not have known" of Mr. Watkins's misconduct throughout the litigation. *Id.* at 8. Mr. Watkins's "unilateral actions concealed the truth, destroyed the underlying materials that would have revealed what occurred, and left Plaintiffs without the ability to understand, evaluate, or correct the filings submitted in their names." *Id.*

### R. Mr. Watkins's Response to the Supplemental Notice

Mr. Watkins asked the court for leave to respond to the supplemental notice, claiming that the notice "appears to be nothing more than a tardy, retaliatory character attack that adds no substance to the matters under submission in this Court." Doc. 110 at 1–2. The court granted Mr. Watkins leave to respond. Doc. 111.

Mr. Watkins initially clarified that "the true conflict here is between Watkins and his law partner Josh Burrill . . . , not the Plaintiffs themselves," though the

68

supplemental notice was filed on behalf of the plaintiffs. Doc. 114 ¶ 1 n.1. Mr. Watkins then argued that the supplemental notice provided nothing substantive to the court's sanctions decision. *Id.* ¶ 2. Rather, he said, "[t]he most recent filing is a transparent attempt to poison this Court against [Mr.] Watkins in the cynical hope that it will result in the imposition of more serious sanctions." *Id.* Further, he asserted that the "unfounded and scandalous attacks on [Mr.] Watkins'[s] honesty and integrity" are "intended merely to damage [Mr.] Watkins so that [Mr.] Burrill can gain a perceived advantage in other litigation currently pending in the Circuit Court of Shelby County, Alabama, in which [Mr.] Watkins sued [Mr.] Burrill and the law firm for dissolution of the firm and fraud." *Id.* (citing *Joshua M. Watkins v. Burrill Watkins LLC, et al.*, Case No. 58-CV-2025-901004.00). According to Mr. Watkins, Mr. Burrill has steadfastly refused to substantively participate in the state court dissolution case, arguing instead "that the present sanctions matter would somehow be dispositive of [the] law firm breakup," so the state court case should be stayed. *Id.* ¶ 4.

Mr. Watkins assured the court that it "need not wade into the Firm Dissolution Case because the allegations of the Supplemental Notice are false and incorrect." *Id.* ¶ 6. He also assured the court that he "did not delete the ChatGPT records as alleged." *Id.* "[He] . . . never intentionally deleted, removed, altered, or modified any

information, conversations, data, or other content from the [Firm's] ChatGPT account . . . for the purpose of hiding or concealing [his] use of the Firm's ChatGPT account for the mistaken filing . . . ." Doc. 114-2 ¶ 2.

Mr. Watkins further represented that since he was terminated from Burrill Watkins, he "ha[s] not accessed the Firm's ChatGPT account in any manner." *Id.* ¶ 3. "[Mr.] Burke did not give any opinion as to" when it was deleted or who deleted the history—whether Mr. Watkins or someone else at the firm. Doc. 114 ¶ 7. And Mr. Watkins said that because Burrill Watkins locked him out of the firm system, he cannot "conduct a review of the relevant information, retain an expert of his own to examine the data, or even confirm that the ChatGPT records for his account have in fact deleted." *Id.* ¶ 8. He has been unable to determine whether someone else at Burrill Watkins accessed his account or deleted history after he was locked out. *Id.*

Regardless, Mr. Watkins maintained that the supplemental notice is not relevant to the court's sanctions determination because "[Mr.] Watkins has been clear and consistent that the erroneous citations included in the filing at issue were generated by ChatGPT and that he alone inadvertently filed an outdated draft containing these 'hallucinated' pleadings." *Id.* ¶ 9.

Mr. Watkins also asserted that "[his] responsibility for the filing in question has never been at issue as [he] has never tried to place blame for the filing at issue

70

on . . . anyone other than himself." *Id.* ¶ 2. Mr. Watkins concluded that Mr. Burrill's supplemental notice is just part of his "ongoing efforts to unnecessarily and improperly exacerbate and weaponize this sanction proceeding against [Mr.] Watkins, presumably in an effort to obtain perceived leverage in the Firm Dissolution Case." *Id.* ¶ 10.

Such attempts are improper for several reasons, according to Mr. Watkins, including that "[Mr.] Burrill and the Firm were fully aware of—and expressly endorsed and directed—[Mr.] Watkins'[s] use of ChatGPT." *Id.* ¶ 11. "[Mr.] Burrill himself routinely used, approved, and directed the use of ChatGPT for drafting, research, and internal work-product acceleration." Doc. 114-2 ¶ 5. "[Mr.] Burrill also personally instructed staff to ensure that prospective hires were set up with ChatGPT accounts for work usage." *Id.* Mr. Watkins purported to attach "a true and correct copy of the March 2025 message from [Mr.] Burrill . . . , in which [Mr.] Burrill expressly instructed that ChatGPT access be set up as part of the onboarding process," *id.*, but the court can find no such document in his attached exhibits.

Further, Mr. Watkins reiterated his belief that Mr. Burrill and the plaintiffs "were aware of the filing at issue and these sanction proceedings." Doc. 114 ¶ 12. For this, he cited the message exchanges from June 24 and 25, 2025, between himself, Ms. Rivera, and Mr. Burrill. *Id.* ¶¶ 12–13; *see* Doc. 114-3; Doc. 114-4. He

71

also cited Burrill Watkins's "contemporaneous service of the filing at issue through the Court's CM/ECF system" and Burrill Watkins's access to the case file in the firm's internal system. Doc. 114 ¶ 14.

Mr. Watkins filed a motion to exclude Mr. Burke from providing further expert testimony and asked the court to strike Mr. Burke's affidavit. Doc. 115. According to Mr. Watkins, Mr. Burke's testimony cannot help the court "because it is not relevant to this Court's determination of whether to sanction [Mr.] Watkins, nor do[es] [it] offer any opinion as to whether [Mr.] Watkins actually deleted the ChatGPT records." *Id.* ¶ 2. And Mr. Watkins objected to the lack of participation in discovery in the state court case. "[Mr.] Watkins has been improperly denied the opportunity to access information that he could use to refute [Mr.] Burke's affidavit and the unsupported claims that [Mr. Burrill] ha[s] now made regarding [Mr.] Watkins'[s] alleged deletion of information from ChatGPT." *Id.* ¶ 11. "Excluding [Mr.] Burke's testimony and striking his affidavit will prevent the conflict in the Firm Dissolution Case from spilling over into this proceeding and allow this Court to remain squarely focused on the issue of sanctions." *Id.* ¶ 12.

### S.  State Court Firm Dissolution Case

When he responded to the plaintiffs' supplemental notice, Mr. Watkins provided a copy of the state court amended complaint. *See* Doc. 114-1. Mr.

Watkins's amended complaint includes seven counts: judicial dissolution of the firm, appointment of a receiver, accounting, breach of contract, breach of duties, fraudulent misrepresentation, and conversion. *Id.* at 13–18. In the amended complaint, Mr. Watkins reiterated many of the work-environment issues he raised in this court. *See id.* at 8 (detailing "repeated 100+ hour work weeks, often sleeping at the office, and working 24+ hours straight at times"). He also alleged a series of misrepresentations that Mr. Burrill made about things such as his finances, his professional success and prospects, and his previous employment history. *Id.* at 3–8. According to Mr. Watkins, he was tricked by these misrepresentations into doing things like personally guaranteeing Mr. Burrill's Range Rover and the firm bank account. *See id.* at 7, 12. Mr. Watkins alleged emotional manipulation, financial misconduct, intentional misrepresentation, and exploitation, among other things. *Id.* at 12–13.

## II.   DISCUSSION

On multiple occasions, in multiple filings and hearings, and in response to multiple questions and orders, Mr. Watkins has intentionally misled the court. Rather than taking responsibility for his actions, Mr. Watkins has feigned contrition, obfuscated the truth, changed his stories when it suits him, and attempted to blame others for his own professional misconduct.

As the foregoing discussion makes clear, Mr. Watkins's misconduct includes—and extends well beyond—the misuse of artificial intelligence to make both misleading and outright fabricated statements of law. Between the protracted misconduct in this case, and the similar AI issue in a sister court, the court is gravely concerned about the consequences of Mr. Watkins's misconduct.

Mr. Watkins's misconduct did not occur in a vacuum. The court also has serious concerns about Burrill Watkins's apparent lack of internal controls and guardrails surrounding its attorneys' use of artificial intelligence—indeed, the very AI the firm pays for and encourages its attorneys to use. Though Burrill Watkins maintains that it acted swiftly to remediate Mr. Watkins's errors, which it says it had no reason to know about, the firm has not explained how it enforced any policies about responsible AI use, how it will prevent improper AI use going forward, or any other circumstance—let alone an extraordinary one—why it shouldn't be sanctioned. Indeed, although Burrill Watkins's purported lack of knowledge has to do with a partner's misuse of a relatively new technology, its core argument about its own ignorance is both old and ordinary. The court need not make findings about the employment disputes between Mr. Burrill and Mr. Watkins to evaluate whether the firm should be sanctioned under Rule 11 for Mr. Watkins's misconduct in this case.

As this court already has explained at length, *see Johnson v. Dunn*, 792 F. Supp. 3d 1241, 1256–57 (N.D. Ala. 2025), every lawyer knows that citing fake cases in a court filing is a terrible decision. In just the few years that generative AI has affected court filings, it has become well established that "[m]any harms flow from the submission of fake opinions." *Mata v. Avianca, Inc.*, 678 F. Supp. 3d 443, 448 (S.D.N.Y. 2023); *see, e.g.*, *Dehghani v. Castro*, 782 F. Supp. 3d 1051 (D.N.M. 2025); *Bevins v. Colgate-Palmolive Co.*, No. 25-576, 2025 WL 1085695 (E.D. Pa. Apr. 10, 2025); *Ferris v. Amazon.com Servs., LLC*, 778 F. Supp. 3d 879 (N.D. Miss. 2025); *United States v. Hayes*, 763 F. Supp. 3d 1054 (E.D. Cal. 2025), *reconsideration denied*, No. 2:24-cr-0280-DJC, 2025 WL 1067323 (E.D. Cal. Apr. 9, 2025); *Sanders v. United States*, 176 Fed. Cl. 163 (Fed. Cl. 2025); *Wadsworth v. Walmart Inc.*, 348 F.R.D. 489 (D. Wyo. 2025); *Gauthier v. Goodyear Tire & Rubber Co.*, No. 1:23-cv-281, 2024 WL 4882651 (E.D. Tex. Nov. 25, 2024); *Park v. Kim*, 91 F.4th 610 (2d Cir. 2024).

As the court explained in *Johnson*:

> Some such harms affect the case at hand: "The opposing party wastes time and money in exposing the deception," and "[t]he client may be deprived of arguments based on authentic judicial precedents." *Mata*, 678 F. Supp. 3d at 448. While the court takes time to investigate, other cases may be disrupted or deprived of judicial attention. Other harms affect the judicial system:

75

> There is potential harm to the reputation of judges and courts whose names are falsely invoked as authors of the bogus opinions and to the reputation of a party attributed with fictional conduct. It promotes cynicism about the legal profession and the American judicial system. And a future litigant may be tempted to defy a judicial ruling by disingenuously claiming doubt about its authenticity.

*Id.* at 448–49. . . .

> The opposing party expends resources identifying and exposing the fabrication; the court spends time reviewing materials, holding hearings, deliberating about sanctions, and explaining its ruling; the substance of the case is delayed; and public confidence about the trustworthiness of legal proceedings may be diminished.

*Johnson*, 792 F. Supp. 3d at 1256–57.

As more than seventy pages of factual recitation in this case illustrate, the fallout of AI misuse in a case has a significant ripple effect: opposing parties expend resources investigating, identifying, and exposing fabrications; the court spends time reviewing materials, holding hearings, deliberating about sanctions, and explaining its ruling; the substance of the case is delayed (as are other cases that need the court's attention); and public confidence about the trustworthiness of legal proceedings diminishes.

Accordingly, the court makes the following findings of fact and conclusions

76

of law.

## A. False Statements of Law

The court finds, based upon its own careful review, that the hallucinated citations at issue in the plaintiffs' response to the Triad Defendants' motion to dismiss were false statements of law. *See* Doc. 42.

Although the Fite Defendants were not subjected to nonexistent or fabricated citations in the plaintiffs' response to their motion to dismiss, the Fite Defendants were subjected to the consequences of those false statements in the plaintiffs' response to the Triad Defendants' motion to dismiss. When the Fite Defendants became aware of the false statements in the plaintiffs' response to the Triad Defendants' motion, the Fite Defendants investigated the response to their motion to determine whether similar issues were present. As part of that, they painstakingly waded through extensive inaccuracies in citations and material overstatements about legal authorities (on top of general professional sloppiness, which Rule 11 does not punish). *See* Doc. 67-2 at 11. This added effort, expense, and overall scrutiny became necessary only because plaintiffs' counsel's misconduct injected the need for it into the case.

## B. False Statements of Fact

The court finds that Mr. Watkins's factual statements about keeping the

77

plaintiffs fully informed of his misconduct and its attendant risk to their case were false. The court credits Dulce Rivera's statements that Mr. Watkins did not advise her about the issues his AI misuse caused for her family's business litigation. Those statements fit with all the other evidence in the record, including the timing of her own decision to ask that Burrill Watkins not allow Mr. Watkins to handle her family's case any longer.

On the other hand, the court finds that Mr. Watkins's entirely unsupported—and directly contradicted—self-serving narrative on this issue is unworthy of belief. Mr. Watkins's last-minute assertion that he promptly told his clients all they needed to know to understand the seriousness of his misconduct does not fit with any other evidence in the record, including the timing of his dismissal from this case or his removal from his law firm. Indeed, the evidentiary record provides no support for this assertion by Mr. Watkins.

### C. Sanctions Authorities

Rule 11(b) provides that "[b]y presenting to the court a pleading, written motion, or other paper[,] . . . an attorney . . . certifies that . . . after an inquiry reasonable under the circumstances . . . the claims, defenses, and other legal contentions are warranted by existing law." Fed. R. Civ. P. 11(b)(2). "If, after notice and a reasonable opportunity to respond, the court determines that Rule 11(b) has

been violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation." *Id.* (c)(1). "Absent exceptional circumstances, a law firm must be held jointly responsible for a violation committed by its partner, associate, or employee." *Id.*

"A sanction imposed under [Rule 11] must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated," and "may include nonmonetary directives." *Id*. (c)(4). The sanction may also include, "if imposed on motion and warranted for effective deterrence, an order directing payment to the movant of part or all of the reasonable attorney's fees and other expenses directly resulting from the violation." *Id.*[6]

---

[6] In this case, the Rule 11 issue was both initiated by the court in a show cause order under Rule 11(c)(3), and the subject of a motion filed under Rule 11(c)(2). According to Rule 11(c)(2), a motion for sanctions under Rule 11 "must be served under Rule 5, but it must not be filed or be presented to the court if the challenged paper . . . is withdrawn or appropriately corrected within 21 days after service or within another time the court sets." Fed. R. Civ. P. 11(c)(2). As explained above, the court first raised the issue of a Rule 11 violation in the initial order to show cause. *See* Doc. 51 at 12. At the June 18, 2025, show cause hearing, the defendants moved for relief that would offset the costs associated with Mr. Watkins's misconduct. Doc. 67-2 at 13–14. The court then provided the parties twenty-one days to file appropriate motions. *Id.* at 21. On July 9, 2025, the defendants supplemented their requests for sanctions. Docs. 64, 67. Though the motion practice unfolded in a manner different from that which Rule 11 contemplates, Mr. Watkins had ample notice of impending sanctions and opportunity to correct his rule violation, which he did not do. The Triad Defendants first raised concern about unverifiable citations on May 16, 2025. *See* Doc. 46 at 7–8. The Fite Defendants similarly raised concerns

"Rule 11 . . . imposes an objective standard of reasonable inquiry which does not mandate a finding of bad faith." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 47 (1991). Rule 11 focuses on "the signer's conduct" "at the time of filing." *Jones v. Int'l Riding Helmets, Ltd.*, 49 F.3d 692, 695 (11th Cir. 1995) (emphasis and internal quotation marks omitted). "[T]he purpose of Rule 11 as a whole is to bring home to the individual signer his personal, nondelegable responsibility." *Pavelic & LeFlore v. Marvel Ent. Grp.*, 493 U.S. 120, 126 (1989) (holding, prior to the 1993 amendment to Rule 11, that sanctions may be imposed on the individual attorney who signs the papers and not on the attorney's law firm).

To impose Rule 11 sanctions *sua sponte*, the court must find that offending conduct is "akin to contempt." *Kaplan v. DaimlerChrysler, A.G.*, 331 F.3d 1251,

---

about misstatements or overstatements of law on May 19, 2025. *See* Doc. 47 at 8–10, 12. More than a week passed before the defendants filed their joint supplemental reply on May 28, 2025. *See* Doc. 48. In that time, Mr. Watkins made no attempt to cure the violation. The court then issued a show cause order on June 3, 2025, which provided Mr. Watkins explicit notice that he was at risk of being sanctioned under Rule 11. *See* Doc. 51 at 12. After that show cause order, he moved for leave to correct the response, *see* Doc. 58, but as he acknowledged at the subsequent hearing, Mr. Watkins did not provide the court a correct copy of the filing, *see* Doc. 67-2 at 19. And, as explained above, even after the defendants indicated an intent to pursue sanctions, the proposed "corrected" version of Mr. Watkins's filing still contained errors and misrepresentations—the same kind of misconduct that violated Rule 11 in the first place. *See* Doc. 62-1.

80

1255 (11th Cir. 2003). Because Rule 11 is objective, *see, e.g.*, *Chambers*, 501 U.S. at 47; *Jones*, 49 F.3d at 695, that standard does not require a finding of subjective bad faith.

The sanction authority of the court is not limited to Rule 11. For more than two hundred years, "[i]t has long been understood that '[c]ertain implied powers must necessarily result to our Courts of justice from the nature of their institution,' powers 'which cannot be dispensed with in a Court, because they are necessary to the exercise of all others.'" *Chambers*, 501 U.S. at 43 (quoting *United States v. Hudson,* 11 U.S. (7 Cranch) 32, 34 (1812)).

"Courts have long recognized an inherent authority to suspend or disbar lawyers . . . derive[d] from the lawyer's role as an officer of the court which granted admission." *In re Snyder*, 472 U.S. 634, 643 (1985). Thus, "a federal court has the power to control admission to its bar and to discipline attorneys who appear before it." *Chambers*, 501 U.S. at 43 (citing *Ex parte Burr*, 22 U.S. (9 Wheat.) 529, 530 (1824)). "An attorney who violates his or her ethical obligations is subject to professional discipline, including sanctions, suspension, and disbarment." *Connick v. Thompson*, 563 U.S. 51, 66 (2011).

Although Rule 11 "reaches only certain individuals or conduct, the inherent power extends to a full range of litigation abuses." *Chambers*, 501 U.S. at 46. "A

court must . . . exercise caution in invoking its inherent power," and "when there is bad-faith conduct in the course of litigation that could be adequately sanctioned under the Rules, the court ordinarily should rely on the Rules rather than the inherent power." *Id.* at 50. "[I]f in the informed discretion of the court, neither the statute nor the Rules are up to the task, the court may safely rely on its inherent power." *Id.*

"But neither is a federal court forbidden to sanction bad-faith conduct by means of the inherent power simply because that conduct could also be sanctioned under the statute or the Rules." *Id.* "The [Supreme] Court's prior cases have indicated that the inherent power of a court can be invoked even if procedural rules exist which sanction the same conduct." *Id.* at 49. "There is, therefore, nothing in the other sanctioning mechanisms or prior cases interpreting them that warrants a conclusion that a federal court may not, as a matter of law, resort to its inherent power to impose attorney's fees as a sanction for bad-faith conduct." *Id.* at 50.

Where "all of a litigant's conduct is . . . sanctionable, requiring a court first to apply Rules . . . containing sanctioning provisions to discrete occurrences before invoking inherent power to address remaining . . . sanctionable conduct would serve only to foster extensive and needless satellite litigation, which is contrary to the aim of the Rules themselves." *Id.* at 51. So relying on inherent authority can be appropriate even when "the District Court could have employed Rule 11 to sanction

82

[an individual] for filing false and frivolous pleadings, and . . . some of the other conduct might have been reached through other Rules." *Id.* at 50 (cleaned up). Such reliance is appropriate where "[m]uch of the bad-faith conduct by [the individual] . . . was beyond the reach of the Rules[,]. . . and the conduct sanctionable under the Rules was intertwined within conduct that only the inherent power could address." *Id.* at 50–51. Courts find themselves in such a situation where an individual's "entire course of conduct throughout the lawsuit evidenced bad faith and an attempt to perpetrate a fraud on the court." *Id.* at 51.

"Because of their very potency, inherent powers must be exercised with restraint and discretion." *Id.* at 44. "A primary aspect of that discretion is the ability to fashion an appropriate sanction for conduct which abuses the judicial process." *Id.* at 44–45. The Supreme Court has held that even "particularly severe sanction[s]" are "within the court's discretion." *Id.* at 45.

A finding of subjective bad faith or something tantamount to it is necessary to support a sanction issued pursuant to a court's inherent power. *See Purchasing Power, LLC v. Bluestem Brands, Inc.*, 851 F.3d 1218, 1223 (11th Cir. 2017). "A finding of bad faith is warranted where an attorney knowingly or recklessly raises a frivolous argument, or argues a meritorious claim for the purpose of harassing an opponent. A party also demonstrates bad faith by delaying or disrupting the litigation

or hampering enforcement of a court order." *Barnes v. Dalton*, 158 F.3d 1212, 1214 (11th Cir. 1998) (quoting *Primus Auto. Fin. Servs., Inc. v. Batarse,* 115 F.3d 644, 649 (9th Cir. 1997)); *accord Thomas v. Tenneco Packaging Co.*, 293 F.3d 1306, 1320 (11th Cir. 2002).

"If particularly egregious, the pursuit of a claim without reasonable inquiry into the underlying facts can be the basis for a finding of bad faith." *Barnes*, 158 F.3d at 1214. "[I]n the absence of direct evidence of subjective bad faith, [the bad-faith] standard can be met if an attorney's conduct is so egregious that it could only be committed in bad faith." *Purchasing Power*, 851 F.3d at 1224–25; *accord Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 767 (1980) (stating that inherent powers require a finding that "counsel's conduct . . . constituted or was tantamount to bad faith"). "This is not the same as simple recklessness, which can be a starting point but requires something more to constitute bad faith." *Purchasing Power*, 851 F.3d at 1225 (citing *Barnes*, 158 F.3d at 1214).

Under the court's inherent authority, the court may "sanction a litigant for bad-faith conduct by ordering it to pay the other side's legal fees." *See Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 103–04 (2017). "[S]uch an order is limited to the fees the innocent party incurred solely because of the misconduct—or put another way, to the fees that party would not have incurred but for the bad faith."

*Id.* But "[a] district court has broad discretion to calculate fee awards under that standard." *Id.* at 104.

### D. Findings and Conclusions as to Mr. Watkins and Burrill Watkins

The court finds itself in a situation where Mr. Watkins's misconduct sanctionable under Rule 11 is "intertwined within conduct that only the inherent power could address." *See Chambers*, 501 U.S. at 51. Mr. Watkins's misconduct extends beyond an isolated false statement of fact or law in a specific filing. Accordingly, the court will not "foster extensive and needless satellite litigation" by categorizing individual instances of misconduct under each authority. *See id.* The court relies on its power under both Rule 11 and its inherent authority to determine the appropriate sanctions.

### 1. Mr. Watkins

Mr. Watkins's conduct in this case is troubling. What began as the misuse of artificial intelligence in a court filing (which Mr. Watkins characterized as an inadvertent technical error) grew into repeated instances of lying and obfuscation. At a minimum, this violated Rule 11.

But Mr. Watkins's misconduct extends well beyond the rule violation. As an initial matter, his repeated efforts to deflect blame reflect little to no appreciation for the seriousness of the rule violation. At best, Mr. Watkins feigned accepting

responsibility for the hallucinated cases; he laced his purported acceptance with blame for court staff and distracted from it by foisting blame on opposing counsel.

Further, in the filings that supposedly corrected the fabricated citations, Mr. Watkins again misled the court, ignored some specific instances of misconduct, and tried to bury the true extent of others through convoluted footnotes. And Mr. Watkins intentionally misrepresented his communications with his clients, describing himself as forthcoming, honest, and diligent with them, when the record reflects the opposite. Mr. Watkins changed his answers to the court's questions and misrepresented basic facts.

Altogether, this course of misconduct reflects an abdication of Mr. Watkins's duty of candor to the court. His false statements of law and fact reflect intentional, repeated choices—not isolated lapses in judgment attendant to unreasonable haste or excusable neglect. The court's finding in this regard is underscored by the reality that the same kind of conduct by Mr. Watkins contemporaneously garnered the attention—and serious concern—of a state court. And the finding is amplified by his failure to follow the court's instructions in its order to show cause, deepening the court's concern about his respect for court rules and orders, the seriousness of these proceedings, and Mr. Watkins's attention to these disciplinary proceedings.

In at least one other case involving false statements of law arising from the

misuse of artificial intelligence, the court has seen lawyers accept responsibility for a lapse in judgment and do the work necessary to establish that it was, in fact, a lapse. *Cf. Johnson*, 792 F. Supp. 3d 1241. This is not that.

The court is sympathetic to Mr. Watkins's stressful circumstances that allegedly caused him to file a draft, unvetted document, but that neither encapsulates nor excuses Mr. Watkins's full complement of misconduct. The court cannot attribute the sequence of events that comprise Mr. Watkins's misconduct in this case—which occurred over a period of months and took the court dozens of pages to recite—to ordinary negligence, or even recklessness, under difficult and stressful working conditions.

Mr. Watkins's intentional misrepresentations and disruptions in this litigation are, at a minimum, knowing. His false statements and effortful misleading, together with his steadfast refusal to accept responsibility, are, at a minimum, tantamount to bad faith. Accordingly, the court will impose appropriate sanctions under Rule 11 and its inherent authority.

### 2. Burrill Watkins

Because Mr. Watkins is subject to sanction under Rule 11, the Burrill Wakins firm is presumptively subject to sanction under Rule 11. *See* Fed. R. Civ. P. 11(c)(1) ("Absent exceptional circumstances, a law firm must be held jointly responsible for

a violation committed by its partner, associate, or employee."). The court is unpersuaded that the firm's alleged lack of prompt knowledge about Mr. Watkins's misconduct constitutes exceptional circumstances that should insulate the firm from parallel sanctions.

At the threshold, the firm's argument seems irreconcilable with the deterrent purpose of the rule. If simple ignorance were an "exceptional circumstance" that could absolve a firm of responsibility for its partners' misconduct, such ignorance would be encouraged, law partners would be discouraged from maintaining awareness and active involvement in the firm's representations, and no deterrent purpose would be served. *See, e.g.*, 5A WRIGHT & MILLER'S FEDERAL PRACTICE AND PROCEDURE § 1336.2 (4th ed. 2025) (discussing a case where "the offending firm was made an example of by the district court and court of appeals to deter not just its lawyers' misconduct, but also to deter other firms from engaging in the same behavior")

Even assuming Mr. Watkins took steps to conceal his misconduct from the firm or obfuscate the full scope of his troubles, the firm appears to have made this relatively easy for him to accomplish. The record contains no evidence—nor even an allegation—that the firm had in place before these disciplinary proceedings began meaningful procedures or internal controls regarding its attorneys' use of artificial

88

intelligence. Rather, the firm appears to have made the technology available (and encouraged its use) without restriction, oversight, or any other guardrail on its proper use.

For purposes of evaluating the firm's argument about its ignorance, the court does not consider steps the firm took upon its discovery of Mr. Watkins's misconduct. The firm has supplied no basis for a conclusion that remedial efforts undertaken *ex post* amount to an extraordinary circumstance *ex ante* sufficient to absolve the firm of Rule 11 liability.

Accordingly, the court will impose appropriate sanctions on the Burrill Watkins firm under Rule 11.

### 3.  Joel A. Rivera and Mi Pueblo Supermarkets

Based on the evidence, the court has no reason to believe that the plaintiffs were aware of or in any way participating in Mr. Watkins's misconduct. Even Mr. Watkins has made no such allegation. In reality, the plaintiffs were among the victims of Mr. Watkins's misconduct. The court has carefully reviewed (and credited) Dulce Rivera's declarations, and the court recognizes that her decision to ask the Burrill Watkins firm to remove Mr. Watkins from her family's litigation, and her effort to prepare her declarations, reflect difficult experiences and decisions that clients are not supposed to encounter. Further, the full effect of Mr. Watkins's

misconduct on this litigation is not yet known.

Accordingly, the court will not sanction the Riveras under Rule 11 or its inherent authority.

### E. Sanctions

To impose appropriate sanctions, the court follows in this case the same analysis it followed in *Johnson*. To exercise its inherent power with restraint and discretion, the court looks first to the purpose of that power. "The purpose of the inherent power is both to vindicate judicial authority without resorting to contempt of court sanctions and to make the non-violating party whole." *Purchasing Power*, 851 F.3d at 1225 (citing *Chambers*, 501 U.S. at 45–46). "This power is . . . for rectifying disobedience, regardless of whether such disobedience interfered with the conduct of the trial." *Id.*

To properly rectify the bad-faith misconduct in this case and vindicate the lawful authority of federal courts to keep proceedings free from falsehoods, the court will impose the least severe sanction that the court finds likely to deter future similar misconduct. As the court exercises its inherent power in this factual context, it assigns primary value to the deterrent function of a sanction, for several reasons.

*First*, standing alone, AI misuse is a serious and time-sensitive problem that is imposing escalating undue costs on litigants, causing extensive disruptions for

courts, and damaging public confidence in the legal community and the integrity of the justice system. At a minimum, protecting judicial authority requires effective preventive measures designed to reduce the practical likelihood that this kind of AI misuse continues apace. The danger and disruption attendant to AI misuse are increased when, as here, the lawyer pairs his misuse with a refusal to accept responsibility and further false statements to the court. It is especially imperative that a sanction deter this kind of misconduct.

*Second*, Rule 11 assigns particular value to the deterrent function of a sanction. *See* Fed. R. Civ. P. 11(c)(4) (providing that sanctions "must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated").

And *third*, there is persuasive precedent in this Circuit for calibrating sanctions issued pursuant to a court's inherent power to serve deterrence purposes. *See Boe v. Marshall*, 767 F. Supp. 3d 1226, 1295–97 (M.D. Ala. 2025) (imposing sanctions for bad-faith judge-shopping to serve deterrence purposes); *Johnson*, 792 F. Supp. 3d at 1267–68 (imposing sanctions to serve deterrence purposes for misuse of artificial intelligence).

Courts across the country have imposed fines in other incidents involving misuse of artificial intelligence where the involved lawyers promptly accepted

responsibility, which Mr. Watkins has not done here. *See, e.g.*, *Versant Funding LLC v. Teras Breakbulk Ocean Navigation Enters., LLC*, No. 17-cv-81140, 2025 WL 1440351, at *7 (S.D. Fla. May 20, 2025) (imposing monetary sanctions ranging from $500 to $1,000); *Ramirez v. Humala*, No. 24-cv-424-RPK-JAM, 2025 WL 1384161, at *3 (E.D.N.Y. May 13, 2025) (imposing a $1,000 monetary sanction); *Nguyen v. Savage Enters.*, No. 4:24-cv-00815-BSM, 2025 WL 679024, at *1 (E.D. Ark. Mar. 3, 2025) (imposing a $1,000 monetary sanction); *Wadsworth*, 348 F.R.D. at 499 (imposing monetary sanctions ranging from $1,000 to $3,000); *Gauthier*, 2024 WL 4882651 at *3 (imposing a $2,000 monetary sanction); *see also Lacey v. State Farm Gen. Ins. Co.*, No. 2:24-cv-05205-FMO-MAA, 2025 WL 1363069, at *5 (C.D. Cal. May 5, 2025) (ordering plaintiff's law firms to pay defendants $31,100 in fees and costs).

In other cases, courts have imposed fines when attorneys were not forthcoming and failed to accept responsibility. *See, e.g.*, *Mata*, 678 F. Supp. 3d at 448, 466 (imposing a $5,000 penalty on attorneys who "continued to stand by the fake opinions after judicial orders called their existence into question"); *Fletcher v. Experian Info. Sols., Inc.*, 168 F.4th 231, 239–40 (5th Cir. 2026) (ordering sanctions for an attorney who used hallucinated cases and noting, "Had Hersh accepted responsibility and been more forthcoming, it is likely that the court would have

92

imposed lesser sanctions. However, when confronted with a serious ethical misstep, Hersh misled, evaded, and violated her duties as an officer of this court."); *Hayes*, 763 F. Supp. 3d at 1067 (addressing an attorney who, instead of "candidly acknowledg[ing]" his citation errors, "made knowing and willful misrepresentations with the intent to mislead the Court" and continued to assert that his filings were "inadvertent citation error[s]").

And at least some of these courts have sanctioned law firms and/or lawyers who were unaware of the AI misuse in real time. *See, e.g.*, *Wadsworth*, 348 F.R.D. at 493–94, 498–99 (sanctioning attorneys who "were not provided a copy of the [sanctionable] Motions to review prior to filing" and were not aware that artificial intelligence had been utilized but had delegated their signatures, reasoning that they "had a nondelegable duty to ensure a motion or filing is supported by existing law"); *Versant Funding LLC*, 2025 WL 1440351, at *5–*7 (imposing sanctions on local counsel for "filing a response without ensuring the accuracy of the case citation and principle of law" despite "t[aking] no part in" *pro hac vice* counsel's drafting process utilizing AI).

Having considered these cases carefully, the court finds that a fine and public reprimand are insufficient here. As the court explained in *Johnson*, and reality continues to bear out, if fines and public embarrassment were effective deterrents,

there would not be so many cases to cite. And in any event, fines do not account for the extreme dereliction of professional responsibility that fabricating citations reflects, nor for the many harms it causes. The court specifically finds that a fine would not rectify the misconduct in this case, particularly in the light of Mr. Watkins's intentionally obfuscatory and deceitful conduct after his AI misuse came to light.

The court finds that the following sanctions are necessary to rectify the misconduct here and vindicate judicial authority: (1) temporary suspension of Mr. Watkins from practice in the Northern District of Alabama for a period of three months, (2) disqualification of Mr. Watkins and Burrill Watkins from further participation in this case, (3) referral of Mr. Watkins to applicable licensing authorities, (4) payment (joint and several by Mr. Watkins and the firm) of the defendants' attorney's fees incurred directly because of the misconduct, and (5) a public reprimand of Mr. Watkins and Burrill Watkins.

A public reprimand for both Mr. Watkins and his firm is necessary, insufficient, and fits well. It makes other clients, counsel, and courts aware of the misconduct in this case so that they may assess whether any measures are needed to investigate or protect their proceedings. It is also the minimum sanction necessary to remind lawyers that should they find themselves in this kind of situation, further

misrepresentations, obfuscations, and deflections are not the way to proceed.

Similarly, payment of the defendants' attorney's fees incurred directly because of Mr. Watkins's misconduct is necessary to deter misconduct (such as what occurred here) that unavoidably results in copious expenditures of time, effort, and funds by other litigants. To have appropriate deterrent force, such payment must compensate each set of defendants for the undue effort spent to painstakingly inspect each filing by the plaintiffs to determine whether and which citations were false; Mr. Watkins's misconduct is a but-for cause of all of this effort and expense.

The court finds that requiring Burrill Watkins to share in the reimbursement of these fees is appropriate. *See Garner v. Kadince, Inc.*, 571 P.3d 812, 816 (Utah Ct. App. 2025) (ordering the sanctioned attorney to pay opposing counsel's attorney's fees "for the time spent responding to the Petition and attending the OSC hearing" even though the attorney accepted responsibility for his misconduct). At a minimum, the court finds that making this kind of misconduct unprofitable for law firms is necessary to deter its recurrence. Modest (even substantial) fines paid into court—rather than fee reimbursements paid to adversaries—appear to be relatively ineffective deterrents.

The court concludes that Mr. Watkins is liable for these fees under both Rule 11 and its inherent authority; the court concludes that the Burrill Watkins firm is

liable for these fees only under Rule 11. The court is therefore mindful that according to the advisory committee's notes to the 1993 amendment to Rule 11, that amendment "provides that a monetary sanction imposed after a court-initiated show cause order be limited to a penalty payable to the court and that it be imposed only if the show cause order is issued before any voluntary dismissal or an agreement of the parties to settle the claims made by or against the litigant." Fed. R. Civ. P. 11 advisory committee's notes to 1993 amendment. As previously explained, this case involves both a court-initiated show cause order and a motion for sanctions. *See supra* n.6. And as of the issuance of this order, this case has not been voluntarily dismissed or settled.

The advisory committee explained that "[w]hether a violation has occurred and what sanctions, if any, to impose for a violation are matters committed to the discretion of the trial court," Fed. R. Civ. P. 11 advisory committee's notes to 1993 amendment, and the court specifically finds that Burrill Watkins's joint and several liability for the defendants' fees directly attributable to Mr. Watkins's misconduct is a necessary and appropriate deterrent sanction.

Further, the referral of Mr. Watkins to licensing authorities is necessary in the light of the primary nature of a lawyer's professional responsibility not to make things up. It is also appropriate in the light of the efforts Mr. Watkins went to to

96

obfuscate his misconduct with both his clients and the court.

Additionally, for the same reason disqualification fit in *Johnson*, it fits here and in other similar cases of AI misuse: lawyers should know that if they make false statements in court proceedings, they will no longer have the professional opportunity to participate in those proceedings. Similarly, litigants should have assurance that false statements will not be allowed in their cases, and no court should be required to allow an attorney responsible for making false statements in the proceedings to continue in the proceedings.

Here, the court extends the disqualification to the Burrill Watkins firm. Unlike the firm at issue in *Johnson*, Burrill Watkins paid for its lawyers to use artificial intelligence in their filings and encouraged them to do so, all while having no internal policies or controls or guardrails in place to prevent AI abuse. This resulted in (1) two separate courts identifying AI abuse by one of Burrill Watkins's attorneys in a relatively short time frame, and (2) a series of misrepresentations by one of the firm's lawyers to and about its clients, in an effort to cover up and distract from the lawyer's AI misuse.

Burrill Watkins proceeded in this manner even as courts and lawyers nationwide were publicly wrestling with serious instances of AI misuse. Because of the firm's reckless approach in the face of serious risks posed by AI misuse, the

97

firm's clients, its adversaries in this case, and the court have been put to extensive undue work and trouble. The case is currently in some disarray, and the full effect of the firm's recklessness is not yet known. The court cannot reasonably be required to allow the firm to continue on in this case. Indeed, the court finds that disqualification is not only necessary to deter future such conduct by Burrill Watkins and other firms, but also to protect these proceedings from further recklessness and disruption.

In reaching this conclusion, the court has carefully considered all the circumstances before it. As the advisory committee's notes to Rule 11 explain,

> The rule does not attempt to enumerate the factors a court should consider in deciding whether to impose a sanction or what sanctions would be appropriate in the circumstances; but, for emphasis, it does specifically note that a sanction may be nonmonetary as well as monetary. Whether the improper conduct was willful, or negligent; whether it was part of a pattern of activity, or an isolated event; whether it infected the entire pleading, or only one particular count or defense; whether the person has engaged in similar conduct in other litigation; whether it was intended to injure; what effect it had on the litigation process in time or expense; whether the responsible person is trained in the law; what amount, given the financial resources of the responsible person, is needed to deter that person from repetition in the same case; what amount is needed to deter similar activity by other litigants: all of these may in a particular case be proper considerations. The court has significant discretion in determining what sanctions, if any, should be imposed for a violation,

98

> subject to the principle that the sanctions should not be more severe than reasonably necessary to deter repetition of the conduct by the offending person or comparable conduct by similarly situated persons.

*Id.*

The court does not take lightly its decision to disqualify a firm from litigation that the firm commenced. It simply finds that a sanction that does not include such disqualification will be an ineffective deterrent, ill-fitting for the facts of this case, and disruptive of the orderly administration of justice in this case.

Finally, and perhaps most significantly, the court finds that temporarily suspending Mr. Watkins from further representations in the Northern District of Alabama is appropriate.

As the court already has explained, "[i]t is axiomatic that federal courts admit and suspend attorneys as an exercise of their inherent power." *In re Finkelstein,* 901 F.2d 1560, 1564 (11th Cir.1990). And "[a] federal court has the inherent authority to . . . disbar an attorney from practicing before it." *In re BellSouth Corp.*, 334 F.3d 941, 963 n.19 (11th Cir. 2003). *BellSouth* decided (in the context of a disqualification order) the standard applicable for sanctions that approach disbarment or suspension: "to the extent that an attorney disqualification order constitutes or approaches a disbarment or suspension, then to that extent the standard

99

should move toward a finding of improper motive on the part of the attorney, that is, that he knowingly or recklessly" engaged in sanctionable misconduct (there, the misconduct was that the attorney "lent himself to a scheme to cause the recusal of a judge"). *Id*.; *accord id.* at 963 (finding "support in the case law for this common-sense notion that as the seriousness of the consequences of a [sanctions] order increases, so too the care and caution exercised by the district court should be enhanced").

As the foregoing recitation of facts, legal analysis, and findings and conclusions make plain, the court has taken great care to afford Mr. Watkins a full and fair opportunity to explain and accept responsibility for his misconduct. Mr. Watkins's responses to those opportunities have invariably deepened rather than ameliorated the court's concerns about his ability to adhere to rules of professional conduct.

The court also has carefully considered the sources and purposes of its sanctions authority, and the relevant restraints on that authority. Mr. Watkins already has been removed from this case (both by his clients and by the court), and the court's disqualification sanction simply prevents his former clients from re-hiring him if they become so inclined.

But the reality is that Mr. Watkins's misrepresentations to the court continued

**after** his clients sought and received his removal: his false statements to the court about keeping the plaintiffs informed about their case postdate their decision to fire him as their lawyer, and he made those statements undeterred by their decision to fire him. Accordingly, the court seriously doubts that exclusion from these proceedings is sufficient to deter Mr. Watkins from again making false statements of fact or law to the court. A modest temporary suspension is the next step up the sanctions ladder.

The court has carefully considered the practical effect of such a serious sanction. As of the issuance of this order, this case is the only case in which Mr. Watkins has appeared as counsel in the Northern District of Alabama. The court cannot know what other representations Mr. Watkins might be considering accepting, nor whether he expects to appear in any cases in federal court in this district in the next few months. Without knowing all the details of the practical effect of the sanction, the court regards it as serious but not unduly destructive of Mr. Watkins's ability to earn a living for the next ninety days.

Practicalities aside, Mr. Watkins bears the sole responsibility for his decisions to make false statements of law and fact and treat his clients and this court with bad faith, and the court has calibrated this sanction to those decisions with specificity and care. These types of misconduct have no place in federal courts, and a proper

101

sanction must show some reasonable probability of deterring them.

This court is aware of relatively few appellate decisions affirming temporary suspension sanctions, none of which relate to bad-faith AI misuse or bad-faith misstatements of law and fact that follow AI misuse. In that respect, this sanction is novel. But it is the technology, not the heart of the misconduct, that makes it novel: lawyers have known for hundreds of years that appropriate professional discipline may include suspensions. *See, e.g.*, *Chambers*, 501 U.S. at 43 (citing *Ex parte Burr*, 22 U.S. (9 Wheat.) 529, 530 (1824)); *In re Snyder*, 472 U.S. at 643.

## III.  CONCLUSION

The court **ORDERS** as follows:

1.  The court **PUBLICLY REPRIMANDS** attorney Joshua B. Watkins and law firm Burrill Watkins LLC for the misconduct described in this order;

2.  To effectuate their reprimand, Mr. Watkins and Burrill Watkins are **ORDERED** to provide a copy of this order to their clients, opposing counsel, and presiding judge in every pending state or federal case in which they are counsel of record. They shall also provide a copy of this order to every attorney in their law firm. They must comply with this requirement within ten days from the date of this order and must certify to the court within twenty-four hours of that compliance that the requirement has been met;

3.      To further effectuate the reprimands and deter similar misconduct by others, the Clerk of Court is **DIRECTED** to submit this order for publication in the Federal Supplement;

4.      Mr. Watkins and Burrill Watkins LLC are **DISQUALIFIED** from further participation in this case;

5.      Mr. Watkins is **DIRECTED** to provide the Clerk of Court with a listing of jurisdictions in which he is licensed to practice law within twenty-four hours of this order;

6.      The Clerk of Court is **DIRECTED** to serve a copy of this order on the General Counsel of the Alabama State Bar and any other applicable licensing authorities for further proceedings as appropriate;

7.      As part and parcel of the disqualification of Burrill Watkins from further participation in the case, the court **DENIES AS MOOT** the pending motion for leave to file a third amended complaint, which Burrill Watkins filed on behalf of the plaintiffs. Doc. 97. The plaintiffs have leave to refile such a motion through substitute counsel and to propose an amended complaint that is untainted by the misconduct in these proceedings, and the court will decide such motion in due course.

8.    The court **DENIES WITHOUT PREJUDICE** the pending motions to dismiss, Docs. 36, 38, with leave to refile as appropriate upon the filing of an amended complaint. Accordingly, the court **DENIES AS MOOT** the pending motions for leave to file a correct response to the motions to dismiss. Docs. 58, 62.

9.    The court **DENIES** Mr. Watkins's motion to exclude Mr. Burke from providing testimony and to strike Mr. Burke's affidavit, Doc. 115.

10.    The court **GRANTS** the defendants' motion for sanctions, Docs. 64, 67, and the defendants' requests for attorney's fees incurred due to the filing issues and improper use of generative artificial intelligence. *See* Docs. 64, 67, 95, 96.

11.    The court **GRANTS** the joint motion to extend pre-trial deadlines, Doc. 101, **VACATES** the operative Scheduling Order, Doc. 34, and **STAYS** this case to allow the plaintiffs a reasonable opportunity to obtain replacement counsel. An updated scheduling order will be entered in due course.

12.    Burrill Watkins and Mr. Watkins have made no arguments as to the reasonableness of the rates or hours presented by the defendants in their respective motions for sanctions and corresponding exhibits. Upon the court's review of the billing records provided, the court finds the attorney's rates and hours to be reasonable. It appears to the court that the requested attorney's fees are limited to the fees and expenses directly resulting from the violation, as the defendants

104

represented. Accordingly, the court **GRANTS** the defendants' requests for attorney's fees. The court **ORDERS** Burrill Watkins to pay the Triad Defendants $11,453. The court further **ORDERS** Mr. Watkins and Burrill Watkins to pay, jointly and severally, $35,603.90 to the Fite Defendants.

      **DONE** and **ORDERED** this 31st day of March, 2026.

_____
**ANNA M. MANASCO**
UNITED STATES DISTRICT JUDGE

# EXHIBIT 1

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| JOEL A. RIVERA individually and, in the alternative, MI PUEBLO SUPERMARKET, LLC, Plaintiffs, | ) ) ) ) ) | |
| v. | ) ) | CIVIL ACTION NO. 2:24-cv-01802-NAD |
| TRIAD PROPERTIES CORPORATION JOSEPH MARION MOSELEY, an Individual, HUGH FULLER MCCLENDON, an Individual, and JOHN KENDALL, an Individual, JACK FITE, an Individual, FITE BUILDING COMPANY, INC., and FITE CONSTRUCTION COMPANY LLC, Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) | (Removed from the Circuit Court of Shelby County, Alabama, Case No. CV-2024-901254) |

---

**PLAINTIFFS' RESPONSE TO TRIAD DEFENDANTS'
MOTION TO DISMISS FEWER THAN ALL CLAIMS AND
FOR MORE DEFINITE STATEMENT**

---

Plaintiff Joel A. Rivera and alternative Mi Pueblo Supermarket, Inc.

("Plaintiffs") respectfully oppose the Motion to Dismiss filed by Triad, Moseley,

McClendon, and Kendall (collectively "Triad Defendants") and state as follows:

**INTRODUCTION**

- 1 -

The Triad Defendants' Motion to Dismiss largely repackages factual disputes and asks the Court to prematurely resolve them without the benefit of discovery. Plaintiffs' Second Amended Complaint more than satisfies the pleading standards under Federal Rule of Civil Procedure 8(a), and provides specific factual allegations supporting each claim. The Triad Defendants' motion should be denied.

## I. The Second Amended Complaint States Plausible Claims Against Triad Defendants

The Second Amended Complaint alleges and it is undisputed that Triad and its agents Mosely, McClendon, and Kendall (collectively "Triad") were introduced and recommended by Fite Building Company and its related defendants (collectively "Fite"), and that the Triad defendants readily accepted Plaintiffs' as clients becoming their exclusive real estate advisor all while failing to disclose material conflicts of interest that they knew or should have known were inaccurate or misleading and were all duty bound to disclose. Triad defendants thereafter pressured Plaintiff Rivera to escalate earnest money deposits in an attempted to further commit Plaintiffs to the transaction from which they and the Fite defendants stood to make thousands of dollars despite clearly unresolved significant risks. These facts are plead in detail and support claims for negligence, breach of fiduciary or quasi-fiduciary duty, fraud, and conspiracy.

- 2 -

Under *Twombly* and *Iqbal*, Plaintiffs are not required to prove their case at the pleading stage. They must only plead enough factual matter to "nudge [their] claims across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The Complaint does so with particularity and plausibility.

## II. The Brokerage Claims Are Properly Plead and Supported by Alabama Law

Triad Defendants' argument mischaracterizes both the factual allegations and the scope of duties under Alabama's Real Estate License Law. Contrary to Defendants' assertions, the Second Amended Complaint (Doc. 35-2) pleads with specificity that Triad Defendants, acting in the role of a licensed real estate brokerage, failed to disclose a material conflict of interest, misrepresented their independence, failed to provide statutorily required disclosures, and acted with knowing disregard of their fiduciary obligations. These facts go beyond mere conclusions and are well-pleaded under Rule 8.

With respect to Ala. Code § 34-27-84(a)(6), Plaintiffs allege and it is undisputed that Triad Defendants were recommended by Fite, and its related defendants, and acted in concert with Fite's interests throughout the transaction, including pressuring Plaintiffs to remain in a speculative deal from which both Fite and Triad

- 3 -

Defendants stood to benefit substantially. Triad's failure to disclose this alignment with Fite's interests—while holding themselves out as serving Rivera's interests—violated both common law duties and their professional obligation to provide timely, written disclosure of such interests. Defendants' argument that there must be a formal "agency" relationship or equity stake ignores the statute's broader reach: it prohibits acting on behalf of any entity where there is a *personal interest*, a standard met where—as here—Triad's agent was undisclosed family to Fite's principal and worked to advance a shared financial outcome.  See also *Belcher v. Birmingham Trust National Bank*, 348 F.Supp. 61 (N.D.Ala. 1968).

Furthermore, Plaintiffs' references to Ala. Code §§ 34-27-36(7), (26), and (27); 34-27-82; and 34-27-83 are not bare citations, but relate directly to Triad's conduct described in detail throughout the Complaint. For example, Triad's failure to act with honesty and fairness, failure to exercise reasonable skill and care, and deceptive representations fall squarely under §§ 34-27-82(2), (3), and 34-27-36(7). At the pleading stage, Plaintiffs need not assign precise subsections to each factual allegation; the Complaint is to be read as a whole. Alabama's notice pleading standard requires only a short and plain statement of the claim showing the pleader is entitled to relief.

## III. Plaintiffs' Have Stated a Claim for Negligent Supervision

- 4 -

Defendants' argument regarding Count II imposes an unduly narrow reading of both the pleading standard and the requirements for negligent supervision under Alabama law. Plaintiffs have sufficiently alleged that Mr. Kendall, acting as Triad's representative, engaged in conduct that constituted professional negligence, including misrepresenting key deal terms, offering unqualified financial advice, failing to convey material facts, incurring unnecessary expenses, and improperly pressuring Plaintiff to proceed with an unsound and undisclosed conflict-laden transaction. These actions, taken together, constitute tortious misconduct under Alabama common law—including negligent misrepresentation, breach of fiduciary duty, and suppression—all of which are recognized torts capable of supporting a claim for negligent supervision. See *Thrasher v. Ivan Leonard Chevrolet, Inc.*, 195 F. Supp. 2d 1314, 1320 (N.D. Ala. 2002).

Moreover, the Complaint alleges that Triad, McClendon, and Moseley failed to oversee Kendall despite clear signs that he was acting far outside the bounds of reasonable agency conduct. The allegations plausibly establish that Defendants knew or should have known of Kendall's incompetence or recklessness. This is particularly true given that Triad placed an inexperienced individual in charge of a multimillion-dollar commercial deal with no meaningful supervision or professional safeguards, and continued to allow that individual to operate unchecked even after irregularities surfaced.

At the motion-to-dismiss stage, Plaintiffs are not required to produce "evidence" but to allege facts that, if true, would entitle them to relief. The pleading here satisfies that standard. Defendants' reliance on *Collins v. Wilkerson*, 679 So.2d 1100 (Ala. Civ. App. 1996), is misplaced, as that case dealt with dismissal after a failure of evidentiary proof—not the sufficiency of allegations under Rule 12(b)(6). Likewise, *Lane v. Central Bank,* 756 F.2d 814 (11th Cir. 1985) reiterates the applicable standard, which the Second Amended Complaint meets by alleging both the misconduct and the knowledge/oversight failures that support Triad's liability.

Accordingly, the motion to dismiss Count II should be denied.

## IV. Plaintiffs Have Adequately Stated a Claim for Negligence Per Se

Defendants' assertion that Plaintiffs failed to state a negligence per se claim mischaracterizes both the nature of the pleading and the applicable standard under Rule 12(b)(6). To survive a motion to dismiss, Plaintiffs are not required to plead each element with evidentiary specificity, but must allege sufficient factual content to state a plausible claim for relief. See *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Plaintiffs have alleged violations of common law and specific statutory duties owed under the Alabama Real Estate License Law (Ala. Code § 34-27-30 et seq.) and RECAD (Ala. Code § 34-27-84), which were enacted precisely to protect

consumers like Mr. Rivera—individuals relying on licensed real estate professionals to provide honest, competent, and conflict-free representation. The statute explicitly identifies the duties of disclosure, loyalty, and reasonable skill and care. These duties were violated when Defendants failed to disclose their personal and financial relationships with other parties to the transaction and placed Mr. Rivera into a severely misaligned, conflicted development deal.

Plaintiffs further allege that Mr. Rivera suffered precisely the kind of injury the statute is intended to prevent—namely, economic losses and exposure to unjust financial risk due to nondisclosure and unlicensed or incompetent conduct. See *Cook's Pest Control, Inc. v. Rebar*, 28 So. 3d 716, 726 (Ala. 2009). The statute's purpose is to ensure transparency, mitigate conflicts of interest, and ensure professional competence in real estate dealings. Triad Defendants' violations directly and proximately caused Plaintiffs' injuries by inducing them to proceed under false pretenses and without adequate protections.

Accordingly, Plaintiffs have pled facts sufficient to satisfy the elements of negligence per se under Alabama law.

## V. Fraud and Other Claims Meet Rule 9(b)

Triad Defendants argue that Plaintiffs' fraud and related claims fail to meet the heightened pleading standard of Rule 9(b), asserting that the Second Amended

- 7 -

Complaint does not specify the "time, place, and content" of the alleged fraudulent statements. This argument mischaracterizes the allegations and overlooks the detailed factual narrative presented in the complaint.

Under Eleventh Circuit precedent, Rule 9(b) is satisfied when the complaint provides enough specificity to put defendants on notice of the precise misconduct with which they are charged, not when every allegation is pled with forensic precision. *Durham v. Bus. Mgmt. Assocs.*, 847 F.2d 1505, 1511 (11th Cir. 1988). Plaintiffs are not required to plead evidence; rather, they must allege sufficient detail to plausibly support each element of fraud and allow for a meaningful response in discovery.

The Second Amended Complaint spans over 40 pages and describes in detail:

- **Who made the misrepresentations:** Defendants Triad, McClendon, Moseley, Kendall, Fite, and Garber.

- **What was misrepresented:** The independence of the parties, the existence of conflicts of interest (e.g., familial ties between McClendon and Jack Fite), the nature and quality of professional services offered, financial projections, market conditions, and the viability of the project.

- **How Plaintiffs were misled:** Mr. Rivera relied on the alleged misstatements and omissions to engage Triad and Fite, expend over $600,000 in out-of-

pocket expenses, and enter into a purchase contract and amendments that he otherwise would not have signed.

- **When and how the misrepresentations were made:** The complaint specifies interactions occurring between early 2023 and late 2024 and identifies documents (such as the purchase agreement) and communications (including texts, emails, and direct advice to Mr. Rivera and his daughter Dulce) that form the basis of the fraud claims.

- **What Defendants gained:** Triad sought a $117,000 commission through an undisclosed conflict, while Fite collected over $160,000 in planning fees and positioned itself to secure a multi-million dollar development contract.

Rule 9(b) also permits allegations based on information and belief where facts are peculiarly within the opposing party's knowledge. *United States ex rel. Clausen v. Lab. Corp. of Am.*, 290 F.3d 1301, 1314 n.25 (11th Cir. 2002). Here, many omitted facts—such as internal communications about the Fite–Triad relationship or Kendall's supervision—are squarely within Defendants' control.

Moreover, the Second Amended Complaint alleges fraudulent concealment, which is subject to a more flexible Rule 9(b) application given the nature of the claim. *See Hill v. Morehouse Med. Assocs., Inc.*, 2003 WL 22019936, (11th Cir. Aug. 15, 2003) (Rule 9(b) may be relaxed where information is uniquely held by the

defendant). Triad and Fite withheld critical facts about their relationship and the integrity of the transaction, which directly affected Rivera's ability to evaluate the risks and terms of the deal.

Defendants' reliance on *Fortson*, *Smith*, and *Inman* is misplaced. In those cases, the plaintiffs asserted general allegations of fraud without the type of contextual specificity that is present here. In contrast, the Plaintiffs' claims are not speculative—they are grounded in specific conduct and financial relationships detailed across multiple factual allegations and exhibits.

Accordingly, Plaintiffs' claims for fraudulent misrepresentation, fraudulent concealment, and negligent misrepresentation are pled with sufficient particularity to meet the requirements of Rule 9(b).

## VI. Plaintiffs Have Adequately Stated a Claim for Civil Conspiracy

Triad Defendants argue that the civil conspiracy claim (Count IX) must be dismissed because it is dependent on the existence of a viable underlying tort, and they contend that Plaintiffs have not properly pled the underlying torts, specifically fraud. This argument is both premature and legally flawed.

First, as discussed in prior sections of this response, Plaintiffs' claims for fraud, fraudulent concealment, and negligent misrepresentation are sufficiently pled under Federal Rule of Civil Procedure 9(b). The Second Amended Complaint

- 10 -

identifies the specific misrepresentations, omissions, parties involved, approximate timing, and resulting harm, and includes extensive factual detail and supporting documents. At the pleading stage, the fraud claims are viable and, therefore, can support a civil conspiracy claim.

Second, the conspiracy allegations are not limited to fraud. Count IX expressly incorporates a broader set of wrongful acts that include—but are not limited to— breach of fiduciary duty, negligence, and unjust enrichment. Alabama law recognizes that a conspiracy may be based on "any unlawful act, including torts other than fraud." *See Ex parte Reindel*, 963 So. 2d 614, 622 (Ala. 2007) (upholding a conspiracy claim based on breach of fiduciary duty); *Hooper v. Columbus Reg'l Healthcare Sys., Inc.*, 956 So. 2d 1135, 1141 (Ala. 2006).

Here, Plaintiffs have alleged that Fite and Triad:

- Actively concealed material relationships and financial conflicts of interest;

- Orchestrated a scenario whereby Triad—while acting as Fite's undisclosed partner—assumed a role of purported independent advisor to Plaintiff;

- Pressured Plaintiff to remain financially committed to a project based on misrepresented cost figures and omitted risks;

- Worked in concert to steer Mr. Rivera into an unreasonably one-sided transaction for their mutual benefit.

- 11 -

These allegations, supported by specific references to exhibits, text messages, and documented conduct, satisfy the requirement that the complaint plead enough factual content to allow the court to draw the reasonable inference that the defendants reached an agreement to accomplish an unlawful objective. See *United States v. Kennard*, 472 F.3d 851, 856 (11th Cir. 2006).

At a minimum, the sufficiency of the underlying tort claims—and, by extension, the conspiracy claim—cannot be resolved at the pleading stage where multiple tort theories remain viable and discovery has not commenced.

## VII. Plaintiffs Have Stated a Valid Claim for Unjust Enrichment

Triad Defendants argue that Count X for unjust enrichment should be dismissed because it does not sufficiently allege that they knowingly accepted a benefit from Plaintiffs or that Plaintiffs had a reasonable expectation of compensation. This argument mischaracterizes both the allegations in the Second Amended Complaint and Alabama law governing unjust enrichment.

Under Alabama law, a plaintiff may state a claim for unjust enrichment by alleging: (1) the defendant knowingly accepted and retained a benefit, (2) provided by the plaintiff, (3) under circumstances that make it inequitable for the defendant to retain the benefit without paying for it. *See Portofino Seaport Vill., LLC v. Welch,* 4

So. 3d 1095, 1098 (Ala. 2008); *Mantiply v. Mantiply*, 951 So. 2d 638, 654 (Ala. 2006).

The Second Amended Complaint meets this standard. Plaintiffs allege that Triad received and retained financial benefits including fees, commissions, or other remuneration stemming from Triad's participation in the project and its representation of Plaintiffs, all while concealing its true relationship with Fite and acting outside the scope of a fair or arms-length commercial relationship. (Doc. 35, ¶¶ 28, 54, 55, 111–113). These allegations are not legal conclusions—they are grounded in factual assertions, including that:

- Triad was referred by Fite while concealing a familial relationship and shared interest;

- Triad presented itself as an independent real estate advisor while working in concert with Fite to advance a mutually beneficial project structure;

- Triad is alleged to have received compensation and certainly planned to in connection with the transaction or the ongoing engagement while failing to disclose its conflict and failing to provide professional and competent service.

These factual assertions support the inference that Triad knowingly accepted benefits—whether in the form of commissions, referral fees, or compensation for

- 13 -

services—from Mr. Rivera under the guise of acting in his interest and without proper disclosure of its true alignment. Mr. Rivera reasonably expected Triad to provide competent and independent representation in exchange for this compensation, and it would be inequitable for Triad to retain those benefits under the circumstances alleged.

Alabama courts have held that unjust enrichment may be alleged in the alternative where a contract may not fully address or govern the misconduct at issue. *See White v. Microsoft Corp.*, 454 F. Supp. 2d 1118, 1133 (S.D. Ala. 2006) (noting unjust enrichment is viable even where a contract exists, if the benefit was conferred under separate circumstances of misconduct or deception). Here, Plaintiffs have alleged precisely such separate circumstances: that Triad's compensation was obtained under false pretenses and through a breach of trust and duty that no agreement could have lawfully permitted.

Accordingly, Plaintiffs have pled sufficient facts to support their claim for unjust enrichment.

## VIII. Plaintiffs' Second Amended Complaint is Sufficiently Clear and Complies with both Rule 8 and 10

Triad Defendants argue that the Second Amended Complaint ("SAC") lacks sufficient clarity to permit a response. This argument lacks merit. The SAC,

although lengthy, complies with the Federal Rules of Civil Procedure and clearly identifies the claims asserted, the parties involved, and the factual basis supporting each cause of action.

Rule 8(a) requires a short and plain statement showing entitlement to relief. Rule 10(b) encourages a "paragraph form" to make pleadings clear, but it does not require perfect sequential numbering. Minor typographical or formatting inconsistencies—such as paragraph numbering—are not grounds for dismissal or repleading when the substance of the complaint is intelligible. Courts in the Eleventh Circuit have long held that pleadings will be upheld so long as a defendant can reasonably ascertain the claims and respond accordingly. *See United States v. Georgia Dep't of Nat. Res.,* 897 F. Supp. 1464, 1471 (N.D. Ga. 1995) ("[T]he ultimate question remains whether the pleading gives fair notice of the claim and the grounds upon which it rests.").

Here, the SAC identifies each cause of action in clearly delineated sections, names the specific defendants implicated in each count, and provides ample factual support. While there is a minor clerical issue where paragraph numbering restarts in Count I, this does not render the pleading unintelligible or ambiguous. The allegations themselves are organized, consistently attributed to the appropriate defendants, and supported by factual detail. No Defendant has claimed genuine

- 15 -

confusion as to the nature of the allegations—only that they prefer a different formatting style.

Courts have repeatedly declined to grant Rule 12(e) motions where, as here, the allegations permit the defendant to frame a responsive pleading. *See SEC v. Dig. Lightwave, Inc.,* 196 F.R.D. 698, 700 (D. Utah 2000) (denying motion for more definite statement despite sloppy formatting because the allegations were substantively clear).

Finally, Triad's argument that Plaintiffs should identify exactly which defendant took each act is not supported by Rule 8 or Eleventh Circuit precedent. When defendants acted in concert—as alleged here in claims for conspiracy, misrepresentation, and coordinated misconduct—group pleading is both appropriate and necessary. *See Brooks v. Blue Cross & Blue Shield of Fla., Inc.,* 116 F.3d 1364, 1381 (11th Cir. 1997) (recognizing that in cases involving concerted action, plaintiffs are not required to plead each act by each defendant with laser precision). See also *Seville Indus. Machinery Corp. v. Southmost Machinery Corp.*, 742 F.2d 786, 791 (3d Cir.1984).

In short, the SAC provides Triad with ample notice of the claims, supporting facts, and legal theories. There is no basis for dismissal or for requiring repleading, and Triad's requests should be denied.

- 16 -

**CONCLUSION**

For the reasons stated above, Plaintiffs respectfully request that the Court DENY

the Triad Defendants' Motion to Dismiss in its entirety, however if deficiency is

found Plaintiff should be allowed to replead as appropriate.


Respectfully Submitted,

/s/ Joshua M. Watkins
Joshua M. Watkins **(WAT075)**
Attorney for Plaintiff
Email: jwatkins@burrillwatkins.com

**OF COUNSEL:**
Burrill Watkins LLC
1000 Eagle Point Corporate Drive, Suite 3
Birmingham, Alabama 35242
Telephone: 205-701-5536

- 17 -

## SERVICE OF PROCESS

I hereby certify that on the date of filing a true and correct copy of the foregoing has been furnished either through the Court's electronic filing or by U.S. Mail, postage prepaid, upon the following parties and other relevant individuals, unless such service is waived:

Steve E. Whitehead, Esq.
Sarah G. Redmond, Esq.
Margaret J. Waldrop, Esq.
LLOYD, GRAY, WHITEHEAD & MONROE, P.C.
880 Montclair Road, Suite 100
Birmingham, Alabama 35213
*Attorneys for Defendants TRIAD PROPERTIES CORPORATION, JOSEPH MARION MOSELEY, HUGH FULLER MCCLENDON, and JOHN KENDALL*

Kevin R. Garrison, Esq.
Katelyn K. Dodd, Esq.
BAKER, DONELSON, BEARMAN, CALDWELL & Berkowitz, PC
1901 Sixth Ave. N., Suite 2600
Birmingham. AL 35203
*Attorneys for Defendants JACK FITE, FITE BUILDING COMPANY, INC. and* FITE CONSTRUCTION COMPANY LLC

/s/ *Joshua M. Watkins*
OF COUNSEL

- 18 -

# EXHIBIT 2

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| JOEL A. RIVERA individually and, in the alternative, MI PUEBLO SUPERMARKET, LLC, Plaintiffs, | ) ) ) ) ) | |
| v. | ) ) | CIVIL ACTION NO. 2:24-cv-01802-NAD |
| TRIAD PROPERTIES CORPORATION JOSEPH MARION MOSELEY, an Individual, HUGH FULLER MCCLENDON, an Individual, and JOHN KENDALL, an Individual, JACK FITE, an Individual, FITE BUILDING COMPANY, INC., and FITE CONSTRUCTION COMPANY LLC, Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) | (Removed from the Circuit Court of Shelby County, Alabama, Case No. CV-2024-901254) |

**PLAINTIFFS' RESPONSE TO TRIAD DEFENDANTS'
MOTION TO DISMISS FEWER THAN ALL CLAIMS AND
FOR MORE DEFINITE STATEMENT**

Plaintiff Joel A. Rivera and alternative Mi Pueblo Supermarket, Inc.

("Plaintiffs") respectfully oppose the Motion to Dismiss filed by Triad, Moseley,

McClendon, and Kendall (collectively "Triad Defendants") and state as follows:

**INTRODUCTION**

- 1 -

The Triad Defendants' Motion to Dismiss largely repackages factual disputes and asks the Court to prematurely resolve them without the benefit of discovery. Plaintiffs' Second Amended Complaint more than satisfies the pleading standards under Federal Rule of Civil Procedure 8(a), and provides specific factual allegations supporting each claim. The Triad Defendants' motion should be denied.

## I. The Second Amended Complaint States Plausible Claims Against Triad Defendants

The Second Amended Complaint alleges and it is undisputed that Triad and its agents Mosely, McClendon, and Kendall (collectively "Triad") were introduced and recommended by Fite Building Company and its related defendants (collectively "Fite"), and that the Triad defendants readily accepted Plaintiffs' as clients becoming their exclusive real estate advisor all while failing to disclose material conflicts of interest that they knew or should have known were inaccurate or misleading and were all duty bound to disclose. Triad defendants thereafter pressured Plaintiff Rivera to escalate earnest money deposits in an attempted to further commit Plaintiffs to the transaction from which they and the Fite defendants stood to make thousands of dollars despite clearly unresolved significant risks. These facts are plead in detail and support claims for negligence, breach of fiduciary or quasi-fiduciary duty, fraud, and conspiracy.

- 2 -

Under *Twombly* and *Iqbal*, Plaintiffs are not required to prove their case at the pleading stage. They must only plead enough factual matter to "nudge [their] claims across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The Complaint does so with particularity and plausibility.

## II. The Brokerage Claims Are Properly Plead and Supported by Alabama Law

Triad Defendants' argument mischaracterizes both the factual allegations and the scope of duties under Alabama's Real Estate License Law. Contrary to Defendants' assertions, the Second Amended Complaint (Doc. 35-2) pleads with specificity that Triad Defendants, acting in the role of a licensed real estate brokerage, failed to disclose a material conflict of interest, misrepresented their independence, failed to provide statutorily required disclosures, and acted with knowing disregard of their fiduciary obligations. These facts go beyond mere conclusions and are well-pleaded under Rule 8.

With respect to Ala. Code § 34-27-84(a)(6), Plaintiffs allege and it is undisputed that Triad Defendants were recommended by Fite, and its related defendants, and acted in concert with Fite's interests throughout the transaction, including pressuring Plaintiffs to remain in a speculative deal from which both Fite and Triad

- 3 -

Defendants stood to benefit substantially. Triad's failure to disclose this alignment with Fite's interests—while holding themselves out as serving Rivera's interests—violated both common law duties and their professional obligation to provide timely, written disclosure of such interests. Defendants' argument that there must be a formal "agency" relationship or equity stake ignores the statute's broader reach: it prohibits acting on behalf of any entity where there is a *personal interest*, a standard met where—as here—Triad's agent was undisclosed family to Fite's principal and worked to advance a shared financial outcome.  See also *Belcher v. Birmingham Trust National Bank*, 348 F.Supp. 61 (N.D.Ala. 1968).

Furthermore, Plaintiffs' references to Ala. Code §§ 34-27-36(7), (26), and (27); 34-27-82; and 34-27-83 are not bare citations, but relate directly to Triad's conduct described in detail throughout the Complaint. For example, Triad's failure to act with honesty and fairness, failure to exercise reasonable skill and care, and deceptive representations fall squarely under §§ 34-27-82(2), (3), and 34-27-36(7). At the pleading stage, Plaintiffs need not assign precise subsections to each factual allegation; the Complaint is to be read as a whole. Alabama's notice pleading standard requires only a short and plain statement of the claim showing the pleader is entitled to relief.

**III. Plaintiffs' Have Stated a Claim for Negligent Supervision**

Defendants' argument regarding Count II imposes an unduly narrow reading of both the pleading standard and the requirements for negligent supervision under Alabama law. Plaintiffs have sufficiently alleged that Mr. Kendall, acting as Triad's representative, engaged in conduct that constituted professional negligence, including misrepresenting key deal terms, offering unqualified financial advice, failing to convey material facts, incurring unnecessary expenses, and improperly pressuring Plaintiff to proceed with an unsound and undisclosed conflict-laden transaction. These actions, taken together, constitute tortious misconduct under Alabama common law—including negligent misrepresentation, breach of fiduciary duty, and suppression—all of which are recognized torts capable of supporting a claim for negligent supervision. See *Thrasher v. Ivan Leonard Chevrolet, Inc.*, 195 F. Supp. 2d 1314, 1320 (N.D. Ala. 2002).

Moreover, the Complaint alleges that Triad, McClendon, and Moseley failed to oversee Kendall despite clear signs that he was acting far outside the bounds of reasonable agency conduct. The allegations plausibly establish that Defendants knew or should have known of Kendall's incompetence or recklessness. This is particularly true given that Triad placed an inexperienced individual in charge of a multimillion-dollar commercial deal with no meaningful supervision or professional safeguards, and continued to allow that individual to operate unchecked even after irregularities surfaced.

At the motion-to-dismiss stage, Plaintiffs are not required to produce "evidence" but to allege facts that, if true, would entitle them to relief. The pleading here satisfies that standard. Defendants' reliance on *Collins v. Wilkerson*, 679 So.2d 1100 (Ala. Civ. App. 1996), is misplaced, as that case dealt with dismissal after a failure of evidentiary proof—not the sufficiency of allegations under Rule 12(b)(6). Likewise, *Lane v. Central Bank,* 756 F.2d 814 (11th Cir. 1985) reiterates the applicable standard, which the Second Amended Complaint meets by alleging both the misconduct and the knowledge/oversight failures that support Triad's liability.

Accordingly, the motion to dismiss Count II should be denied.

## IV. Plaintiffs Have Adequately Stated a Claim for Negligence Per Se

Defendants' assertion that Plaintiffs failed to state a negligence per se claim mischaracterizes both the nature of the pleading and the applicable standard under Rule 12(b)(6). To survive a motion to dismiss, Plaintiffs are not required to plead each element with evidentiary specificity, but must allege sufficient factual content to state a plausible claim for relief. See *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Plaintiffs have alleged violations of common law and specific statutory duties owed under the Alabama Real Estate License Law (Ala. Code § 34-27-30 et seq.) and RECAD (Ala. Code § 34-27-84), which were enacted precisely to protect

- 6 -

consumers like Mr. Rivera—individuals relying on licensed real estate professionals to provide honest, competent, and conflict-free representation. The statute explicitly identifies the duties of disclosure, loyalty, and reasonable skill and care. These duties were violated when Defendants failed to disclose their personal and financial relationships with other parties to the transaction and placed Mr. Rivera into a severely misaligned, conflicted development deal.

Plaintiffs further allege that Mr. Rivera suffered precisely the kind of injury the statute is intended to prevent—namely, economic losses and exposure to unjust financial risk due to nondisclosure and unlicensed or incompetent conduct. See *Cook's Pest Control, Inc. v. Rebar*, 28 So. 3d 716, 726 (Ala. 2009). The statute's purpose is to ensure transparency, mitigate conflicts of interest, and ensure professional competence in real estate dealings. Triad Defendants' violations directly and proximately caused Plaintiffs' injuries by inducing them to proceed under false pretenses and without adequate protections.

Accordingly, Plaintiffs have pled facts sufficient to satisfy the elements of negligence per se under Alabama law.

## V. Fraud and Other Claims Meet Rule 9(b)

Triad Defendants argue that Plaintiffs' fraud and related claims fail to meet the heightened pleading standard of Rule 9(b), asserting that the Second Amended

- 7 -

Complaint does not specify the "time, place, and content" of the alleged fraudulent statements. This argument mischaracterizes the allegations and overlooks the detailed factual narrative presented in the complaint.

Under Eleventh Circuit precedent, Rule 9(b) is satisfied when the complaint provides enough specificity to put defendants on notice of the precise misconduct with which they are charged, not when every allegation is pled with forensic precision. *Durham v. Bus. Mgmt. Assocs.*, 847 F.2d 1505, 1511 (11th Cir. 1988). Plaintiffs are not required to plead evidence; rather, they must allege sufficient detail to plausibly support each element of fraud and allow for a meaningful response in discovery.

The Second Amended Complaint spans over 40 pages and describes in detail:

- **Who made the misrepresentations:** Defendants Triad, McClendon, Moseley, Kendall, Fite, and Garber.

- **What was misrepresented:** The independence of the parties, the existence of conflicts of interest (e.g., familial ties between McClendon and Jack Fite), the nature and quality of professional services offered, financial projections, market conditions, and the viability of the project.

- **How Plaintiffs were misled:** Mr. Rivera relied on the alleged misstatements and omissions to engage Triad and Fite, expend over $600,000 in out-of-

- 8 -

pocket expenses, and enter into a purchase contract and amendments that he otherwise would not have signed.

- **When and how the misrepresentations were made:** The complaint specifies interactions occurring between early 2023 and late 2024 and identifies documents (such as the purchase agreement) and communications (including texts, emails, and direct advice to Mr. Rivera and his daughter Dulce) that form the basis of the fraud claims.

- **What Defendants gained:** Triad sought a $117,000 commission through an undisclosed conflict, while Fite collected over $160,000 in planning fees and positioned itself to secure a multi-million dollar development contract.

Rule 9(b) also permits allegations based on information and belief where facts are peculiarly within the opposing party's knowledge. *United States ex rel. Clausen v. Lab. Corp. of Am.*, 290 F.3d 1301, 1314 n.25 (11th Cir. 2002). Here, many omitted facts—such as internal communications about the Fite–Triad relationship or Kendall's supervision—are squarely within Defendants' control.

Moreover, the Second Amended Complaint alleges fraudulent concealment, which is subject to a more flexible Rule 9(b) application given the nature of the claim. *See Hill v. Morehouse Med. Assocs., Inc.*, 2003 WL 22019936, (11th Cir. Aug. 15, 2003) (Rule 9(b) may be relaxed where information is uniquely held by the

- 9 -

defendant). Triad and Fite withheld critical facts about their relationship and the integrity of the transaction, which directly affected Rivera's ability to evaluate the risks and terms of the deal.

Defendants' reliance on *Fortson*, *Smith*, and *Inman* is misplaced. In those cases, the plaintiffs asserted general allegations of fraud without the type of contextual specificity that is present here. In contrast, the Plaintiffs' claims are not speculative—they are grounded in specific conduct and financial relationships detailed across multiple factual allegations and exhibits.

Accordingly, Plaintiffs' claims for fraudulent misrepresentation, fraudulent concealment, and negligent misrepresentation are pled with sufficient particularity to meet the requirements of Rule 9(b).

## VI. Plaintiffs Have Adequately Stated a Claim for Civil Conspiracy

Triad Defendants argue that the civil conspiracy claim (Count IX) must be dismissed because it is dependent on the existence of a viable underlying tort, and they contend that Plaintiffs have not properly pled the underlying torts, specifically fraud. This argument is both premature and legally flawed.

First, as discussed in prior sections of this response, Plaintiffs' claims for fraud, fraudulent concealment, and negligent misrepresentation are sufficiently pled under Federal Rule of Civil Procedure 9(b). The Second Amended Complaint

- 10 -

identifies the specific misrepresentations, omissions, parties involved, approximate timing, and resulting harm, and includes extensive factual detail and supporting documents. At the pleading stage, the fraud claims are viable and, therefore, can support a civil conspiracy claim.

Second, the conspiracy allegations are not limited to fraud. Count IX expressly incorporates a broader set of wrongful acts that include—but are not limited to—breach of fiduciary duty, negligence, and unjust enrichment. Alabama law recognizes that a conspiracy may be based on "any unlawful act, including torts other than fraud." *See Ex parte Reindel*, 963 So. 2d 614, 622 (Ala. 2007) (upholding a conspiracy claim based on breach of fiduciary duty); *Hooper v. Columbus Reg'l Healthcare Sys., Inc.*, 956 So. 2d 1135, 1141 (Ala. 2006).

Here, Plaintiffs have alleged that Fite and Triad:

- Actively concealed material relationships and financial conflicts of interest;

- Orchestrated a scenario whereby Triad—while acting as Fite's undisclosed partner—assumed a role of purported independent advisor to Plaintiff;

- Pressured Plaintiff to remain financially committed to a project based on misrepresented cost figures and omitted risks;

- Worked in concert to steer Mr. Rivera into an unreasonably one-sided transaction for their mutual benefit.

- 11 -

These allegations, supported by specific references to exhibits, text messages, and documented conduct, satisfy the requirement that the complaint plead enough factual content to allow the court to draw the reasonable inference that the defendants reached an agreement to accomplish an unlawful objective. See *United States v. Kennard*, 472 F.3d 851, 856 (11th Cir. 2006).

At a minimum, the sufficiency of the underlying tort claims—and, by extension, the conspiracy claim—cannot be resolved at the pleading stage where multiple tort theories remain viable and discovery has not commenced.

## VII. Plaintiffs Have Stated a Valid Claim for Unjust Enrichment

Triad Defendants argue that Count X for unjust enrichment should be dismissed because it does not sufficiently allege that they knowingly accepted a benefit from Plaintiffs or that Plaintiffs had a reasonable expectation of compensation. This argument mischaracterizes both the allegations in the Second Amended Complaint and Alabama law governing unjust enrichment.

Under Alabama law, a plaintiff may state a claim for unjust enrichment by alleging: (1) the defendant knowingly accepted and retained a benefit, (2) provided by the plaintiff, (3) under circumstances that make it inequitable for the defendant to retain the benefit without paying for it. *See Portofino Seaport Vill., LLC v. Welch,* 4

So. 3d 1095, 1098 (Ala. 2008); *Mantiply v. Mantiply*, 951 So. 2d 638, 654 (Ala. 2006).

The Second Amended Complaint meets this standard. Plaintiffs allege that Triad received and retained financial benefits including fees, commissions, or other remuneration stemming from Triad's participation in the project and its representation of Plaintiffs, all while concealing its true relationship with Fite and acting outside the scope of a fair or arms-length commercial relationship. (Doc. 35, ¶¶ 28, 54, 55, 111–113). These allegations are not legal conclusions—they are grounded in factual assertions, including that:

- Triad was referred by Fite while concealing a familial relationship and shared interest;

- Triad presented itself as an independent real estate advisor while working in concert with Fite to advance a mutually beneficial project structure;

- Triad is alleged to have received compensation and certainly planned to in connection with the transaction or the ongoing engagement while failing to disclose its conflict and failing to provide professional and competent service.

These factual assertions support the inference that Triad knowingly accepted benefits—whether in the form of commissions, referral fees, or compensation for

- 13 -

services—from Mr. Rivera under the guise of acting in his interest and without proper disclosure of its true alignment. Mr. Rivera reasonably expected Triad to provide competent and independent representation in exchange for this compensation, and it would be inequitable for Triad to retain those benefits under the circumstances alleged.

Alabama courts have held that unjust enrichment may be alleged in the alternative where a contract may not fully address or govern the misconduct at issue. *See White v. Microsoft Corp.*, 454 F. Supp. 2d 1118, 1133 (S.D. Ala. 2006) (noting unjust enrichment is viable even where a contract exists, if the benefit was conferred under separate circumstances of misconduct or deception). Here, Plaintiffs have alleged precisely such separate circumstances: that Triad's compensation was obtained under false pretenses and through a breach of trust and duty that no agreement could have lawfully permitted.

Accordingly, Plaintiffs have pled sufficient facts to support their claim for unjust enrichment.

## VIII. Plaintiffs' Second Amended Complaint is Sufficiently Clear and Complies with both Rule 8 and 10

Triad Defendants argue that the Second Amended Complaint ("SAC") lacks sufficient clarity to permit a response. This argument lacks merit. The SAC,

- 14 -

although lengthy, complies with the Federal Rules of Civil Procedure and clearly identifies the claims asserted, the parties involved, and the factual basis supporting each cause of action.

Rule 8(a) requires a short and plain statement showing entitlement to relief. Rule 10(b) encourages a "paragraph form" to make pleadings clear, but it does not require perfect sequential numbering. Minor typographical or formatting inconsistencies—such as paragraph numbering—are not grounds for dismissal or repleading when the substance of the complaint is intelligible. Courts in the Eleventh Circuit have long held that pleadings will be upheld so long as a defendant can reasonably ascertain the claims and respond accordingly. *See United States v. Georgia Dep't of Nat. Res.,* 897 F. Supp. 1464, 1471 (N.D. Ga. 1995) ("[T]he ultimate question remains whether the pleading gives fair notice of the claim and the grounds upon which it rests.").

Here, the SAC identifies each cause of action in clearly delineated sections, names the specific defendants implicated in each count, and provides ample factual support. While there is a minor clerical issue where paragraph numbering restarts in Count I, this does not render the pleading unintelligible or ambiguous. The allegations themselves are organized, consistently attributed to the appropriate defendants, and supported by factual detail. No Defendant has claimed genuine

- 15 -

confusion as to the nature of the allegations—only that they prefer a different formatting style.

Courts have repeatedly declined to grant Rule 12(e) motions where, as here, the allegations permit the defendant to frame a responsive pleading. *See SEC v. Dig. Lightwave, Inc.,* 196 F.R.D. 698, 700 (D. Utah 2000) (denying motion for more definite statement despite sloppy formatting because the allegations were substantively clear).

Finally, Triad's argument that Plaintiffs should identify exactly which defendant took each act is not supported by Rule 8 or Eleventh Circuit precedent. When defendants acted in concert—as alleged here in claims for conspiracy, misrepresentation, and coordinated misconduct—group pleading is both appropriate and necessary. *See Brooks v. Blue Cross & Blue Shield of Fla., Inc.,* 116 F.3d 1364, 1381 (11th Cir. 1997) (recognizing that in cases involving concerted action, plaintiffs are not required to plead each act by each defendant with laser precision). See also *Seville Indus. Machinery Corp. v. Southmost Machinery Corp.*, 742 F.2d 786, 791 (3d Cir.1984).

In short, the SAC provides Triad with ample notice of the claims, supporting facts, and legal theories. There is no basis for dismissal or for requiring repleading, and Triad's requests should be denied.

- 16 -

**CONCLUSION**

For the reasons stated above, Plaintiffs respectfully request that the Court DENY

the Triad Defendants' Motion to Dismiss in its entirety, however if deficiency is

found Plaintiff should be allowed to replead as appropriate.

Respectfully Submitted,

/s/ Joshua M. Watkins
Joshua M. Watkins **(WAT075)**
Attorney for Plaintiff
Email: jwatkins@burrillwatkins.com

**OF COUNSEL:**
Burrill Watkins LLC
1000 Eagle Point Corporate Drive, Suite 3
Birmingham, Alabama 35242
Telephone: 205-701-5536

## SERVICE OF PROCESS

I hereby certify that on the date of filing a true and correct copy of the foregoing has been furnished either through the Court's electronic filing or by U.S. Mail, postage prepaid, upon the following parties and other relevant individuals, unless such service is waived:

Steve E. Whitehead, Esq.
Sarah G. Redmond, Esq.
Margaret J. Waldrop, Esq.
LLOYD, GRAY, WHITEHEAD & MONROE, P.C.
880 Montclair Road, Suite 100
Birmingham, Alabama 35213
*Attorneys for Defendants TRIAD PROPERTIES CORPORATION, JOSEPH MARION MOSELEY, HUGH FULLER MCCLENDON, and JOHN KENDALL*

Kevin R. Garrison, Esq.
Katelyn K. Dodd, Esq.
BAKER, DONELSON, BEARMAN, CALDWELL & Berkowitz, PC
1901 Sixth Ave. N., Suite 2600
Birmingham. AL 35203
*Attorneys for Defendants JACK FITE, FITE BUILDING COMPANY, INC. and* FITE CONSTRUCTION COMPANY LLC

/s/ ***Joshua M. Watkins***
OF COUNSEL

- 18 -

# EXHIBIT 3

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| JOEL A. RIVERA individually and, | ) | |
| in the alternative, | ) | |
| MI PUEBLO SUPERMARKET, LLC, | ) | |
| Plaintiffs, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | |
| | ) | 2:24-cv-01802-NAD |
| TRIAD PROPERTIES CORPORATION | ) | |
| JOSEPH MARION MOSELEY, an | ) | |
| Individual, HUGH FULLER | )(Removed from the Circuit Court |
| MCCLENDON, an Individual, and | ) of Shelby County, Alabama, Case |
| JOHN KENDALL, an Individual, JACK | ) No. CV-2024-901254) |
| FITE, an Individual, FITE | ) | |
| BUILDING COMPANY, INC., and | ) | |
| FITE CONSTRUCTION COMPANY | ) | |
| LLC, | ) | |
| | ) | |
| Defendants. | ) | |

---

**PLAINTIFFS' RESPONSE TO TRIAD DEFENDANTS'
MOTION TO DISMISS FEWER THAN ALL CLAIMS AND
FOR MORE DEFINITE STATEMENT**

---

Plaintiff Joel A. Rivera and alternative Mi Pueblo Supermarket, Inc.

("Plaintiffs") respectfully oppose the Motion to Dismiss filed by Triad, Moseley,

McClendon, and Kendall (collectively "Triad Defendants") and state as follows:

**INTRODUCTION**

- 1 -

The Triad Defendants' Motion to Dismiss largely repackages factual disputes and asks the Court to prematurely resolve them without the benefit of discovery. Plaintiffs' Second Amended Complaint more than satisfies the pleading standards under Federal Rule of Civil Procedure 8(a), and provides specific factual allegations supporting each claim. The Triad Defendants' motion should be denied.

## I. The Second Amended Complaint States Plausible Claims Against Triad Defendants

The Second Amended Complaint alleges and it is undisputed that Triad and its agents Mosely, McClendon, and Kendall (collectively "Triad") were introduced and recommended by Fite Building Company and its related defendants (collectively "Fite"), and that the Triad defendants readily accepted Plaintiffs' as clients becoming their exclusive real estate advisor all while failing to disclose material conflicts of interest that they knew or should have known were inaccurate or misleading and were all duty bound to disclose. Triad defendants thereafter pressured Plaintiff Rivera to escalate earnest money deposits in an attempted to further commit Plaintiffs to the transaction from which they and the Fite defendants stood to make thousands of dollars despite clearly unresolved significant risks. These facts are plead in detail and support claims for negligence, breach of fiduciary or quasi-fiduciary duty, fraud, and conspiracy.

- 2 -

Under *Twombly* and *Iqbal*, Plaintiffs are not required to prove their case at the pleading stage. They must only plead enough factual matter to "nudge [their] claims across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The Complaint does so with particularity and plausibility.

## II. The Brokerage Claims Are Properly Plead and Supported by Alabama Law

Triad Defendants' argument mischaracterizes both the factual allegations and the scope of duties under Alabama's Real Estate License Law. Contrary to Defendants' assertions, the Second Amended Complaint (Doc. 35-2) pleads with specificity that Triad Defendants, acting in the role of a licensed real estate brokerage, failed to disclose a material conflict of interest, misrepresented their independence, failed to provide statutorily required disclosures, and acted with knowing disregard of their fiduciary obligations. These facts go beyond mere conclusions and are well-pleaded under Rule 8.

With respect to Ala. Code § 34-27-84(a)(6), Plaintiffs allege and it is undisputed that Triad Defendants were recommended by Fite, and its related defendants, and acted in concert with Fite's interests throughout the transaction, including pressuring Plaintiffs to remain in a speculative deal from which both Fite and Triad

- 3 -

Defendants stood to benefit substantially. Triad's failure to disclose this alignment with Fite's interests—while holding themselves out as serving Rivera's interests—violated both common law duties and their professional obligation to provide timely, written disclosure of such interests. Defendants' argument that there must be a formal "agency" relationship or equity stake ignores the statute's broader reach: it prohibits acting on behalf of any entity where there is a *personal interest*, a standard met where—as here—Triad's agent was undisclosed family to Fite's principal and worked to advance a shared financial outcome.  See also *Belcher v. Birmingham Trust National Bank*, 348 F.Supp. 61 (N.D.Ala. 1968).

Furthermore, Plaintiffs' references to Ala. Code §§ 34-27-36(7), (26), and (27); 34-27-82; and 34-27-83 are not bare citations, but relate directly to Triad's conduct described in detail throughout the Complaint. For example, Triad's failure to act with honesty and fairness, failure to exercise reasonable skill and care, and deceptive representations fall squarely under §§ 34-27-82(2), (3), and 34-27-36(7). At the pleading stage, Plaintiffs need not assign precise subsections to each factual allegation; the Complaint is to be read as a whole. ~~See *Skinner v. Beemer*, 293 So.  (Ala. 2019) ("~~Alabama's notice pleading standard requires only a short and plain statement of the claim showing the pleader is entitled to relief~~.")~~.

### III. Plaintiffs' Have Stated a Claim for Negligent Supervision

Defendants' argument regarding Count II imposes an unduly narrow reading of both the pleading standard and the requirements for negligent supervision under Alabama law. Plaintiffs have sufficiently alleged that Mr. Kendall, acting as Triad's representative, engaged in conduct that constituted professional negligence, including misrepresenting key deal terms, offering unqualified financial advice, failing to convey material facts, incurring unnecessary expenses, and improperly pressuring Plaintiff to proceed with an unsound and undisclosed conflict-laden transaction. These actions, taken together, constitute tortious misconduct under Alabama common law—including negligent misrepresentation, breach of fiduciary duty, and suppression—all of which are recognized torts capable of supporting a claim for negligent supervision. See *Thrasher v. Ivan Leonard Chevrolet, Inc.*, 195 F. Supp. 2d 1314, 1320 (N.D. Ala. 2002).

Moreover, the Complaint alleges that Triad, McClendon, and Moseley failed to oversee Kendall despite clear signs that he was acting far outside the bounds of reasonable agency conduct. The allegations plausibly establish that Defendants knew or should have known of Kendall's incompetence or recklessness. This is particularly true given that Triad placed an inexperienced individual in charge of a multimillion-dollar commercial deal with no meaningful supervision or professional safeguards, and continued to allow that individual to operate unchecked even after irregularities surfaced.

At the motion-to-dismiss stage, Plaintiffs are not required to produce "evidence" but to allege facts that, if true, would entitle them to relief. The pleading here satisfies that standard. Defendants' reliance on *Collins v. Wilkerson*, 679 So.2d 1100 (Ala. Civ. App. 1996), is misplaced, as that case dealt with dismissal after a failure of evidentiary proof—not the sufficiency of allegations under Rule 12(b)(6). Likewise, *Lane v. Central Bank*, 756 F.2d 814 (11th Cir. 1985) reiterates the applicable standard, which the Second Amended Complaint meets by alleging both the misconduct and the knowledge/oversight failures that support Triad's liability.

Accordingly, the motion to dismiss Count II should be denied.

## IV. Plaintiffs Have Adequately Stated a Claim for Negligence Per Se

Defendants' assertion that Plaintiffs failed to state a negligence per se claim mischaracterizes both the nature of the pleading and the applicable standard under Rule 12(b)(6). To survive a motion to dismiss, Plaintiffs are not required to plead each element with evidentiary specificity, but must allege sufficient factual content to state a plausible claim for relief. See *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Plaintiffs have alleged violations of common law and specific statutory duties owed under the Alabama Real Estate License Law (Ala. Code § 34-27-30 et seq.) and RECAD (Ala. Code § 34-27-84), which were enacted precisely to protect

consumers like Mr. Rivera—individuals relying on licensed real estate professionals to provide honest, competent, and conflict-free representation. The statute explicitly identifies the duties of disclosure, loyalty, and reasonable skill and care. These duties were violated when Defendants failed to disclose their personal and financial relationships with other parties to the transaction and placed Mr. Rivera into a severely misaligned, conflicted development deal.

Plaintiffs further allege that Mr. Rivera suffered precisely the kind of injury the statute is intended to prevent—namely, economic losses and exposure to unjust financial risk due to nondisclosure and unlicensed or incompetent conduct. See *Cook's Pest Control, Inc. v. Rebar*, 28 So. 3d 716, 726 (Ala. 2009). The statute's purpose is to ensure transparency, mitigate conflicts of interest, and ensure professional competence in real estate dealings. Triad Defendants' violations directly and proximately caused Plaintiffs' injuries by inducing them to proceed under false pretenses and without adequate protections.

Accordingly, Plaintiffs have pled facts sufficient to satisfy the elements of negligence per se under Alabama law.

**V. Fraud and Other Claims Meet Rule 9(b)**

Triad Defendants argue that Plaintiffs' fraud and related claims fail to meet the heightened pleading standard of Rule 9(b), asserting that the Second Amended

- 7 -

Complaint does not specify the "time, place, and content" of the alleged fraudulent statements. This argument mischaracterizes the allegations and overlooks the detailed factual narrative presented in the complaint.

Under Eleventh Circuit precedent, Rule 9(b) is satisfied when the complaint provides enough specificity to put defendants on notice of the precise misconduct with which they are charged, not when every allegation is pled with forensic precision. *Durham v. Bus. Mgmt. Assocs.*, 847 F.2d 1505, 1511 (11th Cir. 1988). Plaintiffs are not required to plead evidence; rather, they must allege sufficient detail to plausibly support each element of fraud and allow for a meaningful response in discovery.

The Second Amended Complaint spans over 40 pages and describes in detail:

- **Who made the misrepresentations:** Defendants Triad, McClendon, Moseley, Kendall, Fite, and Garber.

- **What was misrepresented:** The independence of the parties, the existence of conflicts of interest (e.g., familial ties between McClendon and Jack Fite), the nature and quality of professional services offered, financial projections, market conditions, and the viability of the project.

- **How Plaintiffs were misled:** Mr. Rivera relied on the alleged misstatements and omissions to engage Triad and Fite, expend over $600,000 in out-of-

pocket expenses, and enter into a purchase contract and amendments that he otherwise would not have signed.

- **When and how the misrepresentations were made:** The complaint specifies interactions occurring between early 2023 and late 2024 and identifies documents (such as the purchase agreement) and communications (including texts, emails, and direct advice to Mr. Rivera and his daughter Dulce) that form the basis of the fraud claims.

- **What Defendants gained:** Triad sought a $117,000 commission through an undisclosed conflict, while Fite collected over $160,000 in planning fees and positioned itself to secure a multi-million dollar development contract.

Rule 9(b) also permits allegations based on information and belief where facts are peculiarly within the opposing party's knowledge. *United States ex rel. Clausen v. Lab. Corp. of Am.*, 290 F.3d 1301, 1314 n.25 (11th Cir. 2002). Here, many omitted facts—such as internal communications about the Fite–Triad relationship or Kendall's supervision—are squarely within Defendants' control.

Moreover, the Second Amended Complaint alleges fraudulent concealment, which is subject to a more flexible Rule 9(b) application given the nature of the claim. *See Hill v. Morehouse Med. Assocs., Inc.*, 2003 WL 22019936, (11th Cir. Aug. 15, 2003) (Rule 9(b) may be relaxed where information is uniquely held by the

- 9 -

defendant). Triad and Fite withheld critical facts about their relationship and the integrity of the transaction, which directly affected Rivera's ability to evaluate the risks and terms of the deal.

Defendants' reliance on *Fortson*, *Smith*, and *Inman* is misplaced. In those cases, the plaintiffs asserted general allegations of fraud without the type of contextual specificity that is present here. In contrast, the Plaintiffs' claims are not speculative—they are grounded in specific conduct and financial relationships detailed across multiple factual allegations and exhibits.

Accordingly, Plaintiffs' claims for fraudulent misrepresentation, fraudulent concealment, and negligent misrepresentation are pled with sufficient particularity to meet the requirements of Rule 9(b).

## VI. Plaintiffs Have Adequately Stated a Claim for Civil Conspiracy

Triad Defendants argue that the civil conspiracy claim (Count IX) must be dismissed because it is dependent on the existence of a viable underlying tort, and they contend that Plaintiffs have not properly pled the underlying torts, specifically fraud. This argument is both premature and legally flawed.

First, as discussed in prior sections of this response, Plaintiffs' claims for fraud, fraudulent concealment, and negligent misrepresentation are sufficiently pled under Federal Rule of Civil Procedure 9(b). The Second Amended Complaint

- 10 -

identifies the specific misrepresentations, omissions, parties involved, approximate timing, and resulting harm, and includes extensive factual detail and supporting documents. At the pleading stage, the fraud claims are viable and, therefore, can support a civil conspiracy claim.

Second, the conspiracy allegations are not limited to fraud. Count IX expressly incorporates a broader set of wrongful acts that include—but are not limited to—breach of fiduciary duty, negligence, and unjust enrichment. Alabama law recognizes that a conspiracy may be based on "any unlawful act, including torts other than fraud." *See Ex parte Reindel*, 963 So. 2d 614, 622 (Ala. 2007) (upholding a conspiracy claim based on breach of fiduciary duty); *Hooper v. Columbus Reg'l Healthcare Sys., Inc.*, 956 So. 2d 1135, 1141 (Ala. 2006).

Here, Plaintiffs have alleged that Fite and Triad:

- Actively concealed material relationships and financial conflicts of interest;

- Orchestrated a scenario whereby Triad—while acting as Fite's undisclosed partner—assumed a role of purported independent advisor to Plaintiff;

- Pressured Plaintiff to remain financially committed to a project based on misrepresented cost figures and omitted risks;

- Worked in concert to steer Mr. Rivera into an unreasonably one-sided transaction for their mutual benefit.

- 11 -

These allegations, supported by specific references to exhibits, text messages, and documented conduct, satisfy the requirement that the complaint "plead enough factual content to allow the court to draw the reasonable inference that the defendants reached an agreement to accomplish an unlawful objective.". See *American Federation of Labor & Cong. of Indus. OrganizationsUnited States* v. *City of Miami, 637Kennard,* 472 F.3d *1178, 1193*851, 856 (11th Cir. *2011*2006).

At a minimum, the sufficiency of the underlying tort claims—and, by extension, the conspiracy claim—cannot be resolved at the pleading stage where multiple tort theories remain viable and discovery has not commenced.

## VII. Plaintiffs Have Stated a Valid Claim for Unjust Enrichment

Triad Defendants argue that Count X for unjust enrichment should be dismissed because it does not sufficiently allege that they knowingly accepted a benefit from Plaintiffs or that Plaintiffs had a reasonable expectation of compensation. This argument mischaracterizes both the allegations in the Second Amended Complaint and Alabama law governing unjust enrichment.

Under Alabama law, a plaintiff may state a claim for unjust enrichment by alleging: (1) the defendant knowingly accepted and retained a benefit, (2) provided by the plaintiff, (3) under circumstances that make it inequitable for the defendant to retain the benefit without paying for it. *See Portofino Seaport Vill., LLC v. Welch,* 4

So. 3d 1095, 1098 (Ala. 2008); *Mantiply v. Mantiply*, 951 So. 2d 638, 654 (Ala. 2006).

The Second Amended Complaint meets this standard. Plaintiffs allege that Triad received and retained financial benefits including fees, commissions, or other remuneration stemming from Triad's participation in the project and its representation of Plaintiffs, all while concealing its true relationship with Fite and acting outside the scope of a fair or arms-length commercial relationship. (Doc. 35, ¶¶ 28, 54, 55, 111–113). These allegations are not legal conclusions—they are grounded in factual assertions, including that:

- Triad was referred by Fite while concealing a familial relationship and shared interest;

- Triad presented itself as an independent real estate advisor while working in concert with Fite to advance a mutually beneficial project structure;

- Triad is alleged to have received compensation and certainly planned to in connection with the transaction or the ongoing engagement while failing to disclose its conflict and failing to provide professional and competent service.

These factual assertions support the inference that Triad knowingly accepted benefits—whether in the form of commissions, referral fees, or compensation for

- 13 -

services—from Mr. Rivera under the guise of acting in his interest and without proper disclosure of its true alignment. Mr. Rivera reasonably expected Triad to provide competent and independent representation in exchange for this compensation, and it would be inequitable for Triad to retain those benefits under the circumstances alleged.

Alabama courts have held that unjust enrichment may be alleged in the alternative where a contract may not fully address or govern the misconduct at issue. *See White v. Microsoft Corp.*, 454 F. Supp. 2d 1118, 1133 (S.D. Ala. 2006) (noting unjust enrichment is viable even where a contract exists, if the benefit was conferred under separate circumstances of misconduct or deception). Here, Plaintiffs have alleged precisely such separate circumstances: that Triad's compensation was obtained under false pretenses and through a breach of trust and duty that no agreement could have lawfully permitted.

Accordingly, Plaintiffs have pled sufficient facts to support their claim for unjust enrichment.

## VIII. Plaintiffs' Second Amended Complaint is Sufficiently Clear and Complies with both Rule 8 and 10

Triad Defendants argue that the Second Amended Complaint ("SAC") lacks sufficient clarity to permit a response. This argument lacks merit. The SAC,

- 14 -

although lengthy, complies with the Federal Rules of Civil Procedure and clearly identifies the claims asserted, the parties involved, and the factual basis supporting each cause of action.

Rule 8(a) requires a short and plain statement showing entitlement to relief. Rule 10(b) encourages a "paragraph form" to make pleadings clear, but it does not require perfect sequential numbering. Minor typographical or formatting inconsistencies—such as paragraph numbering—are not grounds for dismissal or repleading when the substance of the complaint is intelligible. Courts in the Eleventh Circuit have long held that pleadings will be upheld so long as a defendant can reasonably ascertain the claims and respond accordingly. *See United States v. Georgia Dep't of Nat. Res.,* 897 F. Supp. 1464, 1471 (N.D. Ga. 1995) ("[T]he ultimate question remains whether the pleading gives fair notice of the claim and the grounds upon which it rests.").

Here, the SAC identifies each cause of action in clearly delineated sections, names the specific defendants implicated in each count, and provides ample factual support. While there is a minor clerical issue where paragraph numbering restarts in Count I, this does not render the pleading unintelligible or ambiguous. The allegations themselves are organized, consistently attributed to the appropriate defendants, and supported by factual detail. No Defendant has claimed genuine

- 15 -

confusion as to the nature of the allegations—only that they prefer a different formatting style.

Courts have repeatedly declined to grant Rule 12(e) motions where, as here, the allegations permit the defendant to frame a responsive pleading. *See SEC v. Dig. Lightwave, Inc.,* 196 F.R.D. 698, 700 (D. Utah 2000) (denying motion for more definite statement despite sloppy formatting because the allegations were substantively clear).

Finally, Triad's argument that Plaintiffs should identify exactly which defendant took each act is not supported by Rule 8 or Eleventh Circuit precedent. When defendants acted in concert—as alleged here in claims for conspiracy, misrepresentation, and coordinated misconduct—group pleading is both appropriate and necessary. *See Brooks v. Blue Cross & Blue Shield of Fla., Inc.,* 116 F.3d 1364, 1381 (11th Cir. 1997) (recognizing that in cases involving concerted action, plaintiffs are not required to plead each act by each defendant with laser precision). See also *Seville Indus. Machinery Corp. v. Southmost Machinery Corp.*, 742 F.2d 786, 791 (3d Cir.1984).

In short, the SAC provides Triad with ample notice of the claims, supporting facts, and legal theories. There is no basis for dismissal or for requiring repleading, and Triad's requests should be denied.

- 16 -

**CONCLUSION**

For the reasons stated above, Plaintiffs respectfully request that the Court DENY

the Triad Defendants' Motion to Dismiss in its entirety, however if deficiency is

found Plaintiff should be allowed to replead as appropriate.


Respectfully Submitted,

/s/ Joshua M. Watkins
Joshua M. Watkins **(WAT075)**
Attorney for Plaintiff
Email: jwatkins@burrillwatkins.com

**OF COUNSEL:**
Burrill Watkins LLC
1000 Eagle Point Corporate Drive, Suite 3
Birmingham, Alabama 35242
Telephone: 205-701-5536

- 17 -

## SERVICE OF PROCESS

I hereby certify that on the date of filing a true and correct copy of the

foregoing has been furnished either through the Court's electronic filing or by U.S.

Mail, postage prepaid, upon the following parties and other relevant individuals,

unless such service is waived:

Steve E. Whitehead, Esq.
Sarah G. Redmond, Esq.
Margaret J. Waldrop, Esq.
LLOYD, GRAY, WHITEHEAD & MONROE, P.C.
880 Montclair Road, Suite 100
Birmingham, Alabama 35213
*Attorneys for Defendants TRIAD PROPERTIES CORPORATION,*
*JOSEPH MARION MOSELEY, HUGH FULLER MCCLENDON, and*
*JOHN KENDALL*

Kevin R. Garrison, Esq.
Katelyn K. Dodd, Esq.
BAKER, DONELSON, BEARMAN, CALDWELL & Berkowitz, PC
1901 Sixth Ave. N., Suite 2600
Birmingham. AL 35203
*Attorneys for Defendants JACK FITE, FITE BUILDING*
*COMPANY, INC. and* FITE CONSTRUCTION COMPANY LLC

> */s/ **Joshua M. Watkins***
> OF COUNSEL

- 18 -